STATE OF ILLINOIS, ex rel. Neil F. HARTIGAN, Attorney General of the State of Illinois, in its proprietary capacity, in its parens patriae capacity, and in its representative capacity, Plaintiff,

v.

PANHANDLE EASTERN PIPE LINE COMPANY, a Delaware corporation, Defendant.

No. 84–1048.

United States District Court, C.D. Illinois, Peoria Division.

Jan. 2, 1990.

As Corrected Jan. 16, 1990.

828

Neil F. Hartigan, Atty. Gen., Burke and Smith Chartered, Edward J. Burke, Raymond J. Smith, Mary Patricia Burns, Freeborn and Peters, William C. Holmes, Chicago, Ill., David M. Lynch, Peoria, Ill., for plaintiff.

Chadwell & Kayser, Paul H. LaRue, Juris Kins, Gregory G. Wrobel, James M. Mrowicki, Andrew M. Gardner, Chicago, Ill., Panhandle Eastern Pipe Line Co., John A. Sieger, Marge Connor, Michael A. Kelly, Irwin A. Bain, Houston, Tex., Heyl, Royster, Voelker & Allen, Mark Howard, Peoria, Ill., for defendant.

## MEMORANDUM OPINION

MIHM, District Judge.

### I. INTRODUCTION

This is an antitrust case. The Plaintiff, the State of Illinois, is suing in its proprietary capacity on behalf of certain state facilities, in its *parens patriae* capacity on behalf of all natural persons in the certified class below, and in its representative capacity on behalf of other indirect purchasers. This class was certified by the Court pursuant to Rule 23, Federal Rules of Civil Procedure, and described as follows:

> All indirect purchasers of natural gas from Panhandle Eastern Pipe Line Company ("PEPL") who reside in or are located in those Illinois counties or parts of Illinois counties served exclusively by PEPL's interstate natural gas transmission system.

The area exclusively served by Panhandle involves part or all of 37 counties. Most of the indirect purchasers involved in this case were supplied their natural gas in those areas by three local distribution companies ("LDC's"): Central Illinois Light Company ("CILCO"), Central Illinois Public Service Company ("CIPS"), and Illinois Power Company ("IP").

The Defendant, Panhandle Eastern Pipe Line Company ("Panhandle" or "PEPL"), a Delaware corporation, is an interstate pipeline company. Panhandle's pipeline system moves natural gas from a number of collection points outside the State of Illinois and distributes the gas elsewhere along its system, in Illinois and other states, primarily to LDC's.

The Plaintiff charges that during the time in question, 1981 to the time of trial in 1986/1987, Panhandle engaged in conduct which constituted violations of federal and state antitrust laws. More specifically, Count I (Monopolization of Gas Sales), Count 3 (Attempted Monopolization of Gas Sales), Count 5 (Monopoly Leveraging), Count 7 (Essential Facility), and Count 9 (Illegal Tying) allege violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and pray for damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

Counts 2, 4, 6, 8, and 10 allege corresponding violations of Section 3 of the Illinois Antitrust Act, Ill.Rev.Stat. ch. 38, ¶ 60–3.

Section 1 of the Sherman Act provides in pertinent part as follows:

> Every contract ... in restraint of trade or commerce among the several state ... is declared to be illegal.

15 U.S.C. § 1.

Section 2 of the Sherman Act provides in pertinent part as follows:

Every person who shall monopolize ... any part of the trade or commerce among the several states ... shall be deemed guilty....

15 U.S.C. § 2.

Section 4 of the Clayton Act provides as follows:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15.

Prior to trial, Panhandle moved to dismiss all indirect purchaser claims on grounds that such indirect claims were barred by the *Illinois Brick* doctrine, which prohibits most antitrust claims by indirect purchasers. *Illinois Brick v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). This Court denied the Motion to Dismiss, citing the "cost plus exception" to the *Illinois Brick* doctrine. On interlocutory appeal, a panel of the Seventh Circuit Court of Appeals reversed the Court's denial of the Motion to Dismiss on January 22, 1988. *State of Illinois ex rel. Hartigan v. Panhandle Eastern*, 839 F.2d 1206 (7th Cir.1988). However, in an *en banc* decision dated July 18, 1988, the Seventh Circuit held that, while industrial indirect purchasers did not fall within the "cost plus exception" to the *Illinois Brick* rule, residential/commercial indirect purchasers did, and therefore claims on their behalf would not be dismissed. *State of Illinois ex rel. Hartigan v. Panhandle*, 852 F.2d 891 (7th Cir.1988), *cert. denied*, — U.S. ——, 109 S.Ct. 543, 102 L.Ed.2d 573 (1988).

This lawsuit was filed on February 7, 1984. On December 13, 1984, after extensive hearing, the Court denied a Motion for Preliminary Injunction filed by Plaintiff. The trial on the merits on the bifurcated issue of liability was heard by the Court from November 17, 1986 to January 30, 1987. The Court stayed the matter during much of the time after trial when the interlocutory appeal was pending.

For the reasons stated in this Opinion, the Court finds in favor of the Defendant and against the Plaintiff on all claims.

This is a complex case, and the Court's ruling on the issue of liability will of necessity involve hundreds of specific findings of Fact and Law.

The Opinion is structured in the following way:

I. Narrative (historical background of the natural gas industry and the events leading up to the disputes between the parties in this case).

II. Findings of Fact (more specific discussion of certain factual bases for the legal conclusions).

III. Conclusions of Law.

NOTE: All matters contained in this Memorandum Opinion are to be considered as findings of the Court, whether the same are found in the Narrative or in the formal Findings of Fact or Conclusions of Law.

References to the injunction hearing and trial testimony are by witness and transcript page number; the injunction hearing and trial transcript have been numbered as one consecutive transcript by the parties. Citations to depositions are to the witness' name and page number. PX citations refer to Plaintiff's Exhibits; DX citations refer to Defendant's Exhibits.

## II. NARRATIVE

### A. *Historical Background of the Natural Gas Industry*

Natural gas has for some time been a major source of inexpensive energy in this country. Over time most homeowners, small businesses, and industrial facilities came to meet their heating needs with gas heat.

An interstate pipeline industry developed. Pipeline companies purchased natural gas from producers at the wellhead and moved the gas from the well to distant customers by way of their pipeline sys-

tems. Panhandle, for example, purchases gas from extensive acreage located in Texas, Oklahoma, New Mexico, Colorado, Wyoming and offshore in Texas and Louisiana from Trunkline Gas Company ("TKL"). Panhandle's pipeline, with lateral and gathering lines, runs northeastward generally from Oklahoma and Texas to the Detroit, Michigan area. Panhandle sells virtually all of the natural gas it purchases to interstate pipeline companies, industrial end-users, and investor-owned and municipally-owned LDC's serving several states including Central Illinois.

Until 1977, the regulatory agency supervising the natural gas industry was the Federal Power Commission ("FPC"). In that year, the FPC was replaced by the Federal Energy Regulatory Commission ("FERC" or "Commission").

The statutory framework for regulatory control of the industry until 1978 was the Natural Gas Act ("NGA"), 15 U.S.C. §§ 717–717w. Under the NGA, every sale of natural gas for resale and every transportation of natural gas in interstate commerce was subject to federal regulatory oversight. The NGA required that a regulatory body (the FPC) review each sale of gas to ensure that the price was "just and reasonable" and review all transportation facilities and transports of gas in interstate commerce to assure that they were "in the public convenience and necessity." 15 U.S.C. §§ 717c, 717f.

The principal functions of the FERC in rate-making are to determine the costs the pipeline should be allowed to recover from its jurisdictional businesses, to apportion the costs on an equitable basis among the different services that are provided, and to develop rates that will give the pipeline a reasonable opportunity to recover those costs, including an appropriate return on the investment in facilities used to provide the services. (Williams 6365).

The NGA gave the FPC/FERC broad powers to regulate both price and non-price activities of interstate pipelines, defined as "natural gas companies" by 15 U.S.C. § 717a(6). Panhandle is such a natural gas company.

In the years leading up to 1978, Panhandle sold natural gas to LDC's such as CILCO, CIPS, and IP pursuant to tariffs approved by the FPC/FERC, and in conformance with long-term service contracts.

In the late 1960's, a natural gas shortage developed and spread throughout the natural gas industry. This shortage continued into the 1970's and on occasion caused curtailment of delivery of natural gas to LDC's because there was not enough natural gas available to meet demand. Naturally, in such an environment, LDC's and the customers behind them clung to the pipelines serving their customer area. Pursuant to typical contract and tariff arrangements, LDC's such as CILCO agreed that they would normally purchase all of their natural gas from a single interstate pipeline, such as Panhandle, and in return the pipeline agreed to give its "best efforts" to see that the LDC received whatever amount of natural gas was needed to meet its customers needs.

In furtherance of those long-term commitments to the LDC's, pipelines entered into long-term contracts with natural gas producers to ensure an adequate flow of gas. Very often these pipeline/producer contracts, because of the oil shortage and tightly regulated price, contained provisions that guaranteed a certain level of "take" from the producer. In other words, the pipeline would guarantee to take a set amount of gas during a 12 month period. If the pipeline did not take the guaranteed amount of gas, it was still obligated to pay the producer for that amount of gas. These "take-or-pay" provisions were common in most contracts between pipelines and producers of natural gas from the mid–1970's until the early 1980's.

In 1978, Congress changed the "rules of the game" by passing the Natural Gas Policy Act ("NGPA"), 15 U.S.C. §§ 3301–3432. The NGPA provided for gradual deregulation of the wellhead price of certain natural gas and for significant deregulation effective January 1, 1985. One goal of the NGPA in deregulating gas producer prices was to provide sufficient incentive

for increased exploration and development of new supplies.

With respect to sales of gas, the NGPA largely eliminated the requirement that gas be sold at "just and reasonable" rates and created instead several categories of gas, establishing for many a "maximum lawful price," referred to commonly as a ceiling price. 15 U.S.C. §§ 3312–3319. Ceiling prices were established for, among others, the following categories of gas:

"raw material gas," referred to in the NGPA as "102 gas."

"new, onshore production wells," referred to in the NGPA as "103 gas,"

"high-cost natural gas," referred to in the NGPA as "107 gas."

Under the NGPA, gas in these categories, commonly referred to as "new gas," could be sold at any price up to the ceiling price without regulatory review. The ceiling prices for 102, 103 and 107 gas were eliminated by the NGPA on January 1, 1985. 15 U.S.C. § 3331.

Section 311 of the NGPA authorized the FERC to implement procedures that would facilitate the movement of gas between the intrastate and interstate markets without being subject to the requirements of Section 7 of the NGA. The FERC implemented procedures under Part 284 of its regulations to permit that type of transportation. This involved transportation by intrastate pipelines for interstate pipelines and LDC's, and also by interstate pipelines on behalf of intrastate pipelines and LDC's. (Williams 6386–6387, DX 1467).

Almost immediately thereafter, the FERC issued Order 60 under the NGA permitting interstate pipelines to perform the same type of service for one another that they could perform for intrastate pipelines. (Williams 6387, DX 1467).

Under Order 63 the FERC permitted Hinshaw companies, i.e., primarily distribution companies that pick up gas and transport it within a state but don't move it outside the state, to perform the same operations permitted intrastate pipelines. (Williams 6387, DX 1467).

Under the increased ceiling prices and monthly escalation mechanism in the NGPA, the producer price of natural gas rose steadily and gas supplies increased. However, because of a general decline in economic conditions, conservation efforts, and some limited amount of switching to alternative fuels, interstate gas industry sales to industrial consumers decreased.

As the country entered the 1980's, a natural gas surplus developed, due to a combination of a shrinking market and the availability of new and increasing gas supplies. This surplus of gas led to the growth of a "spot market," that is, lower priced gas available for purchase from natural gas producers by any willing buyer. The only rub was that the gas had to be moved from the well (producer) to the delivery point (purchaser), and the only way to move the gas was through the natural gas pipeline system.

In a sense, this litigation started with the passage of the NGPA.

B. *FERC Transportation Authorization*

For many years pipelines such as Panhandle purchased natural gas and sold it to their LDC customers without those customers' actively considering whether there was more than one product involved. In other words, the industry was regulated so strictly that there was no real opportunity for other alternatives, such as a transportation service only, to develop.

Departing from its historic policies, in 1975 the FPC responded to the gas shortage by establishing a general policy of permitting interstate pipelines with specific prior authorization to transport gas purchased directly from producers to industrial consumers in certain restricted circumstances. In 1979, the FERC expanded the direct purchase program to include essential agricultural users, use by schools and hospitals, and oil displacement use.

The FERC in 1982 instituted the Blanket Certificate Program. The blanket certificate program utilized Section 7(c) of the Natural Gas Act which provides that no natural gas company, or a company which will upon commencement of the relevant

activities become a natural gas company, may commence any jurisdictional activities or construct any jurisdictional facilities without receiving a Section 7(c) certificate in advance. The FERC in its various blanket certificate programs designated categories of potential pipeline activities, including the transportation of natural gas, in which individualized FERC authorization would not be required so long as the pipeline first received a Blanket Certificate of Public Convenience and Necessity. The Certificate required such activity to be performed in compliance with conditions stated in the underlying regulations.

In 1983, responding this time to the deregulation of wellhead gas prices, a decline in demand for gas, and price competition from alternative fuels and resultant loss of industrial load, the FERC, through Orders No. 234–B and 319, authorized self-implementing transportation under a blanket certificate for any end-user, to become effective on or about August 1, 1983. The FERC acknowledged that this experimental program was undertaken in order to add "flexibility to the market and thereby partially mitigate market distortions that currently may exist or that may emerge in the near future." 48 Fed.Reg. 34872 (Aug. 1, 1983). Transportation under Orders No. 234–B and 319 was voluntary. Under Order 234–B, "low priority" end-users, as defined by the FERC, could purchase gas from producers and arrange for transportation by pipelines. The transportation was self-implementing for the first 120 days. After 120 days, the transportation was conditioned on FERC authorization and was subject to a notice and protest procedure. Order 234–B, by its terms, was effective only through June 30, 1985.

Order 319 permitted "high priority" end-users, as defined in the Order, to purchase natural gas and arrange for transportation. It permitted purchase contracts of up to five years. Prior to Orders 234–B and 319, the FERC had approved the transportation of natural gas purchased by an end-user only on a case-by-case basis. This required obtaining a Section 7(c) Certificate.

On or about January 10, 1983, Panhandle was granted a blanket certificate of authority by the FERC pursuant to its Section 7(c) blanket certificate program. In August 1983, this blanket certificate automatically became usable under Orders No. 234–B and 319.

Order No. 234–B, as amended by Order No. 234–C, and the transportation-related portions of Order 319, as amended by Order No. 319–A, terminated on October 31, 1985 after the United States Court of Appeals for the District of Columbia in *Maryland People's Counsel v. FERC*, 761 F.2d 780 (D.C.Cir.1985) (*MPC II*), vacated the Orders. Thereafter, Order No. 436, established new regulatory requirements applicable to self-implementing transportation. (Stipulation ¶ 32).

On June 23, 1987, in the case of *Associated Gas Distributors v. FERC*, 824 F.2d 981 (D.C.Cir.1987) ("*AGD*"), the court sent Order 436 back to FERC with directions to factor the take-or-pay problem into the equation of change in regulations and also to rectify some procedural problems regarding the contract demand reduction formula.

On August 7, 1987, the FERC, in response to *AGD*, promulgated Order 500 (Interim Rule and Statement of Policy, Docket No. RM 87–34–000). Order No. 500 essentially re-adopted the regulations originally contained in Order No. 436 but with modifications to address take-or-pay problems. Order 500 has now been remanded for further consideration by the FERC. *American Gas Association v. FERC*, 888 F.2d 136 (D.C.Cir.1989).

C. *Events Leading Up To This Litigation*

Much of the focus of this litigation is on the relationship which existed between Panhandle and the three LDC's (CILCO, CIPS, and IP) which supplied natural gas to the relevant portions of the 37 county area of Illinois served exclusively by Panhandle. At the trial of this case, the major focus of evidence was on the conduct of Panhandle and CILCO. Most of the Memorandum will discuss that conduct as well.

CILCO, IP, CIPS, and United Cities Gas Company are local distribution companies served by Panhandle. However, portions of the service areas of CILCO, IP, and CIPS are served by other pipelines, and Panhandle serves two portions of the Illinois portion of United Cities' service area. (Stipulation ¶ 22).

CILCO has two service areas for gas distribution. One is a corridor connecting the Peoria area with the Springfield area representing 98% of CILCO's sales; the second is around the town of Tuscola, representing 2% of CILCO's sales. (Vergon 2837, 2344). CILCO bought gas entirely from Panhandle for the Peoria/Springfield service area and from Panhandle, TKL, Natural Gas Pipeline Company ("NGPL") and Midwestern Gas Transmission Co. for the Tuscola area. (Vergon 2844). For the calendar years 1983, 1984, and 1985, 98% of CILCO's total natural gas purchases were from Panhandle. (Stipulation ¶ 23).

CIPS has three distinct service areas for gas distribution. The western division of the Northern Area encompasses the west-central portion of Illinois and is exclusively served by Panhandle. The eastern division of the Northern Area is located in the east central portion of Illinois. This division was served by TKL, NGPL, and Midwestern, with each pipeline exclusively serving a part of the division. The Southern Area encompasses an area of southern Illinois around Marion and Carbondale and is served by TKL, Texas Eastern, and NGPL with each pipeline exclusively serving a distinct area. Approximately 54% of CIPS service area, by volume, was exclusively served by Panhandle. (Houvenagle dep. 13–18).

IP has numerous service areas throughout Illinois, which were served by five interstate pipelines: NGPL, ANR Pipeline Company ("ANR"), MRT, TKL, and Panhandle. Two of the service areas were served exclusively by Panhandle, that being the areas around the towns of Jacksonville and Danville. These areas represent less than 10% of IP's total service area, by volume. (Brodsky dep. 15, 19–20, 22, 24–25, 36–40, 44–45; DX 1246).

Panhandle sells gas to numerous municipal LDC's throughout Illinois. These LDC's typically only serve one town or city and purchase much smaller volumes of gas than the larger LDC's. These LDC's purchase gas under Panhandle's SG tariff which is available to purchasers who purchase less than 10,000 Mcf per month and purchase gas exclusively from Panhandle. (PX 1006, Sixth Revised Sheet No. 33 and Twenty–Sixth Revised Sheet No. 47–A).

A tariff generally consists of a number of different parts. First, there are rate schedules which spell out the different authorized services that the pipeline provides. Second, the tariff contains terms of service which have general applicability. Third, there are forms of service agreements that apply to each rate schedule. Finally, there is generally a tariff sheet that summarizes all of the rates applicable to the separate services. A customer which wants to contract for service under a rate schedule would contract in accordance with that form of service agreement. Thus, the tariff spells out the services that are provided, the general terms and conditions applicable to those services, the persons eligible to contract for the services, and a summary of all of the rates charged under the separate rate schedules for the different services. (Williams 6363–6364).

Panhandle sells natural gas to its LDC's, such as CILCO, under various FERC approved rate schedules. The general service, or "G," tariff rate schedule was for those LDC's which generally purchased their full requirements of natural gas from Panhandle. Under this rate schedule, Panhandle was to be the sole supplier of the LDC's gas, except in circumstances where the LDC requested an increase in contract demand (gas supply) that Panhandle was unable to provide. Generally, Panhandle's obligation was limited to "its best effort."

Further consistent with the "best efforts" nature of Panhandle's relationship with its LDC customers, was Section 6.2 of its G tariff:

> If during one or more days in the billing month Seller is unable to deliver to Buyer, for any cause whatsoever, natural

gas up to the Billing Demand established for the month, then the total Demand Charge shall be reduced by an amount computed as follows: Determine for each such day the number of Mcf which the Seller was unable to deliver as above stated and multiply the sum of all such days' deficiencies by the currently effective charge.

In other words, if Panhandle failed to deliver "for any cause whatsoever" its customer was entitled only to a credit against the Demand Charge (or reservation fee) for the gas not delivered. (PX 1006).

Panhandle's G and SG customers (including those located within the Central Illinois Market) purchased their gas from Panhandle under tariffs that on their face prohibit gas purchases from any "natural gas company" other than Panhandle. Panhandle and CILCO have had a business relationship for many years. Since 1951, Panhandle has sold gas to CILCO under the G tariff.

The G and SG tariffs do not specify the prices to be paid by the LDC's for their gas purchases from Panhandle. (PX 168; PX 169). Rather, the actual gas prices are determined through a special billing procedure whereby the cost of gas to Panhandle simply flows through to the LDC customer as a separate billing charge as the gas is actually purchased.

Actual purchase quantities are likewise not spelled out in the G or SG tariffs; rather, they are determined as the LDC makes purchases. (Vergon 3120; PX 168; PX 169). The maximum quantity, or contract demand level, that a customer can purchase is set out in the service agreement. When the purchases exceed 90% of the CD, the demand charge is based on the actual amount of gas taken. (DX 73).

The separate contract or "Service Agreement" entered into between Panhandle and each LDC does contain a contract demand or "CD" level. (PX 169). The CD levels do not necessarily reflect actual expected purchase levels; they are instead used to calculate a "reservation" or "demand" charge for pipeline capacity payable regardless of how much gas is actually taken. (Vergon 3169, 4411–4412, 4464, 4474–4475).

Panhandle's tariff obligation with respect to the demand charge was to make that amount of pipeline capacity available if requested by CILCO; Panhandle's supply obligation with respect to the gas was itself a "best efforts" obligation, with the tariff containing explicit language excusing failure to deliver for any reasonable cause. (Vergon 4464–4465; PX 1006).

The CD levels contained in Panhandle's service agreements with its G and SG customers were for the most part negotiated between Panhandle and the customers in about 1970, under long-term (twenty year) contracts, with a 10% reduction occurring in 1984 as a result of settlement of a rate dispute between Panhandle and its customers. (Vergon 3022–3024, 4401).

As of 1970, when the CD levels were set, gas prices were still regulated at the wellhead by the FPC. (Tussing 4222–4223; Vergon 3029).

The advantage of the G rate to the LDC was that it provided for a variable monthly demand level, no minimum commodity bill, and a 90% ratchet on demand charges. Much less natural gas is consumed in the summer than in cooler seasons, since air conditioning is normally powered by electricity. Therefore, it was very much in the LDC's interest to have a variable monthly demand level. The disadvantage to the LDC of the G rate was that, unless the LDC made a demand for more natural gas than Panhandle could expect to provide, the LDC would be required to purchase all of its natural gas from Panhandle.

In the late 1960's and 1970's, with a shortage of available natural gas available to consumers, LDC's such as CILCO normally had no substantial interest in avoiding the sole provider provision of the G tariff. CILCO knew that Panhandle, in reliance on their long term contract and the G tariff, would make its "best efforts" to supply whatever amount of natural gas CILCO needed for its customers. CILCO had anticipated some growth in sales at the time it entered into the October 1970 sales

agreement with Panhandle. (Vergon Trial Tr. 4403).

In the market of the 1960's and 1970's, the only advantage of having access to another pipeline (transportation service alone did not exist at that time except for unusual circumstances requiring specific prior FERC approval) was that, if the gas shortage were to become so acute that a curtailment of natural gas from Panhandle to CILCO occurred, the possibility existed that the other pipeline might be able to make up the difference.

All things considered, at the end of the 1970's, CILCO had no substantial incentive to attempt to deal with anyone other than Panhandle. This was especially true for two other reasons:

1. CILCO's only alternative to the G tariff was the "limited service" ("LS") schedule. The LS tariff was a partial requirements rate schedule for the LDC's which obtained a portion of their natural gas from natural gas companies other than Panhandle. The advantage of the LS tariff to the LDC was that it allowed the LDC to obtain natural gas from any other source. The disadvantage of the LS tariff to the LDC was that it provided for a level (year round) demand level, a minimum commodity bill, and no ratchet on demand charges. Again, because the contract demand was used as the basis for determining the minimum payment under the contract, an LDC such as CILCO (being situated in an area of the country with traditionally harsh winters) would have to have the contract demand set at such a high level to meet winter demands that the much lower summer consumption rate would cost CILCO millions of dollars for gas not purchased by customers in the summer.

So long as the natural gas market did not include as a component a spot market offering natural gas at a price substantially below the regular market price, there was no financial incentive to an LDC such as CILCO to consider switching to the LS rate. Also, because of the substantial payout resulting from the single (year round) contract demand charge, even if much cheaper natural gas were available from another company, the cost of paying the demand charge component would have outweighed (at least in 1982–1984) any savings resulting from the purchase of cheaper gas from someone other than Panhandle.

2. Because of the degree of regulation of the natural gas industry by statute and regulatory agency, an LDC such as CILCO, which did not have immediate physical access to the gas pipeline of another natural gas company, could not simply agree with another company to have it build a pipeline to CILCO's service area and start pumping natural gas to CILCO for its system supply. Rather, such interconnects could only occur with the approval of the FERC, and then only after extended proceedings during which everyone, including Aunt Mary, could object to the new interconnect and supply.

This regulatory review of such requests was not intended by FERC to be obstructionist. Rather, it existed to serve the public interest. The delivery of natural gas to the local communities of this country was considered by Congress and FERC too sensitive a matter to be left solely to the good intentions of a profit-motivated industry.

A G tariff was much to Panhandle's liking, for obvious reasons. Because of the combination of the G tariff and long-term service contracts, Panhandle, in dealing with a G customer, did not have to worry about significant competition in making its business decisions. As long as the world stayed right side up, LDC's such as CILCO would be satisfied with the long term commitment of Panhandle to provide the natural gas needs of CILCO's customers. Under the NGA, as of 1978, the price of gas was strictly controlled, and a lower priced spot market supply did not exist.

In reliance on the assured business of the G tariff LDC, Panhandle could and did enter into many long term contracts with producers. Most of those contracts contained take-or-pay provisions. In addition, because of the shortages and curtailments of the 1970's, Panhandle, with the support of its LDC's and the Illinois Commerce Commission, entered into two long term projects (the Algerian liquid natural gas

project and the Canadian gas project) which would ensure a greater supply of gas to meet customer needs, but also would involve more expensive gas than what was currently being contracted for in the United States.

Panhandle did not like the LS tariff. It did allow Panhandle to get "half a loaf" from LDC's in markets where an LDC had access to more than one pipeline, but, according to the terms of the LS tariff, the customer could decide not to purchase any natural gas from Panhandle. In such event, the only payment that Panhandle would receive from the LDC would be the "minimum bill," as determined from the flat contract demand. If the contract demand level was set relatively low, then such a customer could easily switch to another supplier which offered gas at a lower price.

In addition to the rigors of competition, Panhandle disliked the LS tariff for another reason: The LS tariff made it much more difficult to know how much natural gas needed to be secured for the future by long term contracts with producers. From Panhandle's point of view, it was like a chef going to the market to buy groceries for a dinner party when the chef really did not know how many people were going to show up. Certainly, the chef would much prefer to plan the dinner party armed with guaranteed reservations, so that the chef would be stuck with neither a needlessly big food bill nor leftovers. Similarly, it was important for Panhandle to know in advance the amount of natural gas that would be needed to satisfy its customers' demands.

D. *Panhandle's Gas Purchase Strategy*

Until 1977, the FPC, the predecessor agency of the FERC, set the price of gas at the wellhead, and every producer sale to interstate pipelines was subject to regulatory review. Spurred by dwindling supplies caused by artificially depressed gas prices, Congress, by means of the NGPA, enacted phased deregulation of the price of gas, and removed from the regulators the authority to review the prices passed through to customers. This legislation had the desired effect of spurring new exploration for and production of gas, both by major and independent producers.

During the 1970's, there was intense competition among pipelines for new gas reserves because it was a period of gas shortage. The competition continued until about the early 1980's when the market changed to a buyer's market. (Dixon 5829). The shortage of gas during the 1970's caused pipelines to compete for gas reserves on non-price terms, such as take-or-pay provisions and fixed volume clauses, for new supplies. (Carpenter 1636–37). Price differentials between the system supply cost of pipeline gas and spot market gas emerged due to the NGPA's decontrol of wellhead prices. (Carpenter 1638).

In 1979, Panhandle entered into an aggressive gas purchase program in which it contracted for vast quantities of supplies at the NGPA ceiling, or the maximum allowable price. Initially, the program was a reaction to the curtailments of the mid-1970's and was bolstered by internal company projections of high future sales. The purchasing program also reflected the projections of those LDC customers' needs. A Planning Group (comprised of 10 LDC's, six of whom were LS customers) at first projected huge future demand.

CILCO was a member of Panhandle's Planning Group and submitted information to Panhandle as to CILCO's projected gas sales. In May 1981, CILCO submitted to Panhandle its projections on future gas requirements in the period 1981 to 1990. (DX 158; Vergon 4404–4407). CILCO projected that its annual gas requirements would be 50.4 billion cubic feet ("Bcf") in 1981 and increase to 53.1 Bcf in 1990, with a peak of 54 Bcf in 1982. (*Id.*) CILCO also projected an increase in residential and commercial customers at the rate of 1.5% annually from 1981 to 1985 and 1% annually from 1986 to 1990, and an annual population increase at a rate of 0.8%. (*Id.*) CILCO expected Panhandle to contract for gas supplies to meet CILCO's projected sales requirements or actual usage. (Vergon 4411; 4417; 4445–4446). During the

five years preceding the trial, CILCO purchased 100% of contract demand on certain peak winter days. (Vergon 4417).

But, as the 1980's progressed, some LDC's, including CILCO, began to warn the Planning Group that they would have to scale back their projections. The warnings did not deter Panhandle's Gas Supply Committee, however. Through 1982, Panhandle continued to buy quantities pegged to the company's and its customers' (including the LS customers) most optimistic projections. With apparent disregard for what was happening in the marketplace, Panhandle agreed to significant take-or-pay provisions in virtually all of its purchase contracts, and demanded market-out clauses in virtually none of them. During the same time period, Panhandle committed itself to participation in a partnership that was constructing a pipeline that would deliver costly Canadian gas into its system, and Panhandle's subsidiary and main supplier, TKL undertook the hugely expensive Algerian LNG project.

TKL is the principal subsidiary of Panhandle and owns and operates an interstate natural gas transmission system. TKL purchased gas from extensive acreage located in, and offshore of, the states of Texas and Louisiana. TKL's pipeline generally runs from the Gulf Coast northward to Jackson, Michigan. It interconnects with Panhandle's pipeline at Tuscola, Illinois. TKL is a "Natural Gas Company" under § 2 of the NGA.

The LNG project of TKL was certificated in 1977 after lengthy regulatory hearings. Panhandle's Canadian gas purchases through Northern Border Pipe Line were approved in 1978. Both projects were initiated and approved during a period of intense curtailments. (Langenkamp 1511). Deliveries under these contracts did not commence until the Fall of 1982 due to the time necessary to construct transmission and other facilities. Other pipelines entered into similar long term gas supply contracts for Canadian gas and LNG. For example, NGPL vigorously pursued an LNG project but was unsuccessful in consummating the project. (Langenkamp 1512–1513).

The FERC approved the purchase of liquefied natural gas from Algeria by Panhandle. The ICC supported this purchase. (Tussing 830). When the LNG project was approved by the FERC in the mid–1970's, a period of curtailment, CILCO was neutral on the issue. (Vergon 3176–3177).

In September of 1982 Panhandle was notified that Algerian LNG and Canadian gas would begin to flow. Panhandle had contracted for this gas during the 1970's when the entire nation was experiencing a shortage of natural gas. The effect of these deliveries of new, high-priced gas was to change Panhandle's gas supply from one of the cheapest in the Midwest to one of the most expensive.

This caused many of Panhandle's customers, as well as state commissions like the ICC, which had supported the LNG and Canadian gas projects when Panhandle contracted for them, to petition for immediate cancellation of the projects. This resulted in lengthy hearings before the FERC and the U.S. Economic Regulatory Agency ("ERA") in the Fall and Winter of 1982. TKL was contractually obligated to receive LNG, and it began to do so in the Fall of 1982 while these hearings were taking place. TKL and Panhandle sought recovery of these gas costs immediately, but approval was denied pending the outcome of the hearings. The FERC and the ERA upheld the LNG certificate and permitted the gas to continue to be accepted. The cost of this gas was first reflected in rates in March 1983 due to the delay caused by the hearings, and by that time a substantial deferred gas cost balance had accumulated, which created a significant financial burden for Panhandle and TKL. (Langenkamp 1409–1415).

On February 3, 1983, Phillip O'Connor, Chairman of the ICC, authored a letter to Congressman Edward R. Madigan regarding Algerian LNG. O'Connor was concerned with the ALJ's decision of January 28, 1983 that there was no authority to revoke TKL's importation certificate. He urged Congressman Madigan to have Con-

gress act to stop the importation of LNG. O'Connor noted that the ICC supported the LNG program in the 1970's but stated:

It is evident to the Illinois Commerce Commission that the public interest in the LNG project has changed dramatically since the early 1970's, and *Algerian LNG is no longer needed.*

(DX 1098, emphasis in original).

TKL's contract for Algerian LNG was made with Sonatrach in the mid-1970's. Deliveries finally commenced in September of 1982. The contract provided for full deliveries of about 450 Mcf a day, but at first the deliveries were reduced. There was a gradual increase until early 1983, at which time the Algerians were at their full contract volume. In the spring of 1983, TKL notified Sonatrach that it was unable to purchase the full contract quantities and that it wanted to renegotiate the contract quantity. As a consequence, a 40% decrease in the contract volume was agreed upon, effective approximately April 1983.

TKL continued to purchase LNG at that reduced level until December 1983, at which time it suspended accepting deliveries of gas from Algeria. Sonatrach objected to the suspension and initiated arbitration proceedings for breach of contract. Those proceedings continued slowly until the middle of 1986, when the parties reached a settlement. As a result, TKL had no further obligation to buy Algerian LNG. (Dixon 5880–5881).

Over the last few years, Panhandle renegotiated the Canadian gas supply contract two or three times to reduce the price and volume obligations. (Dixon 5835–5836).

In all of these undertakings Panhandle was banking on its forecasts that the price of fuel oil would remain higher than the price of natural gas. However, to the extent that the purchase contracts and projects posed risks of unmarketability, Panhandle felt somewhat confident that its shareholders would not bear the financial consequences because, under the NGPA, all gas costs were passed through to the consumers, absent "fraud or abuse," a never-applied standard.

By 1982, the price of fuel oil had unexpectedly plummeted, and although lower-priced gas was available from newly developed independent supplies, Panhandle was selling gas for which it—or its affiliate TKL—had contracted at NGPA ceiling prices, which far exceeded the price of both independent supplies and fuel oil. Thus, in the fourth quarter of 1982 Panhandle's commodity rate suddenly jumped from $2.68 per million cubic feet ("Mcf") to $3.83/Mcf in October 1982, and eventually to $4.64/Mcf.

This increase was not unavoidable. Panhandle had inexpensive price-controlled gas under contract, but instead of purchasing it, Panhandle elected to purchase more costly gas. In addition, toward the end of 1982 Panhandle made the corporate decision, approved by its board of directors, to increase its purchases from TKL. TKL gas was even more expensive than that which Panhandle was purchasing from its producer suppliers, but TKL was facing serious take-or-pay problems. At about the same time the expensive Canadian gas came on line, and Panhandle chose to include this gas in its Purchase Gas Adjustments ("PGA's"). The effects of all of these decisions combined to make Panhandle's commodity rate very high.

As a result, Panhandle's prices during the time in question were above the market clearing level. (Carpenter 7138–7140; Stillman 3973; Tussing 3587, 3618, 3632). As of the time of trial, although Panhandle essentially sold gas only to its G and SG customers, Panhandle possessed the highest rate of return of all pipelines featured in a study of major pipeline companies. (Carpenter 6783–6785).

A Panhandle memorandum dated February 10, 1984, described Panhandle gas as the 14th most expensive out of 15 major interstate pipelines that Panhandle analyzed. (PX 647). Panhandle's prices were $1.00 or more per million cubic feet ("Mcf") higher than NGPL's prices on a comparable delivered basis to CILCO. (Vergon 2858–2859).

The service agreement between CILCO and Panhandle in effect at the time of trial

was entered on December 31, 1970, with an expiration date of October 31, 1988. CILCO, anticipating growth in sales, increased the contract demand at the time it entered into the service agreement with Panhandle in 1970. The agreement was amended on May 14, 1984 to reduce the contract demand by 10% and to extend the agreement to December 31, 1989.

As of early 1981, CILCO was becoming disenchanted with Panhandle as its sole supplier. Likewise, CILCO's industrial end-users, such as Keystone Steel & Wire Company and major hospitals in the Peoria area, were restless. The natural gas used to fuel their businesses was costing more and more. Industrial end-users were starting to consider the use of alternative fuels (such as coal and fuel oil) which, in the past, had been more expensive than natural gas. Energy conservation was also becoming a serious component of every company's cost saving strategy.

For years, under the NGA, the cost of natural gas had been a fairly predictable component of the cost of doing business. In the 1980's, the ever-escalating cost of energy for many businesses meant the difference between surviving or not surviving. The cost of energy also became a very important factor, along with the cost of labor, in the struggle to compete with foreign companies.

Neither CILCO nor Panhandle wanted any of its industrial customers to switch to an alternate fuel, because that would mean the loss of that customer for at least as long as the cost of the alternate fuel was less than the cost of purchasing natural gas from Panhandle through CILCO. In some cases, the loss might be permanent.

The commercial/residential consumer, on the other hand, was typically a captive customer. As the cost of energy increased, the small business owner or residential customer could realize some savings by cutting back on the consumption of natural gas, but that was a limited alternative. The same customer could switch to electric heat or fuel oil, but usually, except in the case of new construction, the capital outlay was too great to be realistic or cost effec-

tive. The customer could also substitute for some natural gas by using a wood-burning stove and/or space heaters, but any resulting savings was limited. The cost of purchasing those items was prohibitive for some customers, and the perceived danger to health and safety from use of wood-burning stoves and space heaters detracted from their usefulness on a community wide basis.

By November 1981, CILCO had determined to seek to interconnect with the next nearest interstate pipeline, NGPL. Under the terms of CILCO's tariff, if CILCO requested an increase in contract demand which Panhandle declined to meet, CILCO would then be free to purchase an amount of gas up to the requested demand increase from the second pipeline.

On November 10, 1981, CILCO personnel met with Panhandle personnel. At that meeting, CILCO made an informal request for an increase in contract demand. According to CILCO officer Donald Samburg, CILCO did not need the increase in contract demand, nor did it anticipate using it. In other words, CILCO made a demand for an increase in gas which it knew was a sham. It did so in an attempt to trigger the sole supplier exception, be in a position to purchase a substantial amount of gas from NGPL, and still retain its G tariff status with Panhandle.

Initially, Panhandle informally indicated that it would decline to meet the requested increase, but then Panhandle, to CILCO's surprise, reversed itself and agreed to provide the demand increase. Ironically, Panhandle's response was also a sham, since it was not capable of delivering the entire amount of gas requested by CILCO.

So, in sum, the demand for increased gas supply by CILCO was phony, and the response of Panhandle was phony. Two corporations were playing out a bluff in a high stakes poker game.

In April of 1982, Panhandle informed CILCO that it might be necessary to curtail deliveries to CILCO during the 1982–1983 winter. CILCO responded by again advising Panhandle of its desire to obtain gas

from NGPL. Panhandle declined to respond.

In spite of Panhandle's failure to respond to CILCO's request for increases of gas, CILCO and NGPL proceeded with plans for the interconnection.

As early as the fall of 1981, at the same time that CILCO first approached Panhandle about the proposed interconnect with NGPL, CILCO also requested that Panhandle negotiate a new tariff or service contract with it. At that time CILCO was seeking flexibility to purchase from another interstate pipeline, which is prohibited under the terms of the G tariff. In December 1981, CILCO formally requested that Panhandle enter such negotiations, but Panhandle ignored CILCO's request. CILCO responded by filing a complaint with the FERC in June 1982, requesting that the G tariff be stricken as anticompetitive. Panhandle elected to follow the advice of Truett Kennedy (a Vice President of Panhandle at the time), who suggested that Panhandle could "tough it out."

CILCO's FERC complaint against Panhandle (Docket No. RP 82–105–000) stated that CILCO was seeking to purchase a portion of its supply of natural gas from NGPL; that if it did so it could not remain on the G rate schedule but would have to switch to the LS rate schedule; and that this would result in a dramatic rate increase for CILCO. CILCO further alleged that Panhandle's tariff was unduly discriminatory, anticompetitive, and inconsistent with the NGPA's purpose of furthering a competitive wellhead market for natural gas. CILCO requested the FERC to order amendments to the definition of "General Service Buyer" which would allow CILCO to remain on the G tariff while purchasing gas from a second interstate pipeline supplier.

From Panhandle's point of view, what CILCO wanted would spell disaster, since it would free CILCO of its obligation to purchase all of its gas needs from Panhandle. Not only would the sales volume be lost, but the reduced purchases by CILCO for its system supply would expose Panhandle to an avalanche of take-or-pay liability be-

cause of a resultant drastically reduced take from Panhandle's producers. If that happened, the interests of Panhandle's shareholders would be endangered.

In the fall of 1982, NGPL filed a certificate of application with the FERC for approval of the interconnect. Panhandle intervened and opposed the certificate. In meetings related to that proceeding, Panhandle indicated that it would withdraw its opposition if CILCO would give Panhandle a right of first refusal on the sale of any gas transported to CILCO or CILCO's customers through the interconnect. When CILCO declined to accede to the demand, Panhandle threatened to fight CILCO "to the death" over the issue.

In reaction to Panhandle's price increases, the LDC's on the Panhandle system reacted in a variety of ways. Those who had more than one supplier began to increase their takes from their other suppliers. Those who had only Panhandle as a supplier began to locate available independent supplies and request that Panhandle transport those supplies under Section 311 of the NGPA. (One of the primary purposes of Section 311 was to facilitate the transportation of natural gas by interstate pipelines to end-users).

At the same time, the more aggressive of the industrial customers, not content with the efforts of their LDC's to obtain cheaper supply (and sometimes in economic desperation), began bombarding Panhandle with demands that it transport independent gas directly to them. In 1983, CILCO expressed concern to Panhandle about losing its industrial customers to alternate fuels due to increasing natural gas prices. CILCO estimated that this loss might approximate 20% of its annual sales.

Based on discussions with Panhandle that went back into the fall of 1981, CILCO believed in March 1983 that Panhandle's interpretation of the G tariff was that, if CILCO bought gas from someone other than Panhandle, such purchase would constitute a violation of the G tariff. CILCO's internal documents indicated that it wanted Panhandle to work toward a temporary waiver of the G tariff in March 1983, sub-

ject to FERC approval, so that CILCO could purchase NGPA categories 102 and 103 gas. CILCO believed that such a result would be preferable to forcing the FERC to interpret the definition of "natural gas company" in CILCO's pending FERC complaint case.

On March 17, 1983, CILCO formally requested that Panhandle transport 102 and 103 gas, to be purchased from an independent producer, for its system supply under the authority of Section 311. Panhandle refused, because its top corporate officers had by then decided to refuse to transport independent gas for the system supply of LDC's. Panhandle's President, Richard O'Shields, and its Chief Executive Officer, Kenneth Kalen, acknowledged this policy, and Kalen justified it on this ground: "We have the commitment to supply these local distribution companies, we have an obligation to have long-term supply contract, and we need to be relieved from both of these obligations...." (Kalen dep. 34.)

On March 22, 1983, Truett Kennedy informed Kalen that Kennedy had tentatively resolved to deny CILCO's request because the transport would "displace volumes from Panhandle." (PX 29) Kalen, noting to other corporate officers that "Truett has already declined the request," responded, "We are most anxious to hold off this type of request in favor of providing our customers an opportunity to purchase necessary volumes from our suppliers." (PX 31)

Kennedy met with CILCO on April 11, 1983 and advised CILCO that Panhandle was not going to transport the requested volumes. CILCO asked that Kennedy put Panhandle's position in writing. Informally, on April 12, Kennedy advised CILCO that Panhandle was "not going to transport volumes for customers since it was being swamped with such requests and it would make their own efforts meaningless." (PX 35) On the same day Kennedy prepared a formal response. In a cover memo transmitting his draft to Panhandle's in-house counsel, Kennedy stated that he "did not respond directly to their transportation request." (PX 1012) Indeed, the letter sent to CILCO, dated April 15, 1983, avoided discussion of CILCO's request.

On April 15, 1983, internal memoranda reported that the Panhandle's "transportation strategy" was then "not [to] transport gas purchased from other than Panhandle's eligible producers for customers of Panhandle." (PX 72) This policy was again reflected in a document Panhandle filed with the FERC in April of 1983. Responding to a CILCO data request, Panhandle stated, "Under current transportation policy Panhandle and Trunkline would not be willing to transport gas purchased from third parties for CILCO's overall system requirements." (PX 36)

On April 29, Wayne Slone of CILCO wrote to Kennedy and again requested that Panhandle transport Section 102 and 103 gas. Panhandle did not respond.

During a July 1983 customers meeting in Springfield, Langenkamp told representatives of CILCO, CIPS, and IP that Panhandle would not transport gas from independent producers. A contemporaneous memo memorialized Panhandle's decision to deny LDC and end-user requests for transportation of "non-Panhandle released gas." (PX 217)

In August 1983, Citizens Gas, a G customer of Panhandle, requested that Panhandle transport to it for its system supply 102 and 103 gas that Citizens would purchase from independent producers. Kennedy met with in-house counsel, Michael Kelley, on August 30 to discuss this request. Kelley informed Kennedy that this transaction was permissible under the G tariff. Nevertheless, a few days later, Kennedy and Kelley met with Citizens' general counsel and informed him that the transaction was *not* permissible under the G tariff.

In early 1983, both CIPS and IP made inquiries to Panhandle about Panhandle's willingness to transport independent gas for their system supplies. With slight variations, Panhandle responded as it had responded to Citizens. Langenkamp wrote Illinois Power, "We are unable to provide a meaningful response." He concluded with this statement:

Certainly, interstate pipelines, most gas producers, and a number of local distribution companies are "natural-gas companies" as defined by Section 2(6) of the Natural Gas Act; and therefore, purchases from such natural-gas companies would be inconsistent with the long-standing terms of the G–2 Rate Schedule governing most of your purchases from Panhandle.

(PX 581). He wrote CIPS that "any sale of gas would be in violation of our [G] tariff." (PX 579)

The facts dealing with CILCO's March 17, 1983 request to transport gas and Panhandle's response were presented to the FERC by CILCO during the proceedings on its complaint. CILCO thought it was in a "no-lose" situation in making its request on March 17, 1983—it would either get the gas or use the refusal to help its FERC case.

In 1983, FERC enacted Special Marketing Programs ("SMP's") in order to give selective price cuts to the customers with the most sensitive demand. In the latter part of 1982, the average cost of gas to many pipelines was approaching, and in some instances exceeding, the price of No. 6 fuel oil. As a result, pipelines and their customers were experiencing a reduced demand for gas, which was exacerbating the take-or-pay problem of some pipelines, including Panhandle. In a Transcontinental Gas Pipe Line rate case, it was proposed that the pipeline release higher priced gas to producers who were willing to sell their gas at market clearing prices and that the pipeline would transport the gas into its market areas to retain fuel switchable loads or acquire new loads.

The FERC adopted the proposal and indicated that this appeared to be a reasonable approach to addressing both the rising cost of purchased gas and the take-or-pay problem faced by many pipelines. Thereafter, certain pipelines—including Panhandle and TKL through PanMark—adopted a similar arrangement. The FERC, in what where called "basket orders," adopted the specific programs of certain pipelines and procedures but applied generic conditions to them. (Williams 6407–6408).

Approximately 35 producers and marketers had SMP's. Only five pipelines had SMP programs, and only three actually operated their programs.

Panhandle's reaction to these regulatory initiatives was mixed. It delayed making any decision about participating in the blanket certificate program for several months. By contrast, it eagerly embraced the SMP program, creating PanMark, which partially pacified certain of the industrial customers, while enabling Panhandle to obtain take-or-pay credit for each million cubic feet ("Mcf") of gas it sold. Only "released gas" (or gas already under contract to Panhandle) was eligible for sale through SMP's. Authorization for all SMP's, including PanMark, was to expire on October 31, 1984.

On September 26, 1984, the FERC extended SMP's for another year and allowed LDC's to participate in SMP's for up to 10% of their contract demand for system supply gas. The FERC order specifically provided for a temporary limited waiver of the terms and conditions of the G tariff to allow purchases for system supply by a G customer such as CILCO. Interstate pipelines, such as Panhandle, were given 30 days in which to decide whether to accept or reject the FERC's order. Panhandle filed comments with the FERC in which Panhandle argued that the 10% rule had been adopted by the Commission without sufficient research or basis and would increase the unit cost of gas and result in a build up of the deferred account. Nevertheless, Panhandle participated under the 10% rule because it wanted to continue its PanMark program.

With the limited waiver of the G tariff, Panhandle transported gas for LDC's system supply under the 10% feature. In 1984 and 1985, PanMark sold and Panhandle transported 31.9 billion cubic feet ("Bcf") of natural gas to its LDC customers for system supply. This figure included 2.8 Bcf for CILCO, 1.2 Bcf for CIPS, and 3.9 Bcf for IP. In 1985, approximately 86% of the total volumes transported under PanMark went to LDC customers. In addition, Panhandle transported 6.5 Bcf of gas from

SMP's other than PanMark to its LDC customers for system supply under the 10% rule. CILCO received 1.5 Bcf from the SMP's of Yankee Resources (Yankee Resources' SMP was called "YES"), City Service Oil and Gas Co. ("COGS") and Entrade Corp. ("Enspeed") during the period from July through October 1985. System supply gas purchased from SMP's other than PanMark by Panhandle's LDC customers under the 10% rule was Panhandle-released gas for which Panhandle received take-or-pay relief.

Ten percent of contract demand exceeded 10% of actual purchases by an LDC. In fact, in some months, 10% of contract demand turned out to be in excess of 100% of some of the LDC's actual requirements. CILCO's purchases from SMP's represented from 14.7% to 59% of its actual monthly purchases.

PanMark did not, however, provide a total solution. Industrial and other large consumers ineligible for PanMark continued to press for access to direct sale independent gas through the blanket certificate program. Thus, the stage had been set for crucial corporate decisions about whether to transport independent gas under the blanket certificate program (Market Area Program) ("MAT"), and if so, for which customers. Panhandle also had to decide how to fashion a transportation program that would enable Panhandle to avoid to the maximum extent possible the influx of independent gas into its markets.

Even as Panhandle created the MAT Program and commenced transporting to some end-users, the Company did not change its decision to deny transportation to LDC's. In October 1983, while Panhandle was still formulating the parameters of the MAT Program, R.C. Dixon, Vice President of Gas Supply, instructed Robert Reed, who was in charge of coordinating the transportation program, "Don't let LDC buy cheap gas for system supply to offset our sales. Must be for system supply going to specific end-user." (PX 92). In Panhandle's November 1983 internal draft on its transportation program, Panhandle specifically states that the program was "not intended for general system supply." (PX 102)

The MAT plan Panhandle developed in 1983 contained certain significant features that have given rise to this lawsuit: Under the plan, Panhandle would not transport independent gas to its captive G LDC customers; Panhandle would limit the classes of consumers eligible to participate in transportation programs; and, as to these eligible consumers, Panhandle would insist that they submit to bid-out, or right of first refusal, as a prerequisite to receiving transportation service.

In November 1983, in order to pacify its fuel switchable customers, Panhandle formally adopted its Transportation Guidelines ("Guidelines"), pursuant to which it would transport off-system supplies to an end-user. To stem erosion of its take-or-pay position with its on-system suppliers and to discourage the flow of independent gas into its pipeline system, Panhandle insisted on a right of first refusal as a condition precedent to transporting independent non-Panhandle system gas. Contracts for transportation of off-system supplies were terminable every six months to allow rebidding by on-system Panhandle suppliers. Also, for the purpose of avoiding unreasonable administrative burdens, the minimum volume for which transportation would be provided was set at 100,000 Mcf/year.

Panhandle held meetings with its LDC customers in November of 1983 to explain the transportation policy and Guidelines. A shorthand version or summary of the Guidelines was prepared and distributed to the LDC customers, with the expectation that the LDC's would inform their customers (i.e., end-users) about the Guidelines.

The mechanics of the first refusal process were to be accomplished through a bid-out and rebid system involving the following key features: (1) the program would be available to end-users (not LDC's) using at least 100,000 Mcf of gas per year; (2) at 90 day intervals a qualified end-user could request a desired reduced price and Panhandle would make a single offer of the requested price to its on-system suppliers for possible matching; (3) qualified end-

users could alternatively line up specific set deals with off-system producers for transportation by Panhandle, but only after the deals had first been "bid-out" to Panhandle on-system producers for possible matching; (4) if matching occurred, the end-user then had to purchase from the matching on-system Panhandle producer, after negotiating the specific terms of the purchase; (5) off-system deals that were not matched had to be "rebid" to Panhandle on-system producers every six months. (Kennedy 1146–1147; Reed 1286–1287, 1295–1296; PX 101; PX 102; PX 102). The rebid procedure was eliminated in January 1985. (DX 82).

From the beginning, Panhandle intended that the Guidelines would only apply to industrial end-users and not to G tariff LDC's for system supply. (Kennedy 1137, 1146, 1207; Reed 4925–26, 5121–22; PX 92; PX 101; PX 102; PX 103; PX 268). The reason for this was obvious: If the Guidelines had been available to G LDC's, then Panhandle would, in effect, have been cutting its own corporate throat. As long as the Guidelines served as an economic safety valve in the marketplace to keep the industrial end-users from moving away from natural gas, Panhandle was resigned to the use of the Guidelines; but if a G tariff LDC could use the Guidelines to purchase natural gas, then Panhandle would have lost a critical captive market.

It appears that Panhandle's initial idea was not to transport gas for system supply of *any* LDC. However, as time passed, and as LDC's continued to put pressure on Panhandle to grant them access to transportation services, Panhandle concluded that the proper response was to say that an LS tariff customer did have access to the Guidelines, but a G customer did not. This was justified on the basis that to have allowed a G customer to purchase gas from a non-Panhandle supplier and have it transported on Panhandle's pipeline to the LDC for system supply would have violated the "sole supplier" provision of the G tariff and the sales contracts between Panhandle and the LDC.

As far as Panhandle was concerned, if CILCO, for example, had wanted to buy gas from someone other than Panhandle, it would have had to suffer all of the consequences of an involuntary shift from a G to an LS tariff. Of course, if that change in status had occurred in 1983 or 1984, the net economic consequences to CILCO would have been disastrous, no matter how low priced the gas that CILCO was able to buy on the spot market.

Panhandle required the end-user to submit the following information for the bid-out under the Guidelines: (a) a representation that the end-user had an agreement with a supplier; (b) information as to whether the supplies were off-system or on-system; (c) the supplier price; (d) the quantity of gas to be purchased; (e) the contract term, and (f) the Panhandle pipeline delivery points. Identity of the supplier or producer was not required. (Reed 4742–4743). Panhandle then submitted to its on-system producers under the bid-out: (a) the type of customer, i.e., indirect customer behind an LDC, but not the name of the customer; (b) the price; (c) the volume; and (d) the term. (Reed 4743; DX 298).

Panhandle did not require end-users seeking transport of on-system Panhandle released gas to go through the bid-out and rebid process under the Guidelines. (Reed 4764). End-users desiring transportation of off-system (non-Panhandle supplier) gas *were* required to go through the bid-out process. If they refused to comply, transportation was denied. (Reed 4920).

The information Panhandle required from the end-user as part of the bid-out process, such as price, volume, contract terms, and delivery points, was not information which could have been kept confidential by the end-user on a permanent basis. That information had to be filed in the public files of the FERC upon commencement of the transportation of the gas, but in the marketplace it was information that would not otherwise have been available to the competing on-system suppliers prior to the consummation of a binding agreement.

Because the bid-out and most other conditions of the Guidelines were so restrictive, some off-system producers simply re-

fused to consider submitting to the Guidelines. Several other end-users would have liked to have entered into contracts of one to two years in length, but, because of the six month rebid, could not guarantee a price for longer than six months.

Panhandle contends that it neither permitted nor prohibited negotiations by an end-user for a lower price from its off-system producer after an unsuccessful bid-out, but there is no indication in the record that Panhandle ever presented this possibility to the end-users. Also, while Panhandle neither permitted nor prohibited an end-user from conducting an "auction" between the matching on-system producer and the off-system producer for a lower price, there is no indication in the record that the "auction" possibility was ever announced by Panhandle to its industrial customers.

Since the Guidelines did not provide for an auction between an interested off-system producer and an interested on-system producer, end-users were basically left to purchasing gas at a price that might have been lower had the parties been free to "haggle" over price until the lowest price to the consumer was reached.

The first transportation under the Guidelines was provided for Quincy Soybean (an industrial end-user behind CIPS) starting in January 1984. The request had been submitted to Panhandle's bid-out procedure at the beginning of December 1983 and had not been matched.

In 1984, Panhandle transported 16.8 Bcf of gas involving 52 transportation agreements. Approximately 15 Bcf, or approximately 90%, was off-system supply, that is, supply not matched by on-system producers in the bid-out procedure. Of the total, 9.3 Bcf, or 55%, were transported to end-users in Illinois under 29 transportation agreements. In 1985, Panhandle transported 103.6 Bcf of gas under the Guidelines. That amount involved 149 transportation agreements. Approximately 90 Bcf, or 87%, were from off-system supply and 22.3 Bcf were transported to end-users in Illinois involving 55 transportation agreements. Approximately 93% of the Illinois transports were off-system supply.

Thus, in 1984 and 1985, Panhandle transported approximately 120.4 Bcf under the Guidelines, of which 31.6 Bcf were to Illinois end-users (i.e., 10.3 Bcf involving 17 transportation agreements were transported to end-users served by CILCO; 2.5 Bcf involving 14 transportation agreements were transported to end-users served by CIPS; and 16.1 Bcf involving 16 transportation agreements were transported to end-users served by IP).

In late 1983 and 1984, Panhandle's main desire was to ship on-system gas to all of its customers, but its secondary position was to ship *any* gas to industrial end-users. Initially, Panhandle's hypertechnical construction of the Guidelines and the cumbersome details of the front end of the process, made for a frustrating, maddening, and time-consuming situation for any industrial end-user which utilized the Guidelines.

The time consumed by the bid-out process (i.e., the time from Panhandle's receipt of the request for transportation to the giving of notice to the end-user of the outcome of the bid-out), took 43 days in the fourth quarter of 1983. By October of 1985 the time required to perform the bid-out had been reduced to two days. A number of factors—including action taken by Panhandle—contributed to the reduction of the bid-out time. First, the Guidelines went into effect during the winter heating season in December 1983, when on-system producers were not inclined to respond to bid-out requests since they were selling gas to Panhandle. During the spring and summer of 1984, as less gas was being purchased by Panhandle, producers became more responsive to the bid-out and more familiar with the Guidelines. Second, starting in September 1984, Panhandle stopped mailing bid-out letters to on-system producers. Having accumulated information on eligible and available on-system supplies from earlier bid-out requests, Panhandle was able to utilize the information for matching in-house. Finally, the MAT staff's increased size and greater efficiency helped shorten the bid-out time.

Despite the reduction in the bid-out time, transportation could still be delayed substantially for reasons beyond Panhandle's control. For example, in one case the bid-out process took only two days, but, because the end-user's LDC had not agreed to transport gas, over nine months elapsed before the end-user and the LDC reached agreement and Panhandle could start transporting the gas.

Even without the bid-out, transportation could not start the day after receipt of a request for a *new* transportation transaction (as opposed to amending an existing transaction). This was because the time necessary to begin transportation also depended upon the end-user's completion of negotiations with the producer on the supply contract and with the LDC and Panhandle on the transportation agreement.

During 1984, 32 transactions went through the six-month rebid but only five were matched by on-system producers. In no case was there an interruption of transportation due to the rebid. In some cases, matching under the six-month rebid resulted in a lower price to the end-user, because the off-system producer lowered its price to the end-user after the match. (Reed 4776–4780; DX 1409). In other cases, the opposite was true. However, due to the administrative burden involved, Panhandle eliminated the six-month rebid feature from the Guidelines in January 1985. Panhandle notified the industry and end-users that this feature had been eliminated.

On March 6, 1984, after the filing of this suit, CILCO requested that Panhandle transport up to 15 MMcf/day of NGPA category 102 natural gas from a producer in Texas. This request by CILCO for transportation of natural gas was premised on CILCO's retaining its status as a G customer. Langenkamp responded in a letter dated April 6, 1984, that he did not have sufficient facts to affirm or deny CILCO's interpretation of the tariff but that he was willing to meet with CILCO to learn additional details.

At a meeting with CILCO on May 15, 1984, Langenkamp stated that Panhandle interpreted the G tariff to mean that, if CILCO were to buy natural gas which was sold and transported in interstate commerce from any other supplier, including NGPA categories 102 and 103 gas, those purchases would be purchases from a "natural gas company" and would disqualify CILCO as a G rate customer. Langenkamp emphasized that Panhandle was willing to sell gas to CILCO under other existing rate schedules, including the LS schedule, or to negotiate some alternative rate schedule, either of which would allow CILCO to make purchases from alternate suppliers.

Meanwhile, CILCO enlarged the scope of relief it was seeking in its FERC complaint. By August 1984, CILCO was seeking an interpretation of the G tariff to permit it to purchase 100% of its supply in the form of "certificate deregulated" gas, i.e., Section 102, 103, and 107 gas, from the spot market. CILCO's March 17, 1983 letter coupled its request for transportation with a request for confirmation that it would remain on the G tariff. Panhandle's refusal to interpret the language of the G tariff to favor CILCO if Panhandle transported such gas, as requested in CILCO's letter of March 1983, was raised in the FERC proceeding.

As stated earlier, the limited service or "LS" rate schedule had a level year-round monthly demand level, a minimum commodity bill for natural gas purchases, no ratchet on demand charges, and it permitted the buyer to purchase natural gas from sources other than Panhandle. This tariff would not have been as favorable to CILCO as the G tariff, and CILCO estimated in 1983 that it would have had to pay approximately $50 to $60 million per year more for its gas under the LS tariff than the G tariff.

In the summer of 1983, in an effort to settle the CILCO FERC case, Panhandle proposed a temporary waiver of the G tariff and certain rate terms as a means of permitting G customers to purchase gas from other sources for system supply. CILCO rejected this proposal because it wanted a permanent change in the G tariff. As part of Panhandle's 1982 FERC rate

case settlement, Panhandle in early 1984 agreed to remove the gas commodity charge from the minimum bill. With that cost removed from the minimum bill, CILCO would have had to pay approximately $5 million more per year under the LS tariff than under the G tariff. These were the minimum amounts, in each relevant time period, which CILCO would have had to offset with spot market savings before a switch to LS tariff would have been a reasonable economic decision. Transportation could also have driven up the cost of CILCO's remaining purchases from Panhandle, and CILCO would also have had to offset these amounts. In hindsight, if CILCO had significantly increased spot market purchases, the $5 million increased cost might have been offset completely as spot market prices fell below $2.10 Mcf.

On March 22, 1984, executives of CILCO and Panhandle met in Peoria to discuss the new limited general service ("LGS") tariff proposed by Panhandle which would allow CILCO to purchase gas from other suppliers. CILCO calculated that under this proposed tariff, it would incur an additional gas cost of $55 million (above the G tariff rate) prior to buying any gas from other source. That calculation was made with a minimum bill that included gas costs. At the time, Panhandle was still resisting the deletion of gas costs from the minimum bill. However, at the time it was known in the industry that the FERC was proposing to eliminate gas costs from all minimum bills.

In the summer of 1984, the FERC issued Order 380, which precluded pipelines from charging their customers for gas not taken through minimum bills. Panhandle's LS customers, all of which had minimum bills, took advantage of this development by reducing their purchases from Panhandle even more dramatically and increasing takes from their alternative sources of supply. Thus, whereas in 1980 Panhandle's sales to LS customers had comprised 43 percent of its total sales, by 1984 that percentage had dropped to 32.8 percent. Panhandle, experiencing the adverse effects of the lost revenue from its LS cus-

tomers, had two alternatives: It could lower its commodity rate or it could open its transportation program to its LS customers in order to generate transportation revenues from them. Lowering its commodity rate was obviously unacceptable, because regulations prevented the company from lowering its rate to LS customers without also lowering rates to the captive G customers. This would have put Panhandle's shareholders, instead of the captive customers, at risk for Panhandle's oversupply of expensive gas.

As a result, Panhandle modified its policy of wholesale refusal to transport to LDC's, replacing it with a policy under which transportation to LS, but not G, LDC's would be permitted. In 1984, Panhandle did not transport gas for the system supply of any LDC pursuant to the Guidelines. In 1985, Panhandle transported gas for the system supply of two LS LDC's: 40.4 Bcf were transported to Michigan Consolidated under two transportation agreements, and 3.6 Bcf were transported to East Ohio.

By 1986, Panhandle's sales to LS LDC's had dropped to 4.6 percent of its total sales volumes, but its transportation volumes to these customers increased in corresponding amounts. In other words, Panhandle was able to generate transportation revenues to substitute for lost sales revenues from non-captive customers, revenues it had sacrificed when its commodity rate rose to and remained at a supracompetitive (substantially above the spot market) level. The loss of these LS LDC's as sales customers, however, made it even more crucial for Panhandle to retain its hold on the captive G markets, for they were now Panhandle's only remaining customer for its and TKL's uncompetitively (in relation to the spot market) priced gas.

In September of 1984, CILCO presented Panhandle with a tariff counterproposal containing a 50% minimum bill. Under the proposal, CILCO could purchase up to 50% of its total purchases from sources other than Panhandle without penalty and pay an alternate supply charge of $.42/Mcf only on such purchases. However, Panhandle would still be obligated to have gas re-

serves to supply 100% of CILCO's contract demand. Panhandle rejected the counter-proposal.

Panhandle and CILCO executives and legal counsel met again in Houston on December 5, 1984. Panhandle's LGS proposal made in March was discussed; even though the additional cost to CILCO under this tariff would have been approximately $5 million, due to elimination of gas costs from the minimum bill, it was unacceptable to CILCO. CILCO's September 1984 proposal was also discussed but was not accepted by Panhandle. Following this meeting, Panhandle advised CILCO that it was unwilling to enter into any additional negotiations for a new tariff or service agreement.

On September 6, 1985, an administrative law judge of the FERC rendered an initial decision in the CILCO Complaint Case confirming the sole supplier nature of the G tariff and rejecting CILCO's request to amend Section 1.9 of the G tariff to permit CILCO to purchase from another supplier while remaining on the tariff.

On November 21, 1986, CILCO requested Panhandle to provide firm transportation for system supply for 15 Mmcf per day starting February 1, 1987. CILCO did not expressly request that the transportation be conditioned on retaining the G tariff, because it hoped that the FERC would issue a final decision in its complaint case in its favor by February 1. If there was no decision, it could decide on February 1 whether or not to proceed with the transportation request.

Panhandle had two reliable weapons upon which to draw in its struggle to prevent independent gas from entering its captive system supply markets. One was its ability to refuse to transport independent supplies to the captive customers; this was a powerful weapon since Panhandle's pipeline was the only physical source of transportation access at the time. The other weapon was its G/LS tariff structure. Of course, CILCO could object to Panhandle's construction of the tariff by filing a complaint with the FERC, which it had done.

These tariffs and their companion service agreements were really just contracts for the delivery of gas. Unlike most contracts for the purchase and sale of goods, they contained no price terms, because at the time that the tariffs were entered in 1950, federal regulators tightly controlled the price of gas. The purchasers, therefore, had relied upon the regulators to assure that they paid a fair price for the goods Panhandle was providing. Of course, the purchasers lost their protection in 1978 when Congress, in passing the NGPA, removed the regulators' control over gas prices.

On appeal to the full Commission, the FERC, in Opinion No. 265, issued on February 20, 1987, again confirmed the sole supplier nature of the G tariff but reversed the ALJ and ordered that Section 1.9 of the G tariff be modified *prospectively* to eliminate the sole supplier provision so as to permit CILCO to purchase from another supplier while remaining on the tariff. At the same time, the full Commission eliminated the fixed cost minimum commodity bill from the LS tariff, virtually obliterating all distinctions between G and LS service, with the exception of variable contract demand and the 90% demand charge ratchet in the G tariff. The FERC believed that, under current market conditions and the FERC's recent policy favoring competition and transportation, the sole supplier provision was a "vestige" of past policy and was no longer appropriate. Nevertheless, the FERC's opinion clearly affirmed Panhandle's long-standing interpretation of Section 1.9 as a sole supplier provision that precluded CILCO from purchasing gas from another supplier while remaining on the G tariff. It also held that "full requirements" tariffs, which would identically impact transport of off-system supplies, generally would be upheld.

While the Court was in the process of finalizing this Memorandum Opinion, the United States Court of Appeals for the District of Columbia in *Panhandle Eastern Pipeline Co. v. Federal Energy Regulatory Commission*, 881 F.2d 1101 (D.C. Cir.1989), remanded two issues arising out

of the FERC's ruling in Order 265. Those two issues were:

(1) The fairness of FERC's release of G tariff customers from their obligation (pursuant to the sole supplier provision) to purchase all of their natural gas from Panhandle, while at the same time "ordering Panhandle to continue to provide them with G schedule benefits." *Id.* at 1104.

(2) The reasonableness of FERC's action in order 265 allowing Panhandle's customers "... to nominate low levels of service (thereby reducing demand charges), while at the same time requiring the pipeline to stand ready to serve them at the level described in its operating certificate." *Id.*

### E. *FERC Order 436*

In mid–1985, programs such as Panhandle's Transportation Guidelines and Pan-Mark were struck down by the District of Columbia Court of Appeals as being anti-competitive and discriminatory. *Maryland People's Counsel v. FERC,* 761 F.2d 768 (D.C.Cir.1985) ("*MPC I*"), *Maryland People's Counsel v. FERC,* 761 F.2d 780 (D.C. Cir.1985) ("*MPC II*"), and *Maryland People's Counsel v. FERC,* 768 F.2d 450 (D.C. Cir.1985) ("*MPC III*"). The programs were allowed to continue until November 1, 1985, at which time FERC was to announce new rules governing the provision of non-discriminatory transportation services by interstate pipelines.

The FERC initiated a Notice of Proposed Rulemaking in May of 1985 which culminated in the issuance of Order No. 436 in October, 1985. Panhandle filed comments in that rulemaking proceeding opposing the issuance of the proposed order. Panhandle opposed the rulemaking because it believed the proposal failed to deal with the take-or-pay problem of pipelines, and because it would allow Panhandle's customers to reduce the contract demand in their service agreements to zero without dealing with the pipeline's long term gas supply contracts entered to meet the customers' contract demand. (Bray 5574–5579).

The FERC required in Order No. 436 that pipelines file new transportation tariffs which provided unbundled transportation rates or rates which separately stated the cost components that made up the transportation rate. Order No. 436 allowed the use of a separate demand charge or reservation charge only in a tariff for firm transportation. Panhandle filed new transportation rates pursuant to the conditions in Order No. 436. These rates were in effect subject to refund and were being reviewed by the FERC at the time of trial. Order No. 436 also required that pipelines' state a maximum rate—which included all of the pipelines applicable costs—and a minimum rate which included only the applicable variable costs. Panhandle's new transportation rates stated a maximum rate of approximately 40¢ per Mcf and a minimum rate of approximately 2¢ per Mcf. Panhandle did charge a rate below the maximum rate for transportation services rendered after its new rates went into effect. (Bray 5579–5582).

These rules, contained in the FERC Order 436, were announced in October 1985 and became effective November 1, 1985. Under Order 436, pipelines were informed that, while they could continue offering transportation services, they could no longer do so in a way that discriminated against captive LDC residential/commercial purchasers. Volumetric limitations were permitted and full requirements customers were not eligible for transportation absent conversion to a partial requirements tariff.

However, Order 436 and Order 436–A, which was issued in December 1985, imposed substantial conditions on pipelines' accepting blanket certificate transportation authority, such as the right of an LDC under an existing long-term service agreement with the pipeline to reduce unilaterally its contract demand to zero and convert its contract demand to firm transportation. Order 436 also required that a pipeline which chose to transport on a self-implementing basis must do so on a non-discriminatory basis. In the alternative, the Order allowed a pipeline to seek authorization for transportation under Section 7(c) of the NGA on a case-by-case basis.

Order 436, coupled with Order 380, constituted a major restructuring of the regu-

latory apparatus governing the gas industry. This, and to some extent the take-or-pay provisions in supply contracts, created a significant industry transition problem. The transition problem had to do with restructuring the menu of services that a gas pipeline offers its customers to meet long-term needs, while at the same time restructuring the terms of its long-term relationships with its suppliers. (Carpenter 6885–6886).

In addition to authorizing non-discriminatory Section 7(c) certificates, Order 436 further authorized the use of a special "interim Section 311" blanket transportation program. This program was first made available on November 1, 1985, and was later extended. (FERC Orders 436, 436A, 436B). Under the interim Section 311 program, pipelines could transport gas to direct-buying end-users and LDC's for their system supply, on an interim basis to June 30, 1986, *without* committing themselves to actual participation in the Order 436 program. (Reed 4993). The purpose of this program was to facilitate the continued flow of competitive non-pipeline gas to LDC's as well as individual end-users while pipelines decided whether to adopt a full-blown Order 436 program. (FERC Order 436).

After October 31, 1985, Panhandle continued the transportation agreements that were "grandfathered" by Order 436. Panhandle's Guidelines ended on October 31, 1985. (Vergon 2925; PX 380). End-users that had previously received transportation under the Guidelines and that now found their transportation discontinued were informed that Panhandle would, if requested, seek individual certificates (termed "7(c) certificates") from the FERC to authorized renewed transportation. (PX 380; PX 770). The use of individual 7(c) certificates was specifically provided for in Order 436, so long as they were used in a non-discriminatory manner. (FERC Order 436).

Panhandle received $5.3 million in take-or-pay relief in 1984, and $46 million in 1985, for a total of $51.3 million, as a result of transporting on-system gas under the MAT program Guidelines. Panhandle received approximately $27 million in take-or-pay relief in 1986 under "grandfathered" MAT transports and new Section 311 transports that utilized on-system supplies. There were no matches of gas under the bid-out for which Panhandle did not get take-or-pay relief.

Within six months of its issuance of Order 436, FERC issued over 90 "clarifications" in response to industry and consumer uncertainty regarding the meaning of the Order. Initially, the Order had given pipelines until December 15, 1985 to elect whether to participate under it. The FERC later "clarified" the fact that transportation under Section 311 was allowed on an interim basis without triggering LDC contract demand reductions. It became obvious that December 15 was an unreasonable date, so the FERC extended that date until February 15, 1986, and then until July, 1 1986. It was further extended for some pipelines until December 31, 1986 and later yet until May 1, 1987.

TKL, which had very few captive customers and therefore was not concerned about becoming a *de facto* 436 carrier, began interim Section 311 transportation almost immediately. TKL did so because ANR had commenced interim transportation outside of its own market areas, and Consumers Power Company, TKL's one remaining major customer, was contemplating using this service. TKL believed the adverse implications of this occurring at that time would be very severe. (Bray 5619–5620). Panhandle did not begin interim Section 311 transportation immediately, because it feared that interim transportation would commit it to the open access provisions of Order 436, and thus commit it to begin transporting even to its captive G customers.

Instead of immediately joining FERC's interim 311 program so that its end-users could continue to obtain their off-system gas without interruption, Panhandle shut down its MAT Transportation Program and advised its end-users to apply for Section 7(c) transportation certificates. Not only were these certificates costly ($12,000 apiece, to be paid by the end-user), but

Panhandle's encouragement of the end-users was substantially a sham. In February 1986, when Panhandle filed for the certificates, it knew that it would normally take at least six months to secure them from FERC, but the certificates filed by Panhandle were to terminate on June 30, 1986. Thus, the certificates would have expired at about the same time they were finally approved. One Panhandle official, G.J. Rizzo, commented that this strategy was "essentially holding our ability to provide 7(c) transportation service hostage." Rizzo recommended that all new requests for 7(c) certificates be given a two year term. Panhandle was not swayed. The Company's position, as expressed by Michael Bray, was "no end-user transport. Keep pressure on LDC's to maintain load." (PX 770) No two year certificates were offered.

By February of 1986, even one of Panhandle's own officers was urging that the company begin interim § 311 shipments. Richard Pemberton complained that because sales to LS customers were virtually zero, Panhandle should at least recommence transporting to them. Thus, Panhandle decided to take the plunge.

Panhandle began an intensive effort in January of 1986 to structure a program for operation under Order 436 that took into consideration the circumstances of Panhandle and its customers. Panhandle had a number of meetings with customers regarding its proposals for operating under Order No. 436 from January through June, 1986. (Bray 562). Panhandle proposed a completely new form of tariff to its customers in March, 1986. This proposal called for elimination of Panhandle's G and LS tariffs and replaced them with a single tariff and rate schedule in which customers would be allowed to establish an interrelated Winter and Summer Contract Demand. (Bray 5623–5625). Panhandle's customers did not find this proposal acceptable.

Panhandle presented a second tariff proposal to customers for operation under Order No. 436 in April and May of 1986. (Kelley 6111; PX 439; PX 915; DX 917). This proposal asserted Panhandle's willing-ness, based on the comments received from customers, to phase in Panhandle's original proposal presented in March 1986. The first phase would run from October 1, 1986, to September 30, 1988, and the second phase would run from October 1, 1988, to September 1990. The second proposal included a direct billing mechanism for take-or-pay settlement amounts.

During the first phase, G customers would be permitted to purchase a portion of their requirements from parties other than Panhandle. The proposal included a ratchet in Panhandle's obligation to serve LS customers based on volumes purchased in a prior time period, and it provided for crediting of transport volumes against the minimum bill. The proposal contained an express feature that there would be no cost shifting among classes of customers during the first phase of the program. (Kelley 6113–6114).

Many of Panhandle's customers notified Panhandle that it was appropriate for them to bear some portion of Panhandle's take-or-pay costs, but they expressed many differing views as to how that should be done. Panhandle's partial requirements customers expressed continued objection to the ratchet feature. By June of 1986, Panhandle and its customers were unable to agree on the terms of Panhandle's second new tariff proposal. (Kelley 6112–6118). Panhandle then suggested to the customers in meetings in June 1986 that they attempt to work out a proposal which would only address the first phase, which was the time period until most of Panhandle's major service agreements would expire in September 1988. Panhandle then filed its Order 436 certificate request in late June of 1986. (Kelley 6118–6119).

Panhandle believed that the new tariff proposals it submitted to customers in March and May of 1986 were consistent with Order No. 436. Panhandle's May 1986 proposal contained provisions regarding contract demand reduction which differed from those set out in Order No. 436, but these provisions were based on an interpretation of what the FERC's intent was in Order No. 436 and were not inconsistent

with that Order. The FERC had approved Order No. 436 proposals of other pipelines which contained provisions that differed from those set out in the Order itself. (Kelley 6129). When Panhandle made its new tariff proposals in March, April, May, and June of 1986, it was willing to negotiate changes in those proposals with customers; it so advised its customers, and it attempted to do so.

Panhandle's Order No. 436 certificate application proposed a direct billing mechanism for take-or-pay settlement payments. It also provided for a 10% optional reduction or conversion in sales Contract Demand by customers over two years. The proposal did not alter Panhandle's G and LS tariffs. It provided that if a G customer wished to convert 10% of its sales Contract Demand to firm transportation Contract Demand or to transport gas for system supply on an interruptible basis, the customer must execute an LS service agreement. (Bray 5628–5630, 5635–5637).

CILCO sent notice to Panhandle on August 14, 1986 that CILCO would request a 10% reduction of its Contract Demand with Panhandle in accordance with Panhandle's Order 436 filing. (DX 999C). Jim Vergon discussed this action in an internal CILCO memorandum dated August 12, 1986. (DX 999C). Vergon noted that CILCO reduced its CD by 10% as a result of the settlement of the 1982 Panhandle rate case; CILCO thus saved its customers $1.3 million, even after incurring an additional $200,000 in carrying costs on additional storage. Vergon further stated:

> The objective in considering another reduction in contract demand with Panhandle is to determine if by doing so we can further minimize the cost of gas supply to our customers without unduly undermining or sacrificing security of supply. It is interesting to note that even though our combined sales and transportation service volumes have fallen from approximately 59 Bcf in 1982 to 39 Bcf in 1985, our peak day requirements have changed little falling from 443,000 MCF in 1982 to

our current projection of 426,000 MCF based on a 1982 peak day send out. (DX 999C).

Before committing itself to interim 311 transport, Panhandle contacted its G and SG customers by letter and telephone in March and early April, 1986, and demanded their express assurances that, if Panhandle adopted an interim Section 311 program for industrial end-users, the LDC's would not request Panhandle to transport independent gas for their system supply. (Vergon 3004: PX 422; PX 433; PX 430).

Further, Panhandle informed them that if *any* G or SG LDC violated this condition, the interim Section 311 program would be promptly terminated for all. (Vergon 3007–3009). When making this demand, Panhandle was aware that the FERC intended for interim 311 transportation to be offered to LDC's as well as industrial end-users. (Kelley 6322–6234, 6238–6239).

Objections were voiced by certain of the LDC's including CILCO that the interim Section 311 program was intended for LDC system supply as well as industrial end-users and that the condition imposed by Panhandle violated the non-discriminatory requirements of the program. (Vergon 3006–3007). Nevertheless, all G and SG customers eventually capitulated and agreed to the restriction in order to get cheaper gas flowing to at least their industrial customers, who they feared would switch to other fuels. (Vergon 3009–3010; PX 423; PX 430; PX 432; PX 433; PX 799; PX 802; PX 805; PX 807).

As summarized in an April 11, 1986, internal Panhandle memorandum from R.D. Pemberton to D.B. Kelley, "[a]ll G customers have agreed to refrain from transporting for system supply...." (PX 433). Ten days later, on April 21, 1986, Panhandle announced that it would provide interim Section 311 transportation. (PX 819).

When a media spokesman for Panhandle was contacted by an industry reporter the following month, on May 8, 1986, and was asked whether Panhandle had imposed LDC restrictions as a condition to "opening up to 311 transport," he responded that "such an idea was nonsense" and that

"Panhandle would be stupid for inviting litigation in such a fashion." (PX 876).

Panhandle did not impose similar restrictions on its non-captive partial requirements LDC'S respecting their use of interim Section 311 program. (Vergon 3010). Panhandle provided interim 311 transportation in 1986 for two of its largest LS customers, Michigan Consolidated and East Ohio Gas, while providing no transport for captive G and SG customers. (DX 1420).

On June 23, 1987, in the case of *Associated Gas Distributors v. FERC*, 824 F.2d 981 (D.C.Cir.1987) ("*AGD*"), the court sent Order 436 back to FERC with directions to factor the take-or-pay problem into the equation of change in regulations and also to rectify some procedural problems regarding the contract demand reduction formula.

It is noteworthy that in the *AGD* case the court clearly found that FERC had the power to order an open access commitment on any pipeline which either secured a blanket certificate to provide gas transportation (7(c) of the NGA, 15 U.S.C. 717f (1982)), or actually provided transportation under § 311 of the NGPA (15 U.S.C. 3371 (1982)). The pipelines had argued that imposing such conditions went beyond the scope of FERC's authority. 824 F.2d at 997–1007.

The *AGD* case also upheld in principle the allowance of various types of discounting, including "value-of-service" discounting depending on differing demand characteristics. *Id.* at 1010, 1012.

On August 7, 1987, the FERC, in response to *AGD*, promulgated Order 500 (Interim Rule and Statement of Policy, Docket No. RM 87–34–000). Order No. 500 re-adopted the regulations originally contained in Order No. 436, and made four modifications:

(1) in order to permit pipelines to minimize the incurrence of take-or-pay liability because of open access transportation ... a producer must offer to credit gas transported by a pipeline against that pipeline's take-or-pay liability to a producer accruing under certain pre-June 23, 1987 gas purchase contracts;

(2) in order to provide for equitable sharing, between pipelines and their customers, of the costs of settling already accrued take-or-pay obligations and reforming existing contracts, the Commission adopts a policy as to the acceptable mechanisms for the passthrough of take-or-pay buyout and buydown costs;

(3) in order to avoid the future recurrence of the kind of take-or-pay problems that exist today, the Commission adopts principles on which pipelines may base future gas supply charges; and

(4) while the Commission compiles a record to justify contract demand reductions the Commission eliminates the contract demand reduction option in former § 284.10(c) of its regulations but in order to maintain some meaningful access to transportation for sales customers, the Commission retains the contract conversion option in former § 284.10(d) of its regulations.

On October 16, 1989, the United States Court of Appeals for the District of Columbia in the case of *American Gas Association v. FERC*, ("*AGS*"), 888 F.2d 136 (D.C. Cir.1989), ruled that "... the interim rule does not comply with the mandate in *AGD*. Therefore, we retain jurisdiction of this matter and remand the record for the Commission to issue a final rule within 60 days." *AGS*, 888 F.2d at 142.

The Court expressed several concerns about both the substance of Order No. 500 and the justification for certain provisions. The holding is succinctly summarized as follows:

The AGD mandate was straight forward: it required that the Commission give a reasonable explanation for its decision to act or not to act in particular ways. We instructed the Commission either to take steps to address the take-or-pay problem, explaining the reasoning behind the mechanism it chose and the reasons for preferring that mechanism over others, or to justify its decision not to take those steps. Nonetheless, during the two years since we decided AGD, the Commission has not done so; it has failed to engage in reasoned decision-making, ei-

ther in promulgating an interim rule in Order No. 500, or by issuing a final rule. *AGS*, at 147.

In terms of this litigation, Order No. 500 constitutes the latest chapter in the unfolding revolutionary changes occurring in the natural gas industry beginning with the passage of the NGPA in 1978, through the chaos of the middle 1980's (especially 1983 to 1987).

### F. *NGPL And ANR Interconnection With CILCO*

At the time that this lawsuit was filed, Panhandle was the only pipeline connected to CILCO's Peoria/Springfield service area. However, as early as CILCO's 1981 proposal to buy gas from NGPL, it was able to interconnect with another pipeline. In October 1983, NGPL filed an application with the FERC seeking a Section 7(c) certificate authorizing construction of interconnection facilities with CILCO. The application stated that the purpose of the proposed facilities was to furnish gas for "CILCO's system supply in the event of an emergency or for other lawful purposes." In 1984, the FERC approved construction of the interconnection but, in accordance with the application, limited NGPL's use of the interconnection to "emergencies."

In October 1983, when NGPL filed its Section 7(c) petition to build and use an interconnect to serve CILCO, it may also have had the ability to proceed on a self-implementing basis under Section 311 or its blanket certificate to build an interconnect and provide transportation for CILCO's system supply. Since this was a self-implementing transaction, unless a limitation was subsequently imposed on the use of such an interconnect, it was, or could arguably have been, a direct competitive threat to Panhandle sales.

In February 1984, the Illinois Commerce Commission ("ICC") approved CILCO's request to construct a pipeline approximately 23 miles long from Henry, Illinois to Princeton, Illinois to interconnect with NGPL. CILCO delayed its pipeline construction and interconnection with NGPL until November 1985. CILCO chose an initial interconnect capacity for this pipeline of 60 MMcf per day, although the actual capacity of the pipeline is at least 180 MMcf per day. The actual capacity can be increased by building another parallel pipeline.

On January 10, 1986, NGPL filed an application with the FERC under Section 7(c), seeking to expand the use of its interconnection to include end-user transportation, specifically for Caterpillar Tractor Company. In September 1986, the application was granted only as to Caterpillar. An earlier and broader authorization might have been granted if it had been requested.

On December 1, 1986, NGPL, on a self-implementing basis under Section 311 or blanket certificate authority, completed a separate duplicate interconnection with CILCO, through which NGPL has provided transportation services to CILCO's customers. NGPL chose a design capacity for this interconnect of 180 MMcf per day. Archer Daniels Midland, Keystone Wire & Steel, Pekin Energy, Quaker Oats, and B.F. Goodrich, in addition to Caterpillar, were as of the end of this trial receiving transportation services from NGPL. Caterpillar has had the gas transported pursuant to Section 7(c), and the others pursuant to Section 311.

As of the time of trial, ANR had constructed, or was in the process of constructing, an interconnect with CILCO at approximately the same point as the NGPL interconnection at Princeton, Illinois. Construction was scheduled to be completed in December 1986 or January 1987. ANR chose a design capacity for this interconnect in the range of 150 to 200 MMcf per day. ANR, at the time of trial, had a transportation agreement with Archer Daniels Midland Co.

Approximately 55% of CILCO's total market system, that part located north of Pekin, Illinois, is or will be capable of receiving gas transported over either ANR or NGPL through these interconnections. The Springfield service area, representing approximately 40% of CILCO's total service area, will not be capable of being served by the NGPL or ANR interconnections at

Princeton, Illinois. However, NGPL has proposed to build an interconnection between its Gulf coast line and CILCO's system to serve the Springfield service area; NGPL estimated that the pipeline, with a capacity of 100 MMcf a day, would cost approximately $20 to $21 million. Moreover, studies performed by CILCO during the 1970's suggested that the Peoria market area could be connected to the Springfield market area at a cost of about $20 to $25 million. Authorization to construct any of these facilities might have been obtained at any time if requested.

Immediately following the FERC's directive eliminating the sole supplier provision from the G tariff, CILCO began purchasing gas and physically transporting it to Peoria through NGPL's Section 311 interconnection. The impediment or restriction on CILCO's receipt of system supply gas through NGPL's Section 311 interconnect and ANR's Section 311 interconnect was its desire to continue doing business with Panhandle under the G tariff. Prior to the issuance of FERC Opinion No. 265 on February 20, 1987, CILCO had not requested transportation of system supply gas over NGPL's or ANR's pipeline because of its concern that the FERC would not modify the G tariff to permit the purchase of such gas and remain on that tariff. That is, CILCO wished to be supported by a FERC opinion or order before proceeding to request such transportation.

At the time of trial, NGPL had not requested and did not have authority from the FERC to sell gas to CILCO for its system supply through the two interconnection at Princeton, Illinois. Such authorization would have to be received through FERC certificate proceeding. In January 1985, the FERC (in NGPL's "load growth" proceeding, C–82–355), expressly rejected CILCO's request to increase its entitlements from NGPL by 25,000 MMcf per day.

G. *CILCO'S Rates, Tariffs*

During the 1970's and early 1980's, Panhandle's prices were among the lowest pipeline prices in the Midwest. However, Panhandle's commodity rate to CILCO reached an all-time high in March 1983, primarily as a result of the start of higher-priced Canadian gas and LNG deliveries into Panhandle's system. Thereafter, Panhandle's prices gradually declined as it reduced its gas costs in response to competition. The cost of Panhandle gas reached 85% of CILCO's burner tip price in 1983, but accounted for only approximately 65% in 1986.

CILCO's rates are designed to recover both its fixed and variable costs and to earn its authorized rate of return on the assumption that a certain sales level is achieved. CILCO representatives have testified that it is very important to CILCO to be allowed to earn its authorized rate of return. As of the time of trial, CILCO was authorized by the ICC to earn a return of 11.6% on its rate base of $142 million.

CILCO charged different rates for its customer classes because of load pattern differences, the difference in reliability of service (that is, firm or interruptible), social acceptability of the rates; and the difference in the cost of providing the service to each class. CILCO charged more for firm service because it cost CILCO more money to assure the firm sale customer that the service and product would be available whenever the customer needs them. This is true despite the fact that CILCO had no take-or-pay obligation (i.e., no minimum commodity bill) under its contract with Panhandle.

H. *Take-or-Pay*

"Take-or-pay exposure" is a pipeline's estimate of the dollar amount it would have to pay, subject to its success in asserting various legal defenses, if it fails to purchase the volumes specified in its gas purchase contract. The exposure is calculated by multiplying the difference between volumes that it was obligated to purchase and those it actually purchased by the contract prices.

Pipelines incur take-or-pay exposure when they fail to take the volume of gas called for in their gas purchase contracts and may be called on to pay for the difference between what they take and the con-

tract level. Take-or-pay exposure is exacerbated when the pipelines' customers reduce their purchases from the pipelines, either because of transportation or because the customers' needs have decreased. The take-or-pay exposure problem in the natural gas industry is complicated by the competing rights and interests of the procedures, the pipelines, and the pipelines' customers.

"Deliverability" is the ability of a well to produce gas into a pipeline under a certain set of conditions that are defined in the contract. Deliverabilities are determined by actually testing flow of the wells. A typical take-or-pay contract based on deliverability would require that a pipeline take 80% of the well's deliverability over a period of a year. If the pipeline failed to buy 80% of the deliverability, it must pay the difference. Deliverabilities go down as the well depletes; therefore, there may be some disagreement with a producer on the level of deliverability during a particular test period. The differences between a pipeline and a producer are reconciled in negotiating the take-or-pay liability under the contract.

TKL's take-or-pay exposure for the period 1982 through 1986 was estimated to be $2.86 billion. Panhandle's take-or-pay exposure for the same period was estimated to be $1.299 billion. For the period 1982 through 1986, TKL paid $25 million and Panhandle paid $87 million in "straight" take-or-pay payments, that is, payment of 100% of that take-or-pay liability. In addition, in the same period, TKL paid $252 million to settle an additional $2.138 billion in take-or-pay exposure, and Panhandle paid $13 million to settle an additional $188 million in take-or-pay exposure. The remaining take-or-pay exposure for the 1982 to 1986 period was $699.2 million for TKL and $1.024 billion for Panhandle. Most of the take-or-pay settlements for TKL and Panhandle in 1983 and 1984 were approximately ten cents on the dollar.

Notwithstanding everything Panhandle has had to say about the severe impact of take-or-pay during this lawsuit, its own internal documents and its public filings with the Securities and Exchange Commission paint a somewhat different picture. After stating that Panhandle and TKL "could" incur take-or-pay obligations of up to $100 million and $960 million respectively for 1983–1984, Panhandle's Form 10K for 1982 concludes:

> The actual take or pay obligations which will be incurred by PEPL and Trunkline will be dependent upon a number of factors, including sales levels and the success of remedial efforts under way or yet to be initiated. Management is confident that these remedial efforts will bring this matter to a satisfactory posture during the 1983–1984 period and that actual take-or-pay payments required of PEPL and Trunkline will be substantially less than those indicated above.

(PX 502).

In its 1983 Form 10K Panhandle stated that "approximately 73 percent of [take-or-pay] exposure relates to Trunkline." Panhandle represented that:

> Commercial and other conditions surrounding the domestic gas purchase problem provide reasons to believe that [take-or-pay] can be reduced to manageable proportions.

Referring specifically to "the uncertainty" surrounding take-or-pay, Panhandle disclosed also that "no accruals with respect to unpaid potential obligations for gas not taken under domestic gas purchase agreements in 1983 were made in the financial statements for the year ended December 31, 1983." (PX 503).

In its 1984 Form 10K Panhandle stated: "PEPL and Trunkline believe that significant legal questions exist both as to the enforceability of take-or-pay provisions and the level of damages payable if such provisions are ultimately found to be enforceable." It predicted: "Based upon the significant substantial progress made in 1984, the Company believes that the ongoing negotiations with producers will be successful in obtaining additional [take-or-pay] settlements." It disclosed also that it was *still* not making any accruals for take-or-pay on its financial statements. (PX 504).

In its 1985 Form 10K Panhandle stated that although "significant potential expo-

sure" remains, "the Company believes that taking into account all of the circumstances the problem of take-or-pay exposure under domestic gas purchase agreements will continue to be manageable." (PX 505). It disclosed also that it was *still* not making any accruals for take-or-pay on its financial statements. (PX 505).

With respect to actual take-or-pay payments made by both Panhandle and TKL, Panhandle stated in its 1984 and 1985 Form 10K's that prepayments had been made in only "a limited number of cases" and that: "It is the opinion of the Company that in virtually all of these cases, these amounts can be recovered in the form of future gas production or in cash." (PX 504; PX 505).

With respect to the carrying costs for prepayments actually made and settlements paid out by Panhandle and TKL, Panhandle in its 1985 Form 10K disclosed that such costs were being passed through to its customers:

> The cost of service in the pending PEPL general rate filing, referred to under "PEPL Base Rates," includes a five-year amortization of amounts paid to producers, as of May 31, 1985, to settle take-or-pay claims. The settlement amount reflected in the rate filing is $1.1 Million annually. This filing is subject to possible refund.
> The Trunkline settlement agreement, referred to under "Trunkline Base Rates," provides for recovery, commencing March 1, 1985, of approximately 20 percent ($33 Million) annually of the Trunkline settlement amounts which were paid as of January 31, 1985. Approximately $28 Million was recovered in 1985 under the approved Trunkline rate settlement. The carrying costs relating to Trunkline prepayments are being recovered under a provision of an approved rate settlement. Carrying costs related to $32 Million of the PEPL amount are included in the cost of service in the pending rate filing, which is subject to possible refund.

(PX 505).

As a consequence of all of the above, Panhandle did not absorb a single dollar of gas-associated take-or-pay costs, but was recovering all such costs from its customers. (Bray 5670–5671; Lasseter dep. 94–6).

Panhandle's Legal Department directed Panhandle personnel to refer to "exposure" rather than "liability" when discussing take-or-pay. (Dixon 5965). Take-or-pay is not a liability "until it is claimed by the producer and the producer's position on the level of that claim is confirmed." (Dixon 5966).

Consistent with this, in a November 29, 1983, Panhandle internal memorandum, Panhandle's Controller observed:

> a) The accrual of take or pay liability, and an offsetting prepurchased gas asset, in amounts to be calculated by reference only to the Company's contracts, *could significantly misstate the take or pay situation which will actually confront the Company as the matter develops. In particular, a significant level of producer forbearance is anticipated.* This anticipation is supported by reference to experience in respect to 1982 take or pay and to contracts with various major producers, indicating anything from general reluctance to enforce take or pay to a firm decision not to do so. In the present state of affairs, the Company is not able to estimate the dollar range of forbearance which should be anticipated.
> b) Also, the Company believes that significant legal questions exist as to the enforceability of take or pay provisions, and assumes that similar questions enter into producer decisions on the topic. Furthermore, the Company has taken steps with producers, at the FERC and in its market place with the design of significantly reducing its ultimate take or pay outlays.

(PX 265, emphasis added).

The memorandum concluded that Panhandle would *not* book take-or-pay as a liability:

> In summary, the accumulation of all these factors introduces a degree of uncertainty a to whether take or pay payments will be made, their amount and

their timing. This uncertainty is of such a degree as to render impossible the accrual of any particular liability and offsetting asset ... Likewise, the degree to which an amount can be estimated with reasonable reliability is extremely low to nonexistent.

(PX 265).

Similarly, a Panhandle internal memorandum reflects that Panhandle's outside independent auditor, Peat Marwick, had advised that take-or-pay should not be booked as a liability unless a producer had actually invoiced Panhandle. (PX 625). Only a few of Panhandle's 3,000 on-system producers have actually invoiced Panhandle for take-or-pay and even fewer have initiated litigation over take-or-pay. (Dixon 5958; PX 661).

Panhandle's testimony at trial concerned projections of take-or-pay "exposure" and not "liability." (Dixon 5838–5852). Panhandle itself has referred to take-or-pay as "the legal justification for refusing to transport off-system supplies unconditionally." (PX 97).

Panhandle's LS customers were able to avoid the deferred account surcharge and take-or-pay costs included in Panhandle's sales rates by drastically cutting back on their purchases of Panhandle gas. Panhandle's captive G and SG customers, however, were not able to cut back their purchases of Panhandle gas. As a result, while the G and SG customers accounted for only 57% of Panhandle's gas sales as of 1980, by 1986, with the almost total abandonment of Panhandle by its LS customers, G and SG customers accounted for fully 95% of Panhandle's gas sales. (Means 3315–16; PX 1027–A).

TKL has been more successful than Panhandle in settling take-or-pay exposure because TKL's suppliers are major oil companies or large independent producers who have very substantial financial resources and an understanding of the pipeline's dilemma and are willing to negotiate settlements. By contrast, Panhandle's suppliers consist of many small independent producers, some of whom are not as sophisticated as the major oil companies, and most of whom are without the same financial staying power as the major producers.

"Recoupment" means that the pipeline has a period of time, usually five years, to take the gas for which the take-or-pay payment was a pre-payment. Under some contracts, if, at the end of that period, not enough gas has been taken to offset the prepayment, the producer pays back the deficiency in dollars. The $13 million paid by Panhandle to settle take-or-pay exposure did not include recoupment rights. A portion of the $87.3 million paid by Panhandle in straight take-or-pay payments is subject to recoupment rights.

Panhandle and a producer usually disagreed on the take-or-pay liability under a contract. The producer was interested in getting the take-or-pay bill as high as possible. There were many areas for disagreement on liability under a take-or-pay contract, such as deficiencies in deliveries, *force majeure*, and level of well deliverability. The differences between Panhandle and the producer were reconciled in many cases by negotiating the take-or-pay liability under the contract. Usually, a producer would not send a take-or-pay bill or invoice to Panhandle, since it was hesitant to tip its hand as to what level of take-or-pay it thought was due. Panhandle's estimate might show that Panhandle owed it more than it had estimated; perhaps its estimate was in error. Generally the parties would get together and try to agree on the deficiency under the contract, or the takes, for the period involved. The negotiations usually commenced within 30 or 60 days following the end of the contract year.

There were approximately 1,000 producers with several thousand contracts on the Panhandle system. The end of the contract year for the different supply contracts varied and was spread throughout the year. While several producers had not, as of the time of trial, pressed take-or-pay claims, Panhandle was involved in lawsuits with approximately ten different producers who were pressing damage claims approximating $20 million. The lawsuits first started to be filed in late 1984 or during 1985.

It appears that the real impact of take-or-pay on Panhandle, as of the time of trial, was considerably less than the amount of take-or-pay exposure might indicate. However, as of the time of trial, a tremendous amount of take-or-pay exposure remained, with no guarantees that Panhandle would settle all claims at a rate of 10¢ on the dollar, and no way of knowing how the FERC would ultimately deal with the take-or-pay matter in a way acceptable to the Court of Appeals for the District of Columbia.

### I. *The Proprietary Claim*

In January 1983, the Illinois Commerce Commission ("ICC"), through Phillip O'Connor, its new Chairman, decided to become more active and to criticize and blame Panhandle for the increase in natural gas prices due to costly Algerian LNG. The ICC staff decided to begin an effort to "scream bloody murder." This campaign was undertaken even though the ICC had supported the Algerian LNG project in the 1970's.

In September 1983, the Illinois Department of Central Management Services ("CMS"), at O'Connor's request, surveyed state institutions to determine which institutions purchased natural gas from CILCO, CIPS, and IP. The ICC staff made the decision to limit the survey to CILCO, CIPS, and IP, which were LDC's served by Panhandle.

At the same time, Gerald Keenan, Manager of ICC's Consumer Affairs Division, contacted various natural gas producers. He learned that the State would need to purchase at least 750 to 1,000 Mcf/day of gas to interest producers in dealing with the State. This amounts to 274,000 to 365,-000 Mcf/year. He also learned that some producers would only deal in quantities greater than 1,500 Mcf/day.

On November 30, 1983, Gary L. Hunt, Manager of ICC's Public Utilities Division, wrote a letter to Langenkamp, requesting Panhandle to transport 1,400 Mcf/day of gas from Xena Energy commencing on December 12, 1983, and continuing through and including April 15, 1984. Of the seven state institutional customers named in Paragraph 13 of the Second Amended Complaint, only three—the State Capitol complex (i.e., Office of the Secretary of State), McFarland Zone Center and Adolph Meyer Zone Center—were named in the November 30 letter as the intended end-users of natural gas. The letter requested transportation at the rate set forth in Panhandle's Added Incentive Charge ("AIC") tariff. At this time, Panhandle's AIC tariff had only been filed; it was not conditionally approved until December 2, 1983, and the program of which it was a part was later repealed by the FERC as a failed experiment.

After the November 30, 1983 letter had been mailed, the ICC staff learned that the State Capitol Complex would not need natural gas. The Secretary of State's license facility in Springfield, Illinois, was substituted although it did not use as much natural gas as anticipated for the Capitol Complex. To obtain the additional requisite purchase volume, Hunt, in early December, contacted Richard Poorman, President of Lincoln Land Community College, and Alex B. Lacy, President of Sangamon State University, to request that these institutions participate in the pooling arrangement. On December 19, 1983, Hunt presented the proposal to the Board of Trustees of Lincoln Land Community College.

On December 1, 1983, Langenkamp telephoned Hunt and told him Panhandle would transport the gas pursuant to the Transportation Guidelines. He explained the Guidelines and told Hunt that they were intended to help solve Panhandle's take-or-pay exposure. Langenkamp followed up on the telephone call by sending a copy of the Guidelines to Hunt on December 5, 1983.

Thereafter, in December 1983, the ICC staff prepared a draft letter to Panhandle providing the necessary information for the bid-out procedure under the Transportation Guidelines. That letter was never sent because O'Connor had concluded that the Guidelines violated antitrust laws. O'Connor made that decision even though he

knew that would result in the State institutions not receiving cheaper natural gas and would cost the taxpayers money.

When the seven state institutions involved in the State's proprietary claims refused to acquiesce to the bid-out and other conditions of the Guidelines, their transportation request was refused. (Reed 4921). It would appear that, had the State institutions submitted their proposal to the bid-out, they would have received the gas at the price they sought.

On January 3, 1984, Hunt telephoned Langenkamp and told him the State would not follow the Guidelines. Langenkamp again informed Hunt that the Guidelines were intended to help relieve take-or-pay exposure and that such relief would benefit all customers. Hunt stated that he would check with the State agencies to determine their preferences, but he never did so.

Hunt followed up the telephone call with a letter to Langenkamp dated January 4, 1984. He stated that the State's objection was based on a belief that the bid-out procedure caused delays, was inconsistent with FERC's blanket certificate program, and was likely to suppress open competition. Subsequently, this lawsuit was filed.

## FINDINGS OF FACT

### COUNTS I AND II

#### Monopolization

A. *The relevant product market is the sale of natural gas to G and SG LDC's for system supply, plus alternate fuels and energy conservation, with a submarket of the indirect sale of natural gas to residential/commercial customers, plus alternate fuels and energy conservation.*

■ Because of the manner in which gas costs automatically flow through LDC's to the ultimate end-use customers, the LDC is—with respect to gas costs—essentially in the nature of a purchasing agent on behalf of the ultimate end-user customer. The LDC's demand is a derived demand, reflecting the demand characteristics of final consumers of natural gas. (Carpenter 7244–7245; Tussing 3727; Vergon 2839).

As a consequence, when identifying the relevant product market, it is appropriate not only to look at Panhandle's immediate customers, LDC's and direct-buying end-users but also to consider the demand characteristics of the ultimate end-use consumers to whom the LDC markets gas. Of course, one must also look at the products with which natural gas competes.

Panhandle's position that the sale of gas to LDC's does not constitute a relevant market depends entirely on its assertion that spot market gas was available to LDC's. During the relevant time period, however, spot market gas was not available to Panhandle's G and SG customers in the Central Illinois Market.

The LDC customers to which Panhandle sold gas for system supply did not make up a homogeneous group; rather, they fell into two broad market segments characterized by significantly different demand characteristics. (Means 3310–3315; Stillman 3999–4000; Tussing 3587, 3702; PX 823; PX 261; PX 930).

One segment consisted of so-called General Service ("G") and Small General Service ("SG") LDC customers. (Means 3310–3311; Tussing 3587, 3702, 3800). These customers accounted for 57% of total gas sales by Panhandle as of 1980. (PX 1027-A). By 1986, sales to other Panhandle customers had declined to such an extent that sales to G and SG customers accounted for approximately 95% of total Panhandle gas sales. (Means 3315–3316; PX 1027-A). All LDC's in Central Illinois were G or SG customers of Panhandle. (PX 1006).

The second segment of Panhandle LDC customers consisted of "partial requirements" customers who purchased gas from Panhandle under one of any of the following tariffs: LS, CS or SS. (PX 523; PX 1006). These customers were physically connected to other pipeline systems, and their tariff-contract arrangements with Panhandle made it economically feasible for them to purchase gas from other suppliers, (Means 3310–3315; Tussing 3624;

4227–4228), at least after the entry of Order No. 380 in 1984.

As of 1980, partial requirements customers accounted for 43% of total Panhandle gas sales. (PX 1027–a). By the end of 1986, the percentage of total Panhandle sales accounted for by this group had declined to only 5%. (Means 3315–3316; PX 1027–A).

Internal Panhandle documents recognized the distinction between the G customers and LS customers. For example, a May 7, 1986 memorandum from Panhandle's R.D. Pemberton to D.B. Kelley provides: "The system supply market can be broken down to our pipeline's solely supplied LDC's and the pipeline's partial requirements customers." It notes further that "[i]f our pipeline prices are uncompetitive with fuel oil, spot market and other pipeline rates, the only sales we will make will be to our solely supplied LDC's for their residential and small commercial customers." (PX 823).

Thus initially, the product market must be narrowed to exclude direct sales to LDC's not purchasing pursuant to a G or SG tariff. Even within this narrowed market, however, are two discrete groups of end-use customers possessing significantly different demand characteristics: (a) residential and small commercial end-use customers with limited ability to switch to other fuels, and (b) industrial end-use customers with significantly greater actual or potential fuel-switching capability. (Rana dep. 60–1; Stillman 501; Tussing 3585, 3618; Vergon 2838–2841, 2926–2948; 3003; PX 378).

Panhandle officers acknowledged at trial the distinction between residential/commercial end-users and industrial end-users. For example, Panhandle's Langenkamp testified that the Panhandle PanMark and MAT programs were specially structured for industrial end-users, since these were the customers that Panhandle's LDC customers feared losing. (Langenkamp 1417). Similarly, Panhandle's D.B. Kelley drew a distinction between residential/commercial end-users and fuel-switchable industrial end-users (Kelley 6166–6167), as did Panhandle's J.T. Kennedy. (Kennedy 5357). Industrial and large commercial end-users constituted the marginal demand Panhandle faced (DX 37.5, 37.34, 38.8, 38.17) in its broad market, but in the more narrow market of G and SG system supply the residential/commercial customers constituted the marginal demand.

Panhandle's expert witness Dr. Carpenter similarly acknowledged the distinction between residential/commercial and industrial end-users. He described the Panhandle special marketing program, PanMark, as providing "selective price cuts to certain classes of customers—those that have the most sensitive demands" (Carpenter 1654), and conceded that when Panhandle's sales fell off after 1982, elastic demand customers were the ones who stopped purchasing gas from Panhandle, leaving the more inelastic customers on the Panhandle system. (Carpenter 1727–1728). He further conceded that if a pipeline has the ability to discriminate against residential consumers, then the residential group does not belong in the same competitive market as industrial customers. (Carpenter 7149–7150).

Economists try to examine the elasticity of supply into the firm's markets and the elasticity of demand that the firm itself faces. Internal Panhandle documents reflect the distinction between inelastic residential/commercial end-users and elastic industrial end-users. For example, a May 7, 1986 internal Panhandle memorandum expressly distinguished the industrial "end-use market" from the LDC "system supply market." (PX 823).

Similarly, a March 14, 1984 memorandum captioned "Pipeline Renegotiation Strategy" recommended the following strategy to "improve marketability of Panhandle/Trunkline gas: 'Split pipeline to provide several separate services with different supplies and prices.'" Following this general strategy was a more specific recommendation to make "spot market" gas available to the "industrial market" while continuing to sell "average cost gas" (i.e., the costlier Panhandle gas) to the "residential market." (PX 129).

The definition of the relevant market is further shaped by the sources of competition for both supply and demand facing the pipeline in question. Because gas competes directly with alternate fuels and energy conservation products, and because the demand for gas is affected by the relative price of gas and alternate fuels, the sales of alternate fuels and of energy conservation products must be included in the definition of the relevant product market.

Energy sources other than natural gas are in direct competition with natural gas for all of the principal uses of gas by end-users (i.e., space heating, appliance fuel, industrial process use, electric power generation) and among all types of end-users (i.e., residential, commercial and industrial). These include No. 6 fuel oil, No. 2 fuel oil or distillate, electricity, propane, kerosene, wood and coal.

Many industrial end-users have in place alternate fuel capabilities which allow instantaneous switching between fuels. Others can convert to alternate fuels or install dual fuel equipment for a comparatively reasonable capital cost.

Within Central Illinois, some commercial and industrial customers have dual fuel boilers which can use either fuel oil or natural gas. For certain types of fuel oil the switchover from natural gas to fuel oil is just a matter of flipping a switch. Some end-users monitor the price of fuel oil and will switch to fuel oil when the price is cheaper than natural gas. (T. Weed 2479–2481). In February 1983, CILCO obtained prices of alternative fuels to natural gas and knew that they were in danger of losing customers to alternative fuels. (Cisel dep. 32–33; DX 1235).

In certain circumstances coal also competes with natural gas. Some Peoria schools installed coal-fired equipment in place of natural gas equipment. CILCO and Caterpillar are also fairly significant users of coal in Central Illinois. (T. Weed 2481–2482).

Although "conservation" cannot accurately be called a fuel "source," it also provided a significant "source" of competition, at least on the demand side. In particular, conservation, the only practical alternative source for residential/commercial end-users, significantly reduced demands for natural gas, as illustrated by the examples below.

Residential consumers of natural gas can reduce their use of natural gas to some extent through energy conservation. (Houvenagle dep. 64). CILCO had incentive rates to encourage the use of off-peak electricity and the new use of electricity. CILCO, CIPS and IP also had programs to encourage the use of electric heat pumps. The CILCO program applied to residential and commercial customers. (Weed 2482–2483).

Smaller commercial and residential end-users have used electric and kerosene space heaters which also allow limited instantaneous switching between fuels. These end-users can also partially convert to alternate fuels by installing electric heat pumps or oil-fired burners and by purchasing electric appliances. The utility companies which distribute gas and electric power have engaged in numerous promotional efforts and have put into effect incentive rates which demonstrate that gas and electricity are in direct competition.

Propane heaters and electric space heaters are short term alternatives for residential gas consumers. (Carpenter 1759). For example, Common Place has its offices in the Howett Street Christian Church. Because of higher gas bills, the church lowered the thermostat. Common Place made use of electric space heaters which it purchased at a price estimated at $30 per month. (Rakoff 2716, 2719–2720).

From 1983 to the time of trial, conservation efforts by residential customers decreased consumption of natural gas by approximately 3% per year. Some residential customers can afford to conserve natural gas by increasing the amount of insulation, and installing high-efficiency furnaces and appliances. (Hardy 6526; T. Weed 2478–2479). Residential customers who can't afford to make such changes only have the option of turning down the thermostat or turning it off. This drastic option is best characterized as the "heat or eat" option.

In a March 16, 1984 report entitled Technological Change and Competition in Telecommunications and Energy, the Policy Analysis and Research Division of the ICC concluded after examining a number of conservation products that:

Conservation is a substitute for energy; electric utilities "compete against energy saving measures."

(DX 351).

Thus, conservation products act just like alternate fuels as substitutes for gas. They are a limited short term constraint on a pipeline's ability to increase rates. (Carpenter 1668–1669).

Despite Panhandle's speculation about alternative fuels in the residential/commercial sector, Mr. Houvenagle of CIPS testified fuel oil, coal, electricity and propane are not viable alternatives to gas for CIPS' residential/commercial customers because they are not in a position to readily convert their heating system to an alternative fuel. (Houvenagle dep. 63).

Panhandle's own witness, James Hardy of Kokomo Gas, testified that, to the extent it faced load loss of certain industrial customers with dual fuel capability, Kokomo did not face such load loss with respect to residential customers. (Hardy 6576). Hardy testified further he was not aware of any residential customers who had converted from natural gas to electricity. (Hardy 6594).

Panhandle's Form 10K filed with the SEC for 1982 explains that "[h]igher prices for natural gas will have the greatest impact on sales volumes in the industrial sector," thus admitting the relative inelasticity of demand of residential/commercial users of natural gas. (PX 502).

Natural gas competes, but effectively so, with alternate fuels, such as fuel oil, electricity, and propane, for commercial and residential customers. Natural gas sales to residential consumers are somewhat sensitive to price; i.e., there is some price elasticity with respect to residential demand for natural gas. Residential users of natural gas have other options to using natural gas, including fuel oil, electric heat pumps, and conversion to electricity. (Lin-

demann dep. 24–26; DX 1311; McDonald dep. 27); however, with the exception of new construction or the outlay of substantial money to switch to an alternate fuel, residential users options are usually limited to various types of energy conservation.

Regarding residential/commercial consumers, natural gas as an energy source does not significantly compete with electricity, propane, fuel oil, wood or kerosene, except in the very limited situation of new construction. (Weed 2469–2471). In the case of end-users with real or potential fuel switching capability, natural gas does face serious competition from alternate fuels.

Any ability on the part of residential/commercial customers to conserve or switch fuels appears to have reached its practical limits by the end of 1983, so that, for example, during the period 1983 through 1986, the requirements of CILCO, CIPS, and Illinois Power residential space heating customers remained relatively flat. (Vergon 2926; Vergon 3128, DX 1017). However, from 1983 to the time of trial, LDC's continued to experience reductions in residential demand due to energy conservation.

CILCO and other LDC customers have no meaningful alternate fuel options, since their pipeline systems are designed to carry only natural gas. (PX 1001; PX 1003; PX 1005). CILCO's system, for example, constitutes a fixed capital investment of approximately $250 million incapable of carrying coal, fuel oils, or other fuels. (Vergon 2932–2933; PX 610).

Demand elasticity for gas in the industrial sector is substantially higher than in the residential/commercial sector, reflecting the fact that some industrial end-users can economically switch to coal, fuel oil or electricity if the cost of gas is at a supracompetitive level. (Stillman 508, 638; Tussing 802, 835). This is seen by the fact that load loss by pipelines and LDC's in response to rising gas prices after 1982 came primarily from the industrial sector. (Hughes 328; Stillman 508). Load loss experienced by Panhandle as a result of rising gas prices came from all types of end-users. But the

major loss, comparatively, came from industrial end-users.

During the period 1983 through 1985, while demand by CILCO's residential/commercial customers remained relatively constant, even in the face of high Panhandle gas prices, industrial end-users capable of using other fuels either made the conversion to other fuels or switched to transporting non-Panhandle gas over the CILCO system, causing the residential/commercial percentage of total CILCO sales to jump from approximately 70% in 1983 to nearly 90% in 1985. (Vergon 2926–2927).

The bottom line on the competition of alternative fuels with natural gas is that alternate fuels effectively compete with natural gas at the margin in the case of large commercial and industrial end-users. Some of those consumers could and did avoid Panhandle's exercise or attempted exercise of monopoly power by switching to an alternate fuel, such as coal, or No. 6 fuel oil. As to them, Panhandle was not in a position to exert monopoly power. The State agencies involved in the Plaintiff's proprietary claim are included in this category.

As to the residential/small commercial users of natural gas, the result is the opposite. As to them, alternate fuels and conservation did *not* effectively compete with natural gas. It is certainly true that, because of the use of alternate fuels (e.g., wood stoves, space heaters, etc.) and energy conservation (e.g., insulation and turning down the thermostat on the gas furnace), residential/commercial consumers did reduce their consumption of natural gas. But these savings were inherently limited in scope, and the conservation measures were often one-time measures (e.g., insulation) which could not be repeated for additional savings.

For all these reasons, the Court finds that the relevant product market is the sale of natural gas to G and SG LDC's for system supply, plus alternate fuels and energy conservation, with a submarket of the indirect sale of natural gas to residential and commercial customers, plus alternate fuels and energy conservation.

B. *The Panhandle system of G and SG LDC's is the relevant geographic market. The area designated as the "Central Illinois Market" constitutes a valid submarket.*

■ Panhandle's pipeline system consists of a series of local geographic market segments characterized by their relative access—or lack of access—to other pipeline delivery systems. An individual geographic area representing a concentration of demand along a pipeline can by itself be considered a market. But Panhandle, in dealing with its LDC customers, was obligated to utilize a particular tariff in the same way as to any LDC operating under that tariff, no matter where that LDC is located on the Panhandle system.

Panhandle's rates and the terms and conditions of its services were established on a system-wide basis. Panhandle did not charge different sales or transport rates for service under the same tariff, with the exception of the zone differentials which were part of the actual rate design approved by the FERC and were based on differences in the allocated cost of service. The experts who testified regarding relevant geographic market were essentially in agreement that, because of these features of FERC regulation, the area of effective competition in which Panhandle operated was at least as wide as its entire system.

Panhandle itself considered discrete geographic areas along its pipeline to be separate markets. In a speech given June 5, 1984, Panhandle's President K.E. Kalen presented slides analyzing Panhandle's pipeline in just this way, identifying a separate "St. Louis Market" and "Detroit Market" and isolating Columbia Gas Company and East Ohio Gas Company, two large LS customers of Panhandle with access to other supplies of gas, as separate markets. (PX 263; PX 530; PX 531).

Panhandle argues that the relevant market should be defined solely in terms of supply side considerations and not in terms of the options that were available to consumers being served in particular locations. However, an analysis disregarding the buy-

ers and focusing solely on what the sellers do would not be meaningful.

Panhandle's own expert witness, Dr. Carpenter, has written: "The dependence for transmission on pipelines could well give rise to pockets of local market power." (Carpenter 7229). He testified at deposition in this suit that "the question of the geographic market is essentially irrelevant to this case." However, he admitted at trial that determining the geographic market is an important issue in any antitrust case.

Panhandle's regulatory expert, Mr. Williams, testified that an individual geographic area representing a concentration of demand along a pipeline can by itself be considered a market. (Williams 6665–6667).

The 37 county area identified in the Stipulation of Facts as the "Central Illinois Market" is made up of a series of local LDC service areas. (Tussing 3560–3577). All of the LDC's in the Central Illinois Market purchased gas from Panhandle under the G or SG tariff. (PX 523). Each of them, therefore, were held contractually bound by virtue of Panhandle's enforcement of the "sole supplier" provision of their G and SG tariff-contract arrangements.

A particularly important common characteristic of the Central Illinois Market is that, since at least 1983, competing producers in the gas-producing regions of Oklahoma, Colorado and Texas have sought access to LDC and end-use customers located within this area, where the Panhandle pipeline system has been the only effective physical means available for delivering the gas of the competing gas producers to the LDC's and end-users. (Ballard dep. 14; Dar dep. 32–33; Kuenz dep. 13; Robinowitz 2293, 2303, 2315; Rothchild 2533; D. Wilson 2274; PX 55). This situation was common to Panhandle's entire system, as well as the service areas of many other competing pipelines in the Midwest and does not by itself establish the existence of a separate market in Central Illinois. It does, however, validate the Central Illinois Market as a legitimate submarket for analysis purposes, and it does indicate the existence of a barrier of entry into the market, no matter how the geographic market is defined.

Thus, the Court finds that the Central Illinois submarket of Panhandle's system of G and SG LDC's is the relevant geographic market.

C. *Panhandle held monopoly power over natural gas sales to LDC's for use by residential/commercial customers within the Central Illinois Market.*

Evidence at trial established that Panhandle significantly controlled access to the pipeline system, controlled the cost of gas, and was capable of segmenting the market and discriminating within the market. These facts, discussed below, lead the Court to find that Panhandle did possess monopoly power in the relevant market.

Panhandle controlled the only pipeline delivery system into all portions of the Central Illinois Market except the Peoria portion of CILCO's service area.

As to the Peoria portion of CILCO's service area, Panhandle's pipeline was the sole connected pipeline into the area until November 1985; thereafter, because of FERC limitations on the use of the NGPL interconnect and tariff-contract constraints on CILCO's purchases from other suppliers, Panhandle remained virtually the sole supplier of natural gas to CILCO. Thus, during the years from 1981 through 1986, Panhandle accounted for approximately 98% of the gas purchased by CILCO. (Vergon 2844; Stipulations 1/30/87, ¶ 23).

Panhandle's control over the exclusive pipeline delivery system into the Central Illinois Market has given it monopoly power over residential/commercial customers by virtue of its ability effectively to exclude competitive gas sales into the area. (Stillman 496–497; Tussing 3586–3587, 3806–3807). This has been made possible principally because of the barriers to entry by other pipelines, the major barrier being the regulations of the FERC and the G tariff.

The experience of LDC's within the Central Illinois Market during the period of prolonged gas shortages that existed between 1970 and 1978 showed their dependence on the Panhandle system; even though Panhandle cut back deliveries by as much as 40% during this period, the only responsive options of the LDC's were to stop connecting new customers and to curtail service to existing customers. (Samburg 48; Slone 233–234; Hardy 6590–6591).

A particularly compelling example of Panhandle's own recognition of its inherent monopoly power over LDC's (and the residential/commercial customers behind them) was a June 23, 1986 memorandum from R. Pemberton, Director of Marketing of Panhandle, to his superior D.B. Kelley, in which he discussed the ability of Panhandle to force its LDC customers to negotiate on take-or-pay and other matters by using "[t]he 'stick' " of being able "to discontinue transportation ... at any time." (PX 930).

An April 1, 1984 memorandum from Panhandle's Langenkamp to J.T. Kennedy discussed the creation of a new brokerage entity to market spot gas for delivery through the Panhandle system, but added: "End-users located behind our distributors with no means other than Panhandle or Trunkline to have gas transported to them would not be assisted by our brokerage operation since we would not elect to compete with ourselves." (PX 121).

Based upon Panhandle's market share and control over pipeline transportation of gas, Arlon Tussing, an economic and regulatory expert for the State, concluded that Panhandle had monopoly power over both transportation and sales of natural gas for system supply to each of the individual LDC service areas located within the Central Illinois Market. (Tussing 3561–3587). Dr. Tussing further concluded that, in the aggregate, the service areas of such LDC's included in the Central Illinois Market constituted an area within which Panhandle had monopoly power over gas transportation and sales. (Tussing 3576–3577).

A substantial portion of Panhandle's service area is presently interconnected, both directly and indirectly, to other interstate pipelines. This includes all of Panhandle's large partial requirements customers—MichCon, Michigan Gas Storage, East Ohio Gas Co., Columbia Gas Transmission Co.—and several of its G customers—IP, Michigan Gas Utilities Co., Southeastern Michigan Gas Co., Great River Gas Co., Ohio Gas Co., Northern Indiana Fuel and Light, Northern Indiana Public Service Co., Kokomo Gas and Fuel Co., the Quincy service area of CIPS and the Peoria service area of CILCO.

As of the time of trial several of Panhandle's large G customers had physical interconnections to other interstate pipelines or were engaged in efforts to effect such interconnections:

(1) IP was interconnected to NGPL and ANR, and NGPL had a Section 7(c) certificate to sell gas to Illinois Power Co.;

(2) Michigan Gas Utilities Co. had a physical connection to ANR;

(3) Ohio Gas Co. had a physical connection to ANR and had transported gas over that interconnection for its system supply;

(4) Great River Gas Co. in Missouri had a physical connection to ANR or NGPL in a service are contiguous to that which Panhandle served as a G customer. As of the time of trial Great River had made application to the FERC to interconnect its two service areas with the express intent of buying gas from both pipelines in both service areas;

(5) Northern Indiana Fuel and Light was interconnected to ANR;

(6) Southeastern Michigan Gas Co. was interconnected to ANR and Southeastern had transported gas over this interconnection for its system supply;

(7) Northern Indiana Public Service Co. was interconnected to several interstate pipelines;

(8) CILCO's Peoria service area was interconnected to NGPL and ANR was constructing an interconnect to that service area in late 1986;

(9) NGPL had offered to CILCO to construct an interconnect to CILCO's Springfield, Illinois service area;

(10) Citizens Gas & Coke Co. had notified Panhandle that it would interconnect with Texas Gas Transmission Co. (Kelley 6050–6052, 6059–6060, 6068–6069; DX 641).

CIPS purchased gas from six interstate pipelines: Panhandle, Texas Gas Transmission Company, Texas Eastern Transmission Company, TKL, NGPL and Midwestern Gas Transmission Company. Each supplier exclusively served a discrete service area of CIPS. (Houvenagle dep. 12–13). In the Summer of 1986 CIPS interconnected with Northern Illinois Gas to serve the Quincy area. (Houvenagle dep. 27). In 1983, CIPS identified to the ICC five potential interconnects which would serve to reduce the amount of gas purchased from Panhandle by 95%. These interconnects would be with NGPL and/or Michigan Wisconsin (ANR). (Houvenagle dep. 24–26; DX 1290).

In 1985, 54% of the volume of CIPS' service area was served exclusively by Panhandle. (Houvenagle dep. 17–18). In 1984, between 54% and 56% of CIPS gas volumes were purchased from Panhandle. In 1983, 56% to 57%, and in 1982, 71% of CIPS volumes were purchased from Panhandle. (Houvenagle dep. 19).

CIPS cannot purchase the volumes presently purchased from Panhandle from another supplier and deliver those volumes into the areas supplied exclusively by Panhandle without transporting the gas over Panhandle. (Houvenagle dep. 21–22).

CIPS has three storage facilities which it uses on winter peak days to avoid exceeding its contract demand with Panhandle. CIPS could use these storage facilities to lower its gas costs in a limited way by injecting low cost gas into storage when such gas was available. (Houvenagle dep. 33–35).

It is feasible, through existing or potential interconnects on the Panhandle system for the partial duplication of Panhandle's facilities to occur. Complete physical duplication is not necessary to achieve complete economic duplication. But under certain circumstances, complete physical duplication is possible. As of trial, Panhandle also faced some potential competition through new interconnects for sales and transports in both its G and LS service areas. This potential competition is illustrated by the following examples:

(a) Northern Border Pipeline has applied to extend their mainline facilities. (DX 1063). (Carpenter 7078–7079).

(b) The Texas Gas interconnect to Citizens Gas & Coke is greater than 30 miles and is feasible. (Carpenter 7270–7271).

(c) Midwestern Gas Transmission Co. could interconnect with part of CILCO's Tuscola service area currently served exclusively by Panhandle with the construction of a five-mile pipeline. (Vergon 3188–3192).

(d) ANR constructed an interconnect to CILCO on a self-implementing basis in late 1986. ANR currently has an agreement with Archer Daniels Midland Co. to transport gas over the interconnect.

(e) NGPL proposed to CILCO in July, 1985 construction of a new 60 mile long interconnect to CILCO's Springfield service area at a cost of $21 million. This pipeline would be capable of delivering 100 Mcf per day.

(f) The existing ANR and NGPL interconnects to CILCO are presently capable of being used to transport gas for CILCO's system supply.

(g) NGPL constructed a new interconnect with CILCO in late 1986 by using self-implementing blanket certificate authority and commenced transportation by December of 1986 for end-users on a self-implementing basis under § 311 of the NGPA. (Tussing 3758–3759).

(h) In 1986, ANR presented a proposal to CILCO which involved interconnecting with CILCO; then ANR would transport gas to industrial end-users behind CILCO. (Doyle 5173). On September 18, 1986, ANR sent Keystone a letter offering to transport gas for Keystone over the interconnect once it was completed. (DX 1444).

(i) Keystone began receiving gas it purchased from Mid–Con Marketing Corp. over NGPL in October or November, 1986. Mid–Con Marketing is a subsidi-

ary of Mid–Con Corporation, which also owns NGPL. In December, 1986, Keystone took more gas over NGPL than over Panhandle. (Doyle 5187–5188).

(j) But for the G tariff, CILCO could have, at the time of trial, purchased gas and physically transport it to Peoria over NGPL's § 311 interconnection. (Vergon 2964).

(k) The ICC granted a certificate of public convenience and necessity to CIPS on November 14, 1985, which allowed CIPS to construct pipeline to connect with a Northern Illinois Gas Company pipeline. The NIGAS line is connected to Panhandle and NGPL. (DX 1291).

None of the above examples is particularly relevant to the ability of Defendant to exercise monopoly power against the residential/commercial customer behind the LDC, however, because there was no real opportunity for the customers to avail themselves of any transportation available to an industrial end-user. Rather, Panhandle's control over the pipelines on which the residential/commercial end-users relied is virtually unaffected by any of these examples.

Monopoly power, which is the unilateral power to control prices or exclude competition, was held by Panhandle over its residential/commercial customers. However, Plaintiff has not presented any persuasive evidence that Panhandle possessed any monopoly power with respect to industrial end-users capable of using alternate fuels.

Panhandle's direct control over gas prices within the Central Illinois Market is demonstrated in part by the fact that, for a prolonged period of time, extending from early 1983 to the time of trial, Panhandle gas prices within the market remained substantially above the prices of other pipelines operating in the upper Midwest and substantially above the delivered price of spot market gas. (Farris 2936–2937; Kelley 6163; Stillman 3973; Tussing 3587, 3618, 3632; Vergon 2857–2860; PX 647; PX 1034; PX 1035; PX G; PX BB; PX GG).

One manner in which Panhandle directly affected the price of its gas, and caused that price to rise and remain above competitive levels, was through its selection of the mix of gas included in its inventory. A pipeline's management decides upon the inventory of gas it will purchase. (Williams 6651). Panhandle's gas supply group developed an operating plan that established the priorities of gas Panhandle purchased from fixed sources. These priorities were subject to the approval of Mr. Kalen, Panhandle's President. (Kelley dep. 19). Panhandle's purchasing practices were also subject to prudency review by FERC, although at no time was such a prudency review a factor which impacted Panhandle's control over gas costs.

From 1980 through at least late 1983, Panhandle followed a policy of purchasing expensive gas from its affiliate TKL in favor of cheaper supplies then available from its "West End suppliers" in Oklahoma and Kansas. (Means 3362–3363; Vergon 3175; PX 211; PX 542; PX 552; PX 1018.-1; PX 1018.2; PX 1018.3; PX 1028). Panhandle did so for the specific purpose of helping to "bail out" TKL from excessive gas costs that TKL was then facing (PX 197; PX 1018.1; PX 1018.2) and to ensure that TKL remained an "economically viable entity" capable of continuing to make a profit. (Kelley dep. 20–21, 54).

Between 1983 and 1985 TKL received approximately $1.5 billion in revenues from sales of gas to Panhandle. (Stipulation 1/30/87, ¶ 18). On a per Mcf basis, between 1983 and 1985 TKL gas was the most or second most expensive source for gas for Panhandle. (DX 932, update of DX 99).

The purchase from TKL drove up the average cost of Panhandle gas to its customers and resulted in added take-or-pay exposure for Panhandle to its other, displaced suppliers. (PX 211; PX 736; PX 1018.2). From Panhandle's point of view, this result was justifiable because Panhandle pays a portion of TKL's take-or-pay costs if TKL does not take sufficient gas from producers. Thus, Panhandle considered this a matter of balancing its exposure with the exposure of TKL.

In addition, spot market prices should be compared to Panhandle's price since LDC's look to both as alternatives to Panhandle gas. (Tussing 3806–3807; Vergon 3264–3267).

However, the prices at which gas was sold in spot market transactions do not establish the competitive market level for gas sales. It is common in ordinary markets for spot market prices to be below the level of long-term contract prices. (Stillman 4061–4062). The purpose of a spot market in a commodity industry, like the gas industry, in which most sales are under long term contracts, is to clear the market by providing an outlet for a supplier with a surplus of gas to sell the gas at some price or for a purchaser with a short term need for additional gas to purchase the gas at some price. (Tussing 1239–1241). The price of gas in the spot market may therefore vary substantially at some points in time from the price of gas under long term contracts even though gas from both sources is sold in direct competition with each other. (Carpenter 7030).

Plaintiff's experts failed to define specifically the so-called "competitive market level" of gas in the relevant market. At one time Dr. Stillman implicitly adopted the spot market price achieved by a very large industrial end-user as the competitive market level. (Stillman 562). However, Dr. Stillman later testified that spot market prices do not establish the "competitive market level." (Stillman 4061–4062).

Absent the chaotic conditions in the industry, the spot market price would probably have been higher because the supply of surplus gas would no longer have been available to be sold at depressed prices. (Carpenter 7031).

Notwithstanding the prolonged excess of Panhandle gas prices over those of some other pipelines and spot market gas, LDC customers within the Central Illinois Market had to continue purchasing system supply gas from Panhandle, because of the G tariff.

Another manner in which Panhandle directly affected the price of gas to its customers was through the purchased gas adjustment ("PGA") process. (Means 3363; Tussing 3633; PX 907). Every six months, all pipelines are required to make PGA filings with the FERC projecting gas costs for the ensuing six month period and balancing out actual costs for the preceding six months. If a pipeline—such as Panhandle—so elects, it may file a PGA that under-recovers its actual gas costs, thereby potentially absorbing part of the costs through lower profits, rather than passing them through in full to the pipeline's customers. Panhandle's affiliate TKL did just this in 1985 and 1986 to meet price competition to retain its largest customer, Consumers Power Company. Panhandle, in contrast, never made a similar under-recovery PGA filing. As a result, Panhandle never absorbed a single cent of excess gas costs, while continuing to pay dividends to its shareholders of approximately $100 million per year for the period 1981–1986.

In fact, internal Panhandle documents reveal that in early 1986, Panhandle made a PGA filing specifically designed to raise its gas price relative to TKL's and thereby keep TKL's principal customer, Consumers Power, from switching over to Panhandle from TKL as its supplier. (Means 3365–3366; PX 907).

Panhandle's economic expert Dr. Carpenter, testifying about a hypothetical tool and die plant, acknowledged that in a truly competitive market, where one competitor is faced with higher costs than another, the higher cost competitor would have to absorb the cost difference and would not simply be able to pass it on to its customers through a higher price. (Carpenter 7148–7149). In contrast to the hypothetical plant, however, pipelines exist within a heavily regulated industry, and under the practical circumstances Panhandle did not have to absorb the cost difference because it had no competition in dealing with the G and SG LDC's.

Panhandle's monopoly power is further demonstrated by its ability to segment markets and by its practice of price discrimination. Panhandle recognized that it had the ability to discriminate between different market segments in which it operat-

ed. Thus, a March 14, 1984 internal Panhandle memorandum, captioned "Pipeline Renegotiation Strategy," specifically describes a strategy to "improve marketability of Panhandle/Trunkline gas": "Split pipeline to provide several separate services with different supplies and prices" and specifically ear-marked "spot market" gas for the "industrial market" segment, while showing "current average price" (i.e., Panhandle) gas still going to the "residential market." (Tussing 3582–3585; PX 129).

Panhandle followed just such a strategy in adopting both the Transportation Guidelines and PanMark, programs for transporting cheaper spot market gas which Panhandle released to non-captive industrial end-users, while denying similar transportation to G LDC's for their system supply.

Dr. Carpenter conceded that the SMP's for industrial end-users provided "selective price cuts to certain classes of customers—those that have the most sensitive demands." (Carpenter 1654). While FERC, and not Panhandle, established the eligibility criteria for the PanMark program, Panhandle voluntarily decided to participate in the program.

Other Panhandle documents similarly reflected its ability to segment markets and provide differing services to each. (Tussing 3577–3580; 3582–3585; PX 261; PX 823; PX 834; PX 930).

Where a seller's market is such that it can discriminate between customer groups, it can lack monopoly power as to one such group but still have monopoly power as to the other groups. This was true of Panhandle's sales markets, where it had the ability to exercise monopoly power over the captive G and SG LDC segment, while shifting the non-captive industrial end-user and partial requirements LDC segments over to separate transportation services. (Stillman 4177; Tussing 3586–3587, 3618–3619, 3913, 4226–4227).

As expressly described in internal Panhandle documents, Panhandle's competitive position was that, whereas further losses in sales volume to captive G and SG customers were not expected, even at the high price levels that prevailed, revenues from fuel-switchable industrial end-users and partial requirements LDC's could be achieved by shifting these customers to transport service without dropping Panhandle's own system supply prices. (PX 789; PX 823).

Dr. Carpenter admitted that as to Panhandle, "customers with more elastic demand gain access to gas transportation service network while those with less elastic demand do not." (Carpenter 7193).

As explained by the State's economic experts, Dr. Stillman and Dr. Tussing, a firm cannot practice price discrimination or other market segmentation unless it has monopoly power. (Stillman 526; Tussing 3558–3559, 3676). Panhandle's expert Dr. Carpenter agreed that market power is viewed as a necessary prerequisite to the ability to discriminate. (Carpenter 7188). Evidence of market segmentation and price discrimination, therefore, provides direct evidence of the presence of monopoly power.

D. *FERC regulation did not effectively constrain Panhandle's ability to exercise monopoly power.*

FERC regulation did not effectively constrain Panhandle's ability to exercise monopoly power with respect to key practices at issue in this case: the decision whether to grant access to Panhandle pipeline system to competing gas suppliers; the decision whether to negotiate modified tariffs or service agreements with customers; and the decision whether to absorb part of the costs of gas as lower profits to Panhandle or, instead, "flow" its gas costs through in full to its captive customers.

The decision whether to transport gas for a competitor was discretionary with Panhandle. FERC lacked the authority to order Panhandle to transport gas for a competitor over its objection. (Carpenter 1690–1691, 1706, 7124; Hughes 319, 360; Kennedy 1143, 1161; Tussing 845, 3601, 3604, 3651, 3738, 3841; Williams 6444–6445). The FERC expressly noted this limitation on its authority in Order 436, and

FERC has never ordered any pipeline to transport gas for a competitor, even as a remedy for discriminatory conduct. (Williams 6667–6668).

The FERC also determines whether a pipeline will be allowed to connect to a new customer and commence sales service, and it determines the usage which can be made of pipeline facilities. The FERC exercised this authority through the issuance of Certificates of Public Convenience and Necessity under Section 7(c) and 7(a) of the Natural Gas Act, and through general regulations and orders, such as Orders No. 234 and 436, which permitted the construction of some facilities on a self-implementing basis. For example, the FERC denied a Section 7(c) certificate to NGPL to provide service to CILCO in January, 1985.

The FERC has required pipelines to have long-term gas reserves in order to obtain a Section 7(c) certificate for firm sales service. Once a pipeline has commenced service under a Section 7(c) certificate, including a blanket certificate, it may not abandon or terminate that service unless it first obtains a certificate of abandonment from the FERC. A pipeline is required by the FERC to continue providing service to an LDC customer even after the expiration of the service agreement with the customer. Through these various features of regulation, a pipeline has a continuing service obligation to its customers which requires it to have long-term gas reserves to supply the customers, even after expiration of service agreements.

Thus, Panhandle is obligated to continue providing service to its customers even after the termination of their existing service agreements. This service must be provided in accordance with the terms of the then-existing service agreement. Panhandle has an obligation to maintain a gas supply to satisfy the contract demand levels in the expired service agreements. Panhandle must obtain a certificate of abandonment from the FERC before terminating service to a customer. (Bray 5645).

This obligation conferred rights on the part of customers to benefit from Panhandle's gas reserves and within parameters carried with it a correlative duty on the part of customers to purchase gas from Panhandle under their service agreements. There was, however, no effective remedy available to customers if a pipeline was unable to deliver the gas demanded, such as in the case of a curtailment.

Panhandle does not own any of the gas distribution facilities to which it sells or transports gas. The gas production, long line transmission and local distribution segments of the gas industry are largely not vertically integrated. The FERC, and not Panhandle, therefore regulated, for the most part, entry by another pipeline into Panhandle's service areas. Panhandle did not have power to exclude unilaterally entry by competing pipelines into the CILCO service area or other areas where new interconnects could be constructed at a reasonable cost. Panhandle's LDC customers, and not Panhandle, decided in the first instance whether to seek or agree to interconnect with another interstate pipeline. Panhandle utilized the regulatory process to urge the FERC to prohibit NGPL, a potential pipeline competitor, from transporting and selling natural gas to the CILCO Peoria service area.

The FERC did not sanction wide-open competition between pipelines, and it retained the regulatory authority to determine whether a pipeline would be allowed to connect to a new customer and commence sales service. (Kennedy 5463–5464).

Panhandle cannot unilaterally withhold deliveries of gas requested by customers under a valid Service Agreement when Panhandle has sufficient gas reserves available, without creating the possibility that it would be in violation of its Certificate of Public Convenience and Necessity to serve that customer. (Tussing 3757–3758).

Given FERC's inability to order transport, it follows that Panhandle (and other pipelines) would be able to set its own transportation policy with little interference by FERC. For example, the decision whether to file for an individual Section 7(c) transportation certificate, or to elect to provide transportation under a blanket

FERC transportation authorization such as Section 311 or Orders 319, 234–B and 436, was discretionary with Panhandle. (Carpenter 1675, 1700–1701, 1706; Langenkamp 1468, 1508; Tussing 3602; Williams 6455–6456). In fact, Panhandle was able to implement its Transportation Guidelines without approval or even immediate review by the FERC. (Kennedy 1142; Reed 4992–4992).

The individual gas purchase contracts entered into by Panhandle after the passage of the NGPA did not require FERC review or approval. Panhandle customers had no right to intervene or object to the contracts as being improper or ill-advised at the time they were executed. (Tussing 4266).

The authorization to a pipeline to provide a full requirements service, a partial requirements service, a storage service, or whatever, provides that such service is to be furnished to a specific customer. If the customer wants to change from one service to another, such as from full requirements to partial requirements or vice versa, that would constitute a change in service and would require a subsequent authorization. (Williams 6362–6363). However, there was nothing to prevent Panhandle from negotiating a new tariff in response to CILCO's request in 1981. Such negotiated change would then have been submitted to FERC for its approval.

The FERC has the authority to regulate the service obligations of a pipeline to its customers. Possible sanctions for the failure to meet regulated obligations include refunding of costs, the non-payment of customer demand charges to the pipeline, and the recovery of damages. (Carpenter 6953; Carpenter 1636). However, during the 1970's, when Panhandle did not meet contract demand levels, and cut back deliveries by as much as 40%, its LDC customers had no recourse against it. (Hardy 6590–6591; Samburg 48; Slone 233–234).

Panhandle's G tariff imposes a penalty on Panhandle should it be unable to meet a customers request for increased contract demand; namely, the customer is granted the ability to purchase from alternative suppliers. Several of Panhandle's customers have exercised this right and have reduced their purchases from Panhandle. This adversely affected Panhandle because it was obligated to continue serving the customers under the G tariff but the LDC was allowed to and did purchase gas from other pipelines or suppliers. (Carpenter 6954).

Panhandle does not have the ability without FERC approval to waive provisions in its tariffs, including the provisions in Section 1.9 of the General Terms and Conditions of its G tariff. (Kennedy 5228–5229). But it can agree to change. However, any changes in the terms of service under one of Panhandle's FERC-approved tariffs must be made available to all customers which Panhandle serves under that tariff. (Kennedy 1107–1108). CILCO's 1982 FERC Complaint is an example of an attempt to negotiate new tariff terms.

Panhandle had the discretion to decide whether to file for a new tariff, to seek modification of an existing tariff, or to negotiate a new service agreement with a particular customer. (Carpenter 1691; Means 3353–3355; Slone 279–280). The customer could do the same. FERC review of such requests was usually minimal; when a pipeline requests a change in a filed tariff, unless there is a protest by intervenors, the change is allowed on a rather routine basis simply by substituting tariff sheets. (Hughes 320–321).

Panhandle has on file with the FERC tariffs limited by their terms to specific Panhandle customers, including Michigan Consolidated Gas Co. and Michigan Gas Storage Co. (PX 1006). Thus, it was not FERC regulation which prevented Panhandle from negotiating a new tariff for CILCO.

Until 1978, FERC regulated gas prices at the wellhead by setting maximum prices, but since then a pipeline's purchases have not, for the most part, been regulated at the wellhead due to changes in FERC powers mandated by the Natural Gas Policy Act of 1978.

During the time in question, while fixed cost portions of a pipeline's charges were subject to standard public utility rate-mak-

ing protection, the much larger somewhat unregulated gas cost component accounted for an estimated 80–90% of total pipeline charges to the customer. (Tussing 3666, 3673–3674; Williams 6642; DX 1485).

The FERC regulatory process allowed a pipeline such as Panhandle to pass its gas costs through, in full, to its customers unless the FERC found actual "fraud or abuse" in the gas purchasing practices. (Carpenter 1712; Hughes 313–314, 375; Kennedy 1090–1091; Means 457; Tussing 827, 3631, 3737–3739, 3803–3804). Such a finding by FERC has been virtually non-existent generally and has never been made regarding Panhandle.

In Order 436, respecting the treatment of gas costs, the FERC noted the statutory limitations on its own authority, stating:

> Indeed, in NGPA section 601(c) Congress removed from the Commission any power to prevent interstate pipelines from "flowing through" to their customers the costs of purchasing the gas commodity absent "fraud and abuse or similar grounds."

(Order 436, p. II–26).

To implement the recovery of pipeline gas costs, the PGA mechanism was built into the FERC rate system. A special account, Account 191, is used to keep track of whether there has been an "over-recovery" (projection ultimately exceeds actual cost) or "under-recovery" (actual cost ends up exceeding projection) during each six month period. If a pipeline has under-recovered, it may add a special surcharge on the next six month period to recover the difference. (Bray 5514–14; Kennedy 1090–1091, 1108; Means 417–421). If a pipeline has over-recovered, the rate is reduced for the following six month period.

PGA gas charges automatically go into effect five months after they have been filed by the pipeline, subject to possible customer refunds in the event the FERC later finds the charges to have been fraudulent or abusive. (Kennedy 1091–1092). As of the time of trial, PGA charges by a pipeline had been invalidated as fraudulent or abusive on only one occasion since the automatic PGA recovery process first be-

came effective in 1978. (Hughes 395, Means 3363–3364; Williams 6652–6654). The FERC has never ordered a refund of gas commodity charges as a remedy for conduct found to have been fraudulent or abusive. (Williams 6655).

The FERC cannot find a pipeline's gas charges to be improper simply because the charges exceed competitive market clearing levels, so long as the charges reflect gas prices set at or below the statutory ceiling level, if any, for the type of gas involved. (Carpenter 7115; Tussing 3616, 3620, 3736–3737, 4205; Williams 6648).

A pipeline may recover more or less than its FERC-approved rate of return, which is not the same as its economic rate of return. (Williams 6461–6462, 6641). FERC regulations do not preclude a pipeline from electing to under-recover on its gas costs as a way of responding to competition. (Means 3363–3365; Tussing 3849; PX 849). LDC's can adjust their margins and thus absorb some of the pipeline's increases in rates to the LDC's and some have done so. (DX 114.1, 114.2, 114.5–114.7).

Panhandle had discretion either to absorb gas costs that it had incurred through reduced profits or to seek recovery of the costs through the PGA recovery process. (Means 3363; Tussing 3847; Kennedy 5445). However, Panhandle never elected to under-recover its gas costs from its customers. (Bray 5525–5526). As a consequence, through the end of 1986, Panhandle did not absorb a single dollar of gas-associated "take-or-pay" costs but recovered all such costs from its customers. (Bray 5670–5671; Lasseter dep. 94–6).

FERC regulation of rate design and return has the effect of substantially but not totally constraining Panhandle's ability to exercise market power. Considering all the aspects of FERC authority, regulation determines to a large degree the amount of competition to which Panhandle would be exposed. (Carpenter 6940). But because Panhandle still exercised voluntary decisions concerning such things as choice of gas sold and whether or not to participate in "voluntary programs," market power was still exercised by Panhandle.

The FERC has the ultimate authority to force a change in the actual design of pipeline rates. This authority was exercised with respect to Panhandle's rates in the 1982 rate case. Panhandle has always been free, however, to negotiate changes in rates and tariffs which could then have been submitted to the FERC for approval.

Panhandle argues that its earnings were put at risk depending upon the level of actual throughput. What Panhandle doesn't state is that it could control the level of throughput, increasing it by transporting on an open access basis or by lowering its commodity rate. (Williams 6462, 6468).

Panhandle's approved costs of operation, with the exception of purchased gas costs, were allocated by the FERC between Panhandle's various tariffs in a unified rate case. Panhandle did not have authority to include any additional costs in its rates which had not been approved by the FERC in a rate case or a PGA proceeding. The cost of gas included in Panhandle's commodity rate was the same for Panhandle's G and LS tariff customers. (Tussing 3911–3912).

Panhandle had no unilateral ability to determine the rate it would charge for transportation service. (Tussing 3787). It did have discretion to decide whether to begin a transportation program and the power to choose what customers would be given access to that transportation service.

Panhandle's rate proceedings between 1951—when its present tariffs were developed by the FERC—and 1982, were generally resolved through settlements. Panhandle filed a Section 4 rate case in March 1982 and a Cost and Revenue study in August 1985. Through a settlement in the 1982 rate case which was approved by the FERC in March 1984, Panhandle's design volume for jurisdictional sales was set at 570 Bcf, and its return on equity was set at approximately $55 million. Thus, Panhandle was allowed to earn a return or profit of approximately $.9–10 per Mcf on sales or transportation.

The settlement was approved by the FERC on March 19, 1984. (DX 1448). The settlement: (1) determined the representative sales level to be used in Panhandle's rates—570 Bcf for jurisdictional sales, 31.9 Bcf for non-jurisdictional sales and 4.7 Bcf for off-system sales (Kennedy 5212–5213); (2) set Panhandle's total approved cost of service, including operating costs, depreciation, return and taxes; (3) set the design of Panhandle's interim rates—namely, a modified fixed-variable rate design in which most operating costs and depreciation costs were recovered through demand charges while gas costs, gathering costs, profits and associated taxes were recovered through the commodity rate; (4) set Panhandle's allowed return on equity and associated income taxes, in a total amount of $112 million dollars, approximately half of which was profit and half taxes; (5) set the amount of gathering costs to be recovered through Panhandle's commodity rate, in the amount of $188 million dollars, which were fixed costs; (6) allowed for a 10% reduction in Contract Demand by Panhandle's G customers, which CILCO and several other customers utilized; (7) eliminated gas costs from the 75% minimum commodity bill in Panhandle's LS and other partial requirements tariffs; (8) resolved issues regarding Panhandle's gas purchasing practices in connection with several of Panhandle's PGA filings; and (9) established an operating plan with regard to future gas purchasing practices of Panhandle. (Kennedy 5216–5220, 5222–5223). Panhandle notified its customers of this operating plan, which set forth the criteria and principles Panhandle would follow in its future gas purchasing practices. (DX 300).

On January 3, 1984, CILCO's D. Samburg sent a memorandum to J. Vergon and J. Weisbruch updating the events in RP82–58/RP82–105, the combined FERC docket for the CILCO complaint case and the 1982 Panhandle rate case. CILCO did not oppose the proposed settlement in the rate case. The settlement benefited CILCO's customers in several respects, including:

an immediate rate reduction of approximately 10¢/Mcf; the return of refunds generated since October 1, 1982; the implementation of PanMark; the saving of

legal expenses which would have been incurred had all these issues gone to trial; and, most notably, a 10% decrease in our contract demand volumes (CD's) for each month of the year.

(DX 999C). CILCO also did not oppose Panhandle's application for a PanMark certificate. (DX 999C).

The FERC regulates the inclusion of take-or-pay costs in Panhandle's rates. These costs consist of the principal amount or the carrying charges on the principal amount of "straight" take-or-pay payments, made by Panhandle in accordance with the terms of gas supply contracts where Panhandle has the right to make up past volumes, and settlement payments to resolve take-or-pay claims where Panhandle does not have make-up rights. Panhandle cannot recover take-or-pay costs of either type without FERC approval of such costs in a rate proceeding. As of the time of trial, the FERC had only approved the inclusion of such costs in the *sales* rates of Panhandle and TKL; the FERC had not approved the inclusion of settlement costs in the *transportation* rates of any pipeline. The FERC can deny recovery of take-or-pay costs as it can with any of Panhandle's costs. As of the time of trial, the FERC had not determined whether take-or-pay costs were the exclusive responsibility of pipelines and their shareholders or whether they should generally be included in pipeline rates.

Panhandle did not have authority to recover any take-or-pay amounts through its transportation tariffs from 1982 until the time of trial. (Bray 5496–5497). Northern Natural Gas Co. sought FERC approval to include take-or-pay settlement costs in its transportation rates. In a case of first impression, the FERC denied this request on December 22, 1986. (Bray 5497–5499; DX 1453).

TKL received approval to include $166 million dollars in take-or-pay settlement amounts in its rates over a five-year period in its 1983 rate case. (FERC Dkt. No. RP 83–93). (Bray 5501). These amounts were included in the non-gas portion of TKL's commodity rate. In its 1986 rate case TKL requested approval to recover take-or-pay settlement amounts through the demand charge in its rates. (Bray 5502). The uncollected portion of the $166 million in take-or-pay amounts approved in TKL's 1983 rate case was included in the $370 million in take-or-pay amounts in TKL's 1986 rate filing. (Bray 5502). A portion of the $370 million reflected projected take-or-pay payments for a portion of 1987. (Dixon 5858–5560).

In a rate proceeding, the FERC permitted the pipeline to establish a dollar level for take-or-pay payments in Account 165; the dollar level was based on the typical amount of take-or-pay payments the pipeline had in the deferred account over some time period. The FERC permitted this amount to be capitalized and included in working capital for purposes of recovering the carrying costs of those dollars. That does not mean that the principal was recoverable, but the action did recognize the cost of carrying those dollars. The make-up of the principal was between the pipeline-purchaser and the producer-seller of the gas. (Williams 6378–6379).

The FERC regulates gas costs and gas purchasing practices. While the FERC has authority to deny a pipeline's inclusion in its rates of the cost of certificate deregulated gas if the FERC finds that the cost of the gas is the result of fraud, abuse or other similar grounds, this has almost never occurred (perhaps only once, in the case of Columbia Gas Transmission).

The FERC also has the authority to deny a pipeline's inclusion of gas costs in its rates if the pipeline's gas purchasing practices, and in particular its decisions as to the sources from which it will take delivery during a given time period, are found to be imprudent. This is the same standard by which the FERC reviews other pipeline costs, including take-or-pay costs, and related operating decisions, and, as in those areas, denial rarely occurs.

The FERC has the authority to order a refund of gas costs if it finds the costs are improper under either standard. This has never occurred.

Theoretically, Panhandle does not have the unilateral ability to manipulate its gas costs nor can it purchase high-priced gas solely to avoid take-or-pay exposure when such purchases are not prudent. In practice, however, Panhandle does have this ability, because it decides the mix of gas which will be pumped through its pipeline for the system supply of LDC's.

Panhandle's expert Dr. Carpenter testified at trial that he premised his opinion that FERC effectively regulates a pipeline's gas purchasing practices on FERC's ability to deny pass through of costs found to be "imprudent." (Carpenter 6935–6936). At the preliminary injunction hearing, however, Dr. Carpenter testified that pipelines were entitled to pass through costs unless the costs were the result of "fraud or similar abuse." (Carpenter 1712–1713, 7111–7113).

Dr. Carpenter attempted to explain the difference in testimony by stating that the prudency standard is found in the NGA pass-through policy. (Carpenter 7113). Dr. Carpenter admitted that he was not aware that Panhandle had taken a contrary position before FERC in the 1985 gas purchasing case. In that case Panhandle maintained that:

The NGPA eliminates the prudent standard. Congress prohibited the Commission from denying interstate pipelines recovery of any amounts paid for purchases of first sales of natural gas. If such prices do not exceed maximum lawful prices established under Title 1 of the NGPA or if there are no maximum lawful prices due to the elimination of price controls as set forth in Subtitle B of Title 1 of the NGPA, there is to be no guarantee of refund, however, if the Commission determines that the amount paid is excessive due to fraud, abuse or similar grounds.

(Carpenter 7121–7122).

Dr. Carpenter testified that selling gas at supracompetitive prices would not itself violate the fraud and abuse standard. (Carpenter 7115–7116).

The fact that a pipeline's purchasing practices are subject to scrutiny would appear to provide an incentive to minimize those costs. To the extent that a pipeline believes its gas purchasing practices are not subject to aggressive review for fraud or abuse, however, such scrutiny by FERC would not provide an incentive to minimize those costs.

The fact that the FERC has yet to order gas costs refunded in a specific case does not indicate any lack of authority to do so. (Carpenter 6930–6932). It is, however, an indication of the non-effectiveness of the regulatory process. As the courts and the FERC have interpreted their authority, there are two standards which are available to the FERC. The "Fraud and Abuse" standard of Section 601 of the NGPA, which applies to individual contracts with producers, and the "Prudent Purchaser" standard embodied in the NGA, which applies to the pipeline's selection from among its gas reserves for deliveries during a given PGA period or periods. (Carpenter 6930–6932).

In summary, the pipeline industry was (and remains) extensively regulated by the FERC. However, the regulatory scheme permits a pipeline to exercise a considerable amount of discretion. Thus, Panhandle was not prevented from exercising its monopoly power because of FERC regulation.

E. *Despite the findings that Panhandle possessed monopoly power over residential/commercial customers and that FERC regulation did not effectively constrain the exercise of that power, Panhandle did not (with the exception of certain components of the Transportation Guidelines, discussed below) violate antitrust laws because its conduct was not for the purpose of acquiring and maintaining monopoly power.*

Panhandle's conduct, both in response to CILCO's attempt to purchase gas from NGPL and in response to CILCO's FERC complaint, was not for the purpose of acquiring or maintaining monopoly power and cannot serve as a basis for antitrust liability. The "fight to the death," promised and delivered by Panhandle, was a

lawful effort to enforce the provisions of the G tariff and the service contract.

Furthermore, the Court is persuaded that Panhandle's refusal to negotiate a new tariff was merely a lawful refusal to cut its own throat. There is nothing inherently anticompetitive in opposing a customer's demand or in refusing to modify an existing agreement.

Similarly, Panhandle's adamant refusal to transport spot market gas for its G and SG LDC's was not unlawful acquisition or maintenance of monopoly power. Rather, this too was conduct directed at self-preservation and was lawful, given the G tariff and the chaotic conditions in the industry.

Panhandle transported off-system gas for the system supply of Michigan Consolidated Gas Co. and East Ohio Gas Co. under the Transportation Guidelines in 1985 and 1986 (grandfathered transactions). (Reed 5051–5052). These companies were partial requirement tariff customers. Panhandle received no transport requests under the MAT for system supply from LS or other partial requirements customers prior to 1985. (Reed 4793–4794). Mr. Kennedy believed that transports for the system supply of Michigan Consolidated and East Ohio did not violate the terms of Panhandle's SS and LS tariffs. (Kennedy 5301).

In addition, many of Panhandle's LS customers sought system supply transports under the 10% rule of PanMark in 1984 and 1985. (DX 1418). Panhandle offers no reason why these partial requirements customers settled for only 10% of their requirements under PanMark rather than up to 100% under the MAT Guidelines, except that it was known Panhandle would not transport for LDC system supply.

Panhandle's R.W. Reed confirmed that other than through PanMark there was no LDC system supply transportation at all until mid–1985, after this lawsuit was filed and after FERC's Order 380, the minimum bill order, was issued. Transportation finally did begin at that time for large partial requirements LDC's such as Michigan Consolidated and East Ohio Gas, but not for G or SG customers. (Reed 5051; DX 1420).

By 1985 Panhandle's LS customers started leaving its system altogether; Panhandle realized it would at least be able to generate transport revenues from its partial requirements customers by transporting non-Panhandle gas for them over its system. (Reed 5054). To the extent Panhandle could get these transportation revenues from its partial requirements customers it was better off than getting nothing. (Reed 5054).

East Ohio Gas Company and Michigan Consolidated had both drastically lowered their purchases of Panhandle gas by 1985:

| | 1981 | 1985 |
|---|---|---|
| East Ohio | 666.7 Bcf | 32.2 Bcf |
| Michigan Consolidated | 50.0 | 4.2 |

(Reed 5054; PX 519A; PX 523).

Even after it agreed to transport for its partial requirements customers, Panhandle forced them to go through the right of first refusal process. (PX 341).

The FERC omnibus order in September, 1984, which established the 10% rule for system supply purchase by LDC's under SMP's, specifically provided for a temporary limited waiver of the terms and conditions of the general service tariff to allow purchases for system supply by a G customer, like CILCO. (Reed 5083). This gave CILCO the authorization and opportunity to request transportation for general system supply under Panhandle's PanMark Program, the G tariff notwithstanding. (Vergon 2982). CILCO subsequently participated in PanMark, and received gas for system supply through PanMark from February through October, 1985. (Vergon 2984–2986).

Contrary to Panhandle's assertion, CILCO was not the only LDC that requested that Panhandle transport gas for system supply. Both IP and CIPS made requests in 1983 that Panhandle transport independently produced gas for their system supply. (Brodsky dep. 92; Houvenagle dep. 45–46; PX 579; PX 581). IP made additional requests that Panhandle transport throughout the period 1984 and 1985. (Brodsky dep. 92–96).

In 1984 the volumes transported under the PanMark program were primarily for industrial end-users; in December 1984—after the Commission had modified the program to include LDC's—the volumes started moving to such customers, and in 1985 roughly 86% of the total volumes transported went to LDC customers. (DX 1470–1471; Williams 6409–6410).

Panhandle cites the PanMark program as evidence of its willingness to transport independent gas for G customers' system supply. Panhandle's Reed, however, testified that PanMark gas was the "alter ego" of Panhandle gas and that "when you purchase from PanMark you are essentially purchasing from Panhandle." (Reed 1334, 4042).

It is evident that Panhandle's policy was consistent: no transportation of non-Panhandle gas for any G or SG customer. Once again, however, Panhandle's insistence on enforcing the terms of the G tariff was a legitimate decision considering the context in which it took place.

Closely related to Panhandle's refusal to transport and to its opposition to CILCO's FERC case was its interpretation of the G tariff. The Court finds that this interpretation does not subject Panhandle to antitrust liability.

Panhandle's G tariff defined a "General Service" purchaser as any buyer which "does not purchase gas from any other natural gas company as defined in the Natural Gas Act." (Stipulation 1/30/87, ¶ 33; PX 168). That tariff was put in place in 1951.

Section 601(a)(1) of the Natural Gas Policy Act, effective since 1978, defines a "natural gas company" for purposes of the Natural Gas Act as excluding producers of certain categories of deregulated gas, specifically including so-called "Section 102" and "103" gas. (Means 3357–3359; PX 186). So the definition of "General Service" purchaser in Panhandle's 1951 tariff cannot be read to employ the meaning as contained in the NGPA, effective 27 years later. Thus, objectively, Panhandle's interpretation of the G tariff was not for any anticompetitive purpose.

Panhandle's subjective belief regarding the application of the G tariff is another matter. While the Court believes that Panhandle was prepared to do whatever was necessary to block transport of off-system G and SG LDC's for system supply, the Court finds that Panhandle's subjective belief regarding the sole supplier provision of the G tariff was substantially in good faith.

There is evidence in the record which seems to indicate that Panhandle knew of certain other interpretations which were defensible and which would have permitted transportation for CILCO under the G tariff. For example, regulatory experts for the State testified that since the G tariff is keyed explicitly into the Natural Gas Act definition of a "natural gas company," the tariff's coverage should expand or contract with changes in that statutory definition, thus bringing into play the definitional changes implemented in 1978 by Section 601 of the Natural Gas Policy Act. (Means 3357–3360); Tussing 3635–3641). Of course, the problem is not the wording of the NGPA, but rather what the parties (e.g., CILCO and Panhandle) had agreed to in 1951 and later.

A State expert noted that the TKL G tariff, in contrast to the Panhandle G tariff, is a true "sole supplier" tariff expressly prohibiting purchases from any other supplier; and that by taking the position that it has, Panhandle has effectively tried to construe the Panhandle tariff as being synonymous with the TKL tariff, which on its face it is not. (Means 3361, 3533).

Panhandle's regulatory expert, Dr. Williams, took the approach that the meaning of the tariff should be viewed according to the understanding of the parties when they first entered into the tariff. (Williams 6629–6631). This is the view which the Court adopts.

Even under this view, however, Plaintiff argues direct purchases from producers of Section 102 and 103 gas should have been allowed, since at the time the tariff was first entered into—in 1951—the accepted industry understanding was that producers were *not* "natural gas companies" subject

to NGA regulation, unless they were also interstate pipelines; this industry understanding did not change until three years later, with the Supreme Court's 1954 decision in *Phillips Petroleum v. State of Wisconsin*, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954). (Tussing 3653, 3946–3949). It must be noted, however, that the tariff was renewed by contract between CILCO and Panhandle subsequent to the *Phillips Petroleum* decision in 1970. Thus, the parties' understanding of the meaning of the G tariff effectively included this change.

Thus, neither the objective nor the subjective interpretation of the G tariff was indefensible. Because the interpretation was feasible, it cannot support an inference that Panhandle's insistence upon and enforcement of the sole supplier term of the G tariff was merely a sham undertaken to maintain its monopoly power.

As discussed above, Panhandle's position was that the statutory reference to other natural gas companies meant that purchases could not be made from any other supplier, whether another pipeline, a distribution company, a producer, a broker, or any other entity. If such purchases were made, the practical result would have been an automatic conversion from the G tariff to an LS tariff.

There is no provision in Panhandle tariffs providing for an automatic conversion from the G tariff to any other tariff, including the LS (PX 1014), but one can only assume that if a purchase by a G customer had violated the G tariff, Panhandle would have immediately acted to punish the violator. To do otherwise would have placed Panhandle's entire G/SG tariff network at risk.

The cost of a shift to the LS tariff made non-Panhandle gas purchases economically unfeasible for most G and SG customers, at least until 1984. For example, the added cost to CILCO of purchasing just one molecule of gas from a non-Panhandle source and being shifted to the LS category as of March, 1983, would have been an estimated $150 million. (Samburg 95). Likewise, in the cases of IP and CIPS, involuntary transfer to an LS tariff would almost certainly not have had an economically positive effect.

This added cost would have been somewhat of a windfall to Panhandle, since it would have been justified by neither added real costs to Panhandle nor displaced sales of gas. (Means 3341–3343; Vergon 3107). But one would have to factor into this equation (transfer from G to LS tariff) the effect that the transfer would have had on Panhandle's take-or-pay exposure, that is, long-term commitments with producers to provide natural gas to the LDC's. FERC rejected these grounds as for adherence to the G tariff in Order 265 and Order 436, but in order 500, these concerns were factored back into the equation.

As a result of Order 380, the amount of the economic penalty to a G customer's being shifted to the LS tariff was reduced through removal of gas costs from "minimum bill" provisions such as those found in the LS tariff. (Vergon 3089–3090, 3102). Gas costs were removed from Panhandle's minimum bill prior to Order 380 as a result of the settlement of the 1982 rate case.

Even with these charges removed, however, the non-gas cost portion of the minimum bill remained a significant economic penalty in the event a G or SG customer attempted to purchase gas from a non-Panhandle supplier and was shifted by Panhandle to the LS tariff. (Vergon 3101–3102).

The economic effect of the LS penalty, depending on the circumstances, could have been to remove any delivered cost savings from spot market purchases, rendering them uneconomic to LDC customers such as IP. (Means 3347–3348; Vergon 3109–3110). Therefore, the economic penalty for transfer from G to LS tariff was an amount payable to Panhandle that resulted from the manner in which it structured the tariffs and Service Agreements that it chose to offer to its G and SG customers and that they chose to accept. (Means 3341–343, 3352–3353; Vergon 3107). Such a penalty is best described as "liquidated damages" for an LDC to decide to act contrary to the understandings which led to Panhandle's long-term commitments from suppliers for G and SG customers.

For this conduct to have imposed antitrust liability on Panhandle, however, this Court would have to find that Panhandle's threat to convert the G tariff customers to an LS tariff was made with the intent to drive them out of business or for some other anticompetitive purpose. This the Court will not do for the same reasons as stated above. While it is true that the G tariff did not expressly provide for automatic conversion, Panhandle's assertion of its intent to enforce the tariff in this particular manner does not rise to the level of anticompetitive conduct.

For the same reasons, Panhandle's refusal to negotiate a new tariff or service agreement with CILCO (or any other LDC) was not an unlawful exercise of monopoly power.

Because of the chaos in the marketplace, and the uncertainty regarding the ultimate shape of new regulations by FERC, it was not unreasonable for Panhandle not to do any more than it did regarding negotiation of a tariff substitute for the G tariff. In view of the pending complaint case regarding the status of the G tariff, and in view of the rapidly changing natural gas market, the Court does not believe that Panhandle's failure to negotiate a new tariff with CILCO was unlawful under either the letter or the spirit of the antitrust laws.

CILCO wanted to "have its cake and eat it too." On one hand, CILCO wanted the security of a tariff with Panhandle that would obligate Panhandle to use its best efforts to meet the needs of CILCO for natural gas. Panhandle could only provide that security by entering into long term contracts with producers. Those producers had their own interests to protect, so the terms of those contracts could not likely be set in a way that provided Panhandle total flexibility to vary the mix of gas it purchased.

On the other hand, CILCO wanted the freedom to purchase spot market gas when it was cheaper without paying any substantial consideration for that freedom of choice. In the period of time of 1981 to 1986, nobody knew with any certainty where and under what conditions the natural gas market and FERC regulations would finally come to rest. Changing market conditions could have sent the spot market price of natural gas back up as quickly as it had gone down. FERC regulations in response to market conditions were and still are constantly changing.

To suggest as the Plaintiff does that, when faced with such conditions of market and regulatory disequilibrium, the Defendant had a duty to negotiate a new tariff that basically gave CILCO (and similarly situated G and SG LDC's on the Panhandle system) the freedom and security that it wanted in its gas purchases, without addressing Panhandle's long-term problems, is not reasonable.

The Court does not believe that it would make any sense to require under the antitrust laws that, in terms of potentially long term or permanent tariff changes, companies be required to negotiate changes in those tariffs at a time when the regulatory agency responsible for oversight of that industry is adjusting its industry-wide regulations to respond to chaotic market conditions.

In addition, Panhandle's take-or-pay exposure provided a legitimate business rationale for Panhandle's refusal to modify the G tariff. The FERC has recognized that take-or-pay is a problem in the industry. Some of FERC's programs, e.g., SMP's, were specifically aimed at helping to alleviate the problem. The blanket certificate transportation program was not primarily intended by FERC to give pipelines take-or-pay relief. Rather, it was intended to "more easily permit gas to reach markets at prices reflective of the supply and demand characteristics of those markets." (*Maryland People's Counsel v. FERC*, 761 F.2d 780, 783 (D.C.Cir.1985) (quoting Order 234–B)). As of trial, the FERC had allowed pipelines to recover take-or-pay related costs through their sales rates only.

Panhandle argues that, since 1983, Panhandle's take-or-pay exposure has been a serious concern to Panhandle, since Panhandle has been sued by several of its producers for its failure to take-or-pay for gas. Panhandle claims that its concerns

over take-or-pay were a major consideration in Panhandle's decision as to how to operate under Order No. 436.

Take-or-pay and fixed take contract provisions, to the extent that they actually operated to handcuff fiscally a pipeline's ability to adjust to market forces (because of the payout required for gas not taken), constrained a pipeline's ability to reduce the price of its system supply gas. (Carpenter Inj. Tr. 1643–1644). To the extent that the take-or-pay provisions and fixed take provisions were renegotiated, or were not enforced by the supplier, they did not constrain a pipeline's ability to reduce the price of its system supply gas.

It is reasonable for a pipeline to attempt to avoid take-or-pay for a number of reasons. One is the cost associated with actually making take-or-pay payments. Another is the effect upon the pipeline's relationship with its producer-suppliers. Still another is the impact upon the market of recovering costs associated with take-or-pay payments. If take-or-pay payments are not being made but the pipeline is accumulating that exposure, the exposure still has to be a major concern because it represents an unresolved contractual obligation. (Williams 6385).

While take-or-pay had the potential for being a problem with serious consequences for Panhandle, two things must be recalled which, in the opinion of the Court, place the take-or-pay problem into perspective: (1) the take-or-pay problem of Panhandle and TKL was created in large part due to corporate misjudgments in the early 1980's as to the need to include such take-or-pay provisions in their contracts with producers. There is much evidence in this record indicating that Panhandle continued agreeing to such terms much longer or to a greater degree than other companies similarly situated. (2) Panhandle has never reported its take-or-pay exposure as a liability in any annual report to stockholders. For stockholder purposes it was apparently not considered worthy of mention, either as a real or seriously threatened obligation of the company.

Many of Panhandle's gas contracting practices were reasonable in light of Panhandle's obligations to secure long-term supplies for its customers and do not evidence any specific anticompetitive intent. But many decisions made in 1980–1982 were ill-advised in view of how the rest of the industry was reacting to a changing situation (i.e., the development of a surplus of gas).

Without stating the relevance of its assertion, Panhandle blames its LDC customers, and especially those on its Ad Hoc Committee, for overestimating their gas supply needs. Panhandle, however, made its own forecasts of its customers' requirements before it made any purchasing decisions and supplied the pricing and other assumptions used by its LDC customers in arriving at their projections. (Dixon 5908–5909; 5913–5914).

Although Panhandle's conduct may have initially aggravated the problem, it was impossible for Panhandle to ignore its take-or-pay liability by 1983. Even though the company and the SEC viewed the situation as manageable (PX 569; PX 612; PX 616; PX 625; PX 714; PX 724; PX 757), there were no guarantees that it would remain manageable; in fact, given the dollar amounts involved, take-or-pay could conceivably have had a crippling economic effect on Panhandle (and other pipelines).

Panhandle's gas purchasing decisions were subject to a number of constraints. The volume of Panhandle's purchases fluctuated seasonally due to fluctuations of its customers' demands. Several other factors contributed to limiting Panhandle to taking minimum volumes from certain wells, including drainage claims, claims from well owners in danger of losing their leasehold interest, and the need to maintain TKL's viability. Panhandle faced a capacity constraint, especially in the winter season, which required it to purchase from TKL to meet its customers' needs. Since 1983, Panhandle has employed a least-cost purchasing program, and it has renegotiated contracts with producers, discouraged producers from increasing production, reduced its takes of Canadian gas and renegotiated

the price of Canadian gas and suspended LNG shipments.

Panhandle asserts that because of "capacity limitations" on its line from the West End (Oklahoma, Kansas), it had to rely on TKL for some of its supplies. From the perspective of a Panhandle customer, it makes no difference whether the gas provided is Panhandle gas, TKL gas, independent producer gas, another pipeline's gas, or whatever other source of supply the customer wishes to select, provided that the gas is available. (Vergon 3264–3265). Thus, even if it is assumed that TKL pipeline capacity was needed to supplement Panhandle pipeline capacity, it does not follow that the gas had to be TKL gas; it could just as well have been competitive gas delivered over the TKL system. Moreover, the actual evidence shows that adequate capacity has been available on the Panhandle system during all but discrete "peak" days in the middle of winter.

Most significantly, the claims of capacity limitation have no bearing where the question is whether a customer was improperly precluded from displacing Panhandle gas with gas from another pipeline or a producer. If the competitive gas comes to the customer over the other pipeline's system (the CILCO–NGPL situation), then purported capacity limits on Panhandle are wholly irrelevant. Even if the gas is delivered over the Panhandle or TKL system (the producer gas situation), since it would displace Panhandle gas, capacity would similarly still not be a problem.

In fact, Panhandle's gas purchasing practices were examined in the March 1984 PGA proceedings before the FERC. CILCO and other G customers raised many of the same objections in that proceeding as the Plaintiff has in this case. The Court notes that the FERC rejected CILCO's position that Panhandle's gas purchasing strategy was imprudent. (Vergon 3199).

Given all the circumstances in the industry, the Court must also reject that contention here. The potentially serious consequences of take-or-pay exposure provided a legitimate business rationale for Panhandle's refusal to modify the G tariff or otherwise alter its historical relationship with its G and SG LDC's.

The State agencies' claims involved in this case fall into the same category as the claims of the industrial end-users for two reasons. First, evidence in the record regarding volumetric requirements and policy indicate that these claims are similar. Second, Plaintiff has utterly failed to demonstrate how the proprietary claims differ from the industrial end-users' claims or how they are more similar to the residential/commercial claim or that they should fall into a distinct third category.

Accordingly, the analysis accorded to the industrial end-users' claims is adopted in full as to the State's proprietary claims. The claims thus fall for the same reasons.

F. *Panhandle's Transportation Guidelines did constitute a willful maintenance of monopoly power; however no person or entity represented by the Plaintiff can take advantage of that finding.*

For the reasons discussed below, the Court finds the Transportation Guidelines were repugnant to antitrust laws. However, the indirect purchasers which were industrial end-users (to the extent that they are still in this case for any purpose), cannot take advantage of the Court's findings regarding the Guidelines because Panhandle had no monopoly power as to them. For the same reason, the State's proprietary claims also fail regarding the Guidelines. An LS LDC might have standing to complain about the anticompetitive nature of the Guidelines, but no such LS LDC is a party to this action.

The residential/commercial consumers bought their gas from G LDC's, which were precluded from use of the Guidelines because of the sole supplier provision in their tariff. The Court has determined that the enforcement of that sole supplier provision does not lead to antitrust liability here.

In November 1983 Panhandle adopted the Guidelines as part of a market segmentation strategy in which transportation of

less expensive gas was offered to fuel-switchable industrial end-users, albeit on limited terms, while continuing Panhandle's policy of not transporting lower priced spot market gas to captive LDC customers. The Guidelines as a whole had an anticompetitive effect. The record reflects substantial evidence, in the form of testimony by producers, users, experts and other witnesses, that the Guidelines did significantly retard fully competitive bidding for gas sales to those customers eligible under the Guidelines. Producer and end-user witnesses also substantiated the general observations of the State's economic experts with specific examples of how the Guidelines had frustrated their attempts to secure competitively priced gas and to market gas into the Central Illinois Market.

Producer and end-user witnesses substantiated the general observations of the State's economic experts with specific examples of how the Guidelines had frustrated their attempts to secure competitively priced gas and to market gas into the Central Illinois Market.

For example, Dr. Stillman, an economic expert for the State, concluded that the Guidelines tended to restrict freely competitive gas pricing. He reasoned that the bid-out and rebid restrictions would cause off-system producers to tack on an additional charge to reflect the added uncertainty of having to go through the bid-out and rebid process. (Stillman 544–551). This was contradicted by the State's producer-marketer witnesses, Messrs. Dar, Ballard, and Kuenz, who testified that the bid-out had no effect on the price they offered to purchasers on their profits. (Ballard dep. 63–64).

Panhandle argues that it presented evidence by its expert, Dr. Carpenter, which included an "economic analysis involving actual transactions that proved no anticompetitive impact and, in fact, demonstrated that the Guidelines achieved prices well below the national average and well below that achieved by competing pipelines."

At trial, however, Dr. Carpenter conceded that the analysis he had performed did not indicate what prices might have been absent the Guidelines. His analysis simply compared prices under the Guidelines with prices of other pipelines. He made no attempt to determine whether they entailed similar circumstances and no attempt to calculate the actual pricing impact of the Guidelines. (Carpenter 7288–7289).

Panhandle argues that the competitive restrictions contained in the Guidelines are relevant only to the State's proprietary claims. The State responds that, assuming LDC's were eligible under the Guidelines, then the Guideline restrictions applied with equal force to LDC customers, industrial and residential/commercial alike. The State further argues that LDC's *were* excluded under the Guidelines.

The Court finds that G and SG LDC's were excluded from the Guidelines and were not allowed to transport gas under them because of the sole supplier provisions of the G tariff and service contracts. The only LDC's that could be treated as eligible were LS LDC's (beginning in 1984). Since the G and SG LDC's were not potential customers under the Guidelines, then the provisions of the Guidelines are not relevant to the claims of any residential/commercial customers behind the LDC's. The Guidelines, however, are specifically relevant to the proprietary claims of the State. As to those claims, the Court finds that since the state agencies involved can best be described as being in the same category as industrial end-users (because of their level of use), no monopoly power existed. Consequently, there can be no liability as to the monopoly counts. As to all of the proprietary claims no liability can be found because Plaintiff has not met its burden of proof regarding monopoly power.

There is no finding of antitrust liability here as to the residential/commercial indirect purchaser claims because Panhandle was under no duty to extend the use of the Guidelines to the three G tariff LDC's (CILCO, IP, and CIPS) which served the residential/commercial customers in the Central Illinois Market. As set out above, it is the Court's belief that the sole provid-

er provision of the G tariff and service agreements were valid and enforceable at all material times and not in violation of the antitrust laws.

Plaintiff also argues that the Guidelines constituted an unlawful segmentation of the market, and since Panhandle extended the use of the Guidelines to industrial end-users and refused to extend use to LDC's, that decision subjects it to antitrust liability in favor of the residential/commercial consumers who were effectively denied access. There is certainly support for this position in the *MPC* cases.

But in view of the fact that this Court has found that, in the chaos that existed at the time in question, the sole supplier provision of the G tariff and service agreements was enforceable, there was no duty on the part of Panhandle to extend transport services to G LDC's.

Panhandle agreed, in implementing the Guidelines, to transport gas for industrial end-users, which then became direct purchasers of gas. They were not receiving that gas indirectly from the system supply of the LDC. They were purchasing it directly from the gas producer. This segmentation of the market certainly occurred because Panhandle wanted to do transport business with its fuel-switchable marginal customers while at the same time continuing to require that CILCO, CIPS, and IP purchase their system supply needs from Panhandle at a higher price. Under the circumstances, it was not unreasonable for Panhandle to so segment the market.

The following provisions of the Guidelines were either "good" or "bad" in an antitrust sense for the following specific reasons:

i. *Minimum Volume Requirement*

The minimum volume requirement did not constitute an unreasonable restraint of trade. Panhandle's Guidelines contained a minimum volumetric limitation of 100,000 Mcf per year. This limitation was imposed to reduce the administrative burden of managing a transportation program; e.g., the volumes transported had to be carefully monitored, and off-system producers had to be connected to Panhandle's gathering

system. Everyone would agree that some minimum amount would be reasonable, to prevent an administrative nightmare. As a practical matter, producers and brokers would not be interested in selling in "small" quantities. So what would a reasonable amount be?

Most LDC's, including CILCO, CIPS, and IP, had transportation tariffs which either expressly precluded transportation services for residential end-users or effectively precluded transportation for residential end-users by imposing a volumetric limitation. Some such limitations were greater than the limitation in the Transportation Guidelines. These LDC limitations were the only restriction on residential end-users transporting gas under interim Section 311 authority. In addition to LDC's express limitations, most producers and brokers were unwilling to enter into contracts for small volumes of gas.

It should be noted that the PanMark (on-system only) program did not have a volumetric limitation. The reason that it was reasonable for the MAT program to have a volumetric limitation while the PanMark program did not was that the PanMark program involved solely producers who were already attached to the pipeline system and who had the needed facilities, such as meters, already in place. It was simply a matter of continuing to operate as before. With respect to transporting supplies from producers who had not been attached to the system before, a whole new operational change and cost change was introduced. (Williams 6738–6739).

It is not uncommon in an arrangement such as the MAT program to select some minimum level in order to monitor the volumes of gas and to avoid any adverse cost impact. The number selected is largely a matter of judgment. The FERC has categorized industrial end-user customers and classified the smallest category as those whose gas purchases are below 300 Mcf per day, which roughly equates to 100,000 Mcf per year. The Commission's recognition that 300 Mcf per day was a reasonable demarcation for industrial end-users may have influenced Panhandle in selecting a

100,000 Mcf per year volumetric limitation. (Williams 6406).

Transaction costs for both Panhandle and LDC's are a reality and are a significant consideration in achieving end-user transportation transactions. A volumetric minimum is reasonable because of the nuisance cost of small transactions. (Tussing 861–864).

There has been no evidence in this case that the 100,000 Mcf/year volumetric limitation in Panhandle's Transportation Guidelines restricted the number of producers or the availability of supply to end-users on the Panhandle system. (Carpenter Trial Tr. 7060). The 100,000 Mcf per year minimum set by Panhandle was not unduly restrictive. Also, in regard to its proprietary claims, the State lacks standing to object to the minimum because its request involved over 100,000 Mcf.

The more difficult question regarding the volumetric limitation is the contention that it was unreasonable for Panhandle not to allow a "pooling" of Mcf use per year by two or more customers to meet the 100,000 Mcf figure. The Court does not believe that the failure to allow pooling was an unreasonable restraint of trade, even though it appears that the "poolers" could have entered into single service contracts with the gas producer and Panhandle. While the Court feels that pooling could have been permitted without unduly adding to the administrative burden of Panhandle, the Court does not believe that the refusal to allow pooling rises to the level of an unlawful restraint of trade.

The inability of residential/commercial consumers to take transportation gas is not germane, since Panhandle's customer with respect to residential/commercial demand was the LDC, not the LDC's customers.

ii. The Right of First Refusal

The bid-out was unduly burdensome and constituted an unreasonable restraint of trade.

At first glance the practice is repugnant because it created an unfair competitive advantage for Panhandle suppliers. All the Panhandle supplier had to do was sit there and wait for the bid to come in and then decide whether to meet the bid or not. This "couch potato" Panhandle supplier did not have to expend any time or money identifying potential customers or negotiating a price with them.

But, as Panhandle argues, the focus of the antitrust laws is to protect competition not competitors; unless the Guidelines somehow impact competition, there is no antitrust liability.

Mr. Williams, one of Panhandle's experts, observed that a high proportion of the gas transported by Panhandle under the Guidelines was off-system gas. From this, he reasoned that the bid-out and rebid requirements had not had a restrictive effect on competition by off-system producers. (Williams 6403–6404). This conclusion fails to take into account internal Panhandle documents, which reveal that the high proportion of off-system gas was due to the ineligibility for regulatory reasons of most Panhandle and TKL gas supplies to take part in the Guidelines program, thereby necessarily causing a high proportion of the deals bid out not to be matched. (PX 223; PX 238; PX 247; PX 268).

The first-refusal component of the Guidelines did injure competition, because it put the bidding process in a straight jacket. The record establishes that this component of the Guidelines dissuaded some non-Panhandle producers and brokers from participating in the process. It is more than mere speculation to suggest that those who chose not to participate in this one-sided process held the real potential to provide gas at a lower price than it was actually provided.

More importantly, the bid-out did not specifically provide for an "auction" process, where the off-system and on-system producers could lower their price below the price in the bid and thereby attempt to succeed in making a deal with the industrial end-user.

Panhandle argues that the Guidelines did not specifically prohibit an "auction," and that such an auction did occur in some cases. Yankee Resources participated in

approximately 50% of the "auctions" which took place under the Guidelines. (Reed 4840). In addition, Yankee Resources requested of A.E. Staley a 10¢/MMBtu increase in price after Yankee's offer was not matched in the bid-out. This demonstrated that Yankee Resources would have offered a reduced price to avoid matching in the bid-out. (Reed Trial Tr. 4841–4842).

The Court is not impressed with this argument. It is clear that in the vast majority of cases the potential auction participants acted as if no auction was available. Since the Guidelines did not provide for an auction, this is not surprising.

Panhandle argues that in many cases, the broker or off-system producer retained the sale by offering a lower price. That assertion simply is not borne out by the record. To the extent such an "auction" did occur it was certainly unofficial. No document ever prepared by Panhandle and disseminated to potential bidders ever suggested that such an auction was possible under the Guidelines, even though subordinate Panhandle personnel recommended to management that the Guidelines be so modified. (Reed 5137–38; PX 307).

Panhandle argues that, even if no additional bidding occurred, the buyer still obtained the gas at the price it wanted. Such an argument is frivolous. To suggest that a buyer would not "want" to purchase gas at a price lower than the price tendered to the bid-out procedure is not worthy of any further comment.

The bid-out caused delays. It is true that much of the delay cited by the State did not involve the bid-out but rather the negotiation of contracts and ordinary operational and regulatory problems involved in starting the flow of gas. At least, that was the situation at the end of the operation of the Guidelines, when the bid-out took about two days. However, at the beginning of the operation of the Guidelines the bid-out took 43 days. Between the 43 day situation and the two day situation were a lot of situations where the bid-out significantly contributed to the delay. For example, in one case, the bid-out process took two days and the end-user

was notified that there was no matching; but, because the end-user's LDC had not agreed to transport gas, over nine months elapsed before the end-user and the LDC reached agreement and Panhandle could start transporting the gas. (Reed 5090–5091).

Panhandle was required to file information with the FERC with respect to transportation undertaken under the Guidelines. With respect to low priority end-user transports under Order 234B, an "Initial Report" had to be filed within 48 hours of the commencement of the transportation. That report set forth the name of the shipper or end-user, the name of the pipeline, and the transportation agreement rate, term, quantity and commencement date. (Reed 4749–4751). Thereafter, a Prior Notice had to be filed and approved within 120 days of the start of transportation in order to continue transportation beyond 120 days. Panhandle filed such notice before the 60th day of the transaction because under the regulations, the Prior Notice filing was subject to a five-day notice and public comment period starting on the day notice was published in the Federal Register. (Reed 4751–4753). The Prior Notice filing included the information in the 48 Hour Report and also listed the seller of the gas, the location of the gas supply, the wellhead price, the term of the supply agreement, and the identity of the end-user of the gas. The notice in the Federal Register also gave the FERC docket number for the transportation; with knowledge of the docket number, an interested party could access the FERC file for additional information about the transportation. (Reed 4754–4757).

Transportation for high priority end-users required the filing of a 30–day initial report within 30 days of the commencement of the transportation. This report contained information similar to that in the Prior Notice filing for 234–B transports and was available to the public in the FERC files. (Reed 4758). In addition, Panhandle had to file annual reports for all transports, both low and high priority, giving cumulative information about the actu-

al transportation undertaken. (Reed 4758–4759).

Producers unanimously objected to the provision of the Guidelines' bid-out that required them to reveal confidential information to Panhandle and its on-system producers as to the price, term, volume and location of supply. (Dar dep. 85–86; Kuenz dep. 36–37; D. Wilson 2195; Fowler 11).

The bid-out thus resulted in the disclosure of confidential information. It is true that, in the bid-out procedure, the names of the buyer and seller were not disclosed to Panhandle's on-system suppliers. However, the information was made known to Panhandle. It is also true that the information supplied to on-system producers did not distinguish between price requests by an end-user where no alternate supply had been lined up and actual deals with a producer or marketer at a stated price. The idea of forcing a buyer to divulge the price that it has worked out with a willing seller so that the Panhandle on-system suppliers could scratch their back sides and ponder whether they wanted to meet that price or not, without any competitive sales effort, or any expenditure of energy at all, is repugnant to every traditional view of what is expected of competitors in the marketplace. And it places the buyer (consumer) in the ridiculous position of not being able truly to bargain for the best price.

It is also true that the information required as part of the bid-out which identified the buyer and seller and the selling price had to be filed anyway, and in some circumstances published in the Federal Register. But that misses the point. The important consideration is *when* the information had to be divulged to Panhandle, not *if.*

End-users also objected to the possibility of spending time negotiating a contract with an off-system supplier only to have to break off those negotiations and negotiate a new one with a Panhandle producer who was matched in the bid-out. (Farris 3792; L. Brown 2411, 2413; Owens 2672; Elder 2594–95; PX 118).

Panhandle argues that the bid-out procedure did not foreclose an end-user or marketer from dealing directly with an on-system producer. If a deal was achieved with an on-system producer, the deal did not have to go through the bid-out procedure. Of course, this very feature is one of the principal reasons that the Guidelines have such an antitrust smell. It is the same as saying: "If you buy from me no strings, no red tape. If you don't buy from me, be prepared to deal with minimum amounts, a bid-out procedure, a 6 month limit on contracts, etc. Plus, you may well end up having to do business with someone you don't want to do business with, because if an on-system producer matches your deal, you must deal with that producer instead of the off-system producer you had chosen."

A final repugnant quality of the bid-out was that it forced the industrial end-user to do business with a producer on one basis only—the price of the natural gas. Producers also objected to the time, effort and expense in finding an end-user and negotiating a contract only to lose the deal to a Panhandle on-system producer who did not have to expend similar time or money. (Kuenz dep. 45–46; D. Wilson 2194). For example, Vinod Dar of Hadson Petroleum Corp., an oil and gas exploration and production company, testified that he was commercially disappointed after having spent a great deal of time and money developing a deal only to lose it to an on-system Panhandle producer after the bid-out. (Dar dep. 66). Similarly, Robert Kuenz, General Manager of Williston Gas Company, testified that Panhandle's bid-out procedure put producers such as Williston at a competitive disadvantage because it forced them to reveal to Panhandle all the details of a deal, and then allowed Panhandle to decide whether to take away the deal. (Kuenz dep. 45–46).

Panhandle's economic expert, Dr. Williams acknowledged that the bid-out process and the Guidelines afforded Panhandle's on-system suppliers a competitive advantage over off-system producers. (Williams 6609–6610).

Dave Wilson testified to the added cost incurred by independent producers as a result of the bid-out procedure. These producers spent significant amounts of money developing gas reserves only to find they could not make a sale because a Panhandle on-system producer had matched their price and taken away their market. This uncertainty was a contributing factor in Wilson's decision to avoid Panhandle's market area. (Wilson 2194).

Likewise, Robert Kuenz stated that the bid-out and rebid affected his willingness to deal with Panhandle. He testified that the uncertainty of the bid-out had a direct effect on a producer's cash flow and on his ability to contract for new gas supplies from producers who were willing to contract once they knew their contract could be in jeopardy of being canceled because of the bid-out. Kuenz stated that independent producers need to be assured of continued cash flow, and the bid-out and rebid provisions of the Guidelines foreclosed this assurance. (Kuenz dep. 39–40).

Kuenz also testified that stability of supply was an important consideration to the end-users he contacted in the Central Illinois Market and that they wanted a longer than six month commitment of supply. Kuenz testified that the bid-out and rebid affected his ability to supply end-users with long term supply. (Kuenz dep. 40).

That stability of supply is important to end-users was confirmed by Panhandle's Fred Fowler, General Manager of Panhandle Trading Company, who stated that in his experience end-users would like to enter into contracts of longer duration, and because of that fact Panhandle Trading Company generally entered into two year contracts with its suppliers. (Fowler dep. 18–20, 22).

Finally, producer witnesses testified that the bid-out put both independent producers and end-users at a competitive disadvantage because it reduced the competitive process solely to price when other factors such as a producer's financial stability, the reliability of its supply, and longevity of business relationship are also important considerations. Under the Guidelines, an end-user was forced to accept any on-system Panhandle producer who matched regardless of any other factor. (Kuenz dep. 41–42, 45–46, 85, 117; D. Wilson 2195; Fowler 36; Dar 78; Owens 2673–74; Brown 2410–14; Elder 2593).

That is bad because it forced an industrial end-user to do business with producers with whom they would otherwise not have done business, because the producer was a stranger, or the end-user had had a previous bad experience in dealing with the producer, or the producer was on shaky ground in terms of the end-user's perception of the producer's ability to actually fulfill the contract for gas during the next month period, or the producer had a bad general reputation in the industry, etc. The list of reasons as to why factors other than just price could and would be added to the decision of what producer to do business with could go on and on.

### iii. The Six–Month Rebid Requirement

The Guideline transport contracts had to be rebid every six months. When rebid, Panhandle had a renewed right of first refusal with all of the problems cited above. As Panhandle points out, the six month rebid never resulted in an interruption in service. But this component was still an unreasonable restraint of trade. It interfered with the ability of an end-user and a producer to establish an ongoing business relationship. Such longer term relationships, because they often include a growing element of trust, can act as a foundation for resolving disputes when they arise.

Further, limiting the contract period to six months could have had effect of higher gas prices for the end-user six months down the road because it had been unable to lock in a lower price for a longer period of time.

Without the six month interruptability restriction, a producer might have traded a lower price for the assured cash flow of a two or three year contract; it would be unwilling to do this under the Guidelines, since the deal would have to be rebid every six months. (Tussing 816). However, dur-

ing 1984 no spot market sales contacts had terms of longer than 30–60 days with a set price. Most of those that did had price renegotiation clauses.

Panhandle argues that the spot market was basically a six month contract market and, because of changing market conditions, spot market producers were unwilling to enter into commitments of any longer duration. While this was certainly true as to some spot market producers, the record is clear that there were industrial end-users and producers which wanted to enter into longer term contracts and were prohibited from doing so by the six months rebid provision of the Guidelines. Price was only one factor in the purchase. Other relevant considerations were the security of the longer contract in a fluid market and the reduction of administrative red tape if the contract did not have to be rebid every six months.

Rebid was eliminated from the Guidelines in January of 1985. Consequently, many deals for the transportation of gas pursuant to the Guidelines never went through the rebid.

## SUMMARY

Panhandle had monopoly power over the residential/commercial natural gas consumers who purchased their gas from CILCO, CIPS, and IP in the portions of the 37 counties served exclusively by Panhandle.

CILCO, CIPS, and IP received their system supply gas from Panhandle pursuant to a "sole supplier" G tariff structure. Panhandle also had monopoly power over these LDC's.

Panhandle did not have monopoly power over the industrial end-users, which could switch to alternate fuels if Panhandle's prices became unreasonable. Because of the level of gas usage involved, the state agencies involved in the State's proprietary claims fall into the category of industrial end-users. Consequently, Panhandle did not exercise monopoly power over them.

When blanket certificate transport came along, CILCO wanted to take advantage of it to purchase cheaper spot market gas. It could not do so without violating the G tariff.

Panhandle and CILCO were free to negotiate a new tariff, but neither side was willing to concede enough to make the negotiations successful. One of the reasons for this was that the FERC regulatory picture was changing dramatically, and neither side wanted to give up more than they had to prior to some new stability being created on an industry-wide basis.

Panhandle did not want to transport gas at all but recognized that fuel-switchable end-users at the margin were beginning to switch to alternate fuels. Panhandle wanted to keep them as customers, even if it was only as transport customers. So Panhandle developed the Transportation Guidelines.

The Guidelines had two features which constituted an unreasonable restraint of trade—the right of first refusal and the six month rebid.

Originally, no LDC's had access to the Guidelines, but after Order 380 removed the minimum bill from LS tariffs, it was in Panhandle's interest to allow LS LDC's to transport gas as an alternative to the LS LDC's buying their gas from another pipeline. That left only the G LDC's captive to buying Panhandle's higher gas.

Plaintiff's basic argument that Panhandle was required to make its pipeline available to its competitors and to renegotiate its contracts to allow its customers access to other suppliers under any circumstances (and without restrictions) is contradicted by its own authority. In *MCI Communications Corp. v. AT & T,* 708 F.2d 1081 (7th Cir.1983) the plaintiff argued that AT & T refused to provide plaintiff with multipoint connections (i.e., intercity interconnections) and this refusal violated the antitrust laws.

Similarly, Plaintiff here claims competitors should have had unlimited access not only to Panhandle's entire pipeline but also to its sole-supplier customers prior to any FERC order requiring that Panhandle allow its G and SG customers to purchase gas from other sources. The access sought here is even more far reaching than

in *MCI Communications*. Thus, as did the Seventh Circuit in *MCI Communications*, this Court finds that the denial of such access is not a basis for antitrust liability.

Plaintiff erroneously argues that Panhandle forced G and SG LDC's into exclusive dealing arrangements. Plaintiff has ignored the fact that Panhandle's tariffs were approved by the FPC (now the FERC) in 1951. These tariffs were subject to and have been challenged before the FERC by CILCO and Plaintiff. Similarly, the FERC and G and SG customers can propose, and have proposed, changes and modifications to Panhandle's tariffs. Furthermore, the FERC can order, and has ordered, modifications of Panhandle's tariffs to allow G and SG customers to purchase gas from other sources. Thus, regulatory restrictions and bilateral service contracts with LDC's such as CILCO, not unilateral conduct by Panhandle, were responsible for the sole supplier provisions in Panhandle's G and SG tariffs, and Panhandle was entitled to operate in accordance with the terms of its approved tariffs.

Panhandle had no antitrust duty under the circumstances to waive the G tariff or agree to modifications of the G tariff which were to the liking of CILCO.

The "segmentation of market" which occurred as a result of Panhandle's implementation of the Guidelines was the segmenting of the system supply customer from the industrial end-user. Under the chaotic conditions of the time, the Court cannot find that this segmentation constituted unlawful monopolization, especially since FERC had initiated programs which did the same thing (SMP's).

The fact that LS LDC's were allowed access to the Guidelines was not a "segmentation" of the market for this antitrust analysis, because pursuant to the LS tariff, the LS LDC had the right to purchase gas from another pipeline.

Panhandle's methods and attitudes about the effect of its corporate decisions on the little person at the end of the pipeline will not qualify it for any civic award. Some of the sentiments expressed by Panhandle executives internally are despicable. But the State has failed to prove by a preponderance of the evidence that Panhandle is liable on the claims as charged in Counts I and II of the Complaint.

## COUNTS III AND IV

### Attempted Monopolization
### Attempted Monopolization of Gas Sales

For the same reasons stated previously in regard to Counts I and II, the Court finds that Panhandle is not liable on the claims of attempted monopolization as charged in Counts III and IV.

## COUNTS V AND VI

### Monopoly Leveraging

Earlier Findings concerning Panhandle's control over pipeline transportation of natural gas into the Central Illinois Market and individual LDC service areas within the Central Illinois Market (see Findings in Counts I and II) lead the Court to conclude that pipeline transportation of natural gas into the Central Illinois Market constitutes a service market.

The industry recognized pipeline transportation of natural gas as being a discrete service market separate from the sale of gas itself. (Stillman 492–493, 499, 511; Tussing 3554–3558). Pipeline customers, including LDC's, brokers, producers and end-users, perceived separate demands for gas and pipeline transportation. (Carpenter 7234–7244; Doyle 5195; Elder 2598; Farris 2793; Tussing 3554–3558, 4275–4275; Vergon 2838; D. Wilson 2208; K. Wilson 2374).

Panhandle itself in its Form 10K's filed each year with the SEC described its business as including not only selling gas, but "also provid[ing] transportation of gas for unaffiliated companies." (PX 502–505).

There is no economically viable substitute for the pipeline transmission of gas as the means of getting natural gas from the producing regions of the country to consuming areas such as the Central Illinois Market. (Stipulations 1/30/87, ¶ 31; Reed 4933). Truck transportation, the most like-

ly substitute, is prohibitively costly in comparison. (Carpenter 1735; Stillman 500, 598).

Pipeline transmission of gas as a separate service has long existed in the industry. (Tussing 798; Tussing 3554–3558). For example, the FPC certificated pipelines to transport gas for other parties on a separate contract basis as early as the 1950's. (Tussing 799).

Transportation of gas to direct buying industrial end-users has similarly existed as a separate service since at least the mid–1970's. (Tussing 791–793). Gas and transmission of gas have been unbundled and offered separately for literally decades in the intrastate market. (Stillman 706). With the enactment of the Natural Gas Policy Act in 1978, the offering of "unbundled" pipeline transportation as a service separate from the sale of gas greatly accelerated. (Tussing 3554–3448).

In fact, Panhandle itself viewed gas and transportation as separate products as evidenced by its creation of a marketing affiliate, Panhandle Trading Corp., to deal exclusively with the buying and selling of natural gas. (Tussing 3557).

Panhandle offered pipeline transportation of gas as a service separate from gas sales. For example, Panhandle's Transportation Guidelines and interim Section 311 transportation programs both have involved the separate service of transporting gas. (Stillman 563–564).

To implement these separate transportation services, Panhandle used separate transportation rates from its gas sales rates, reflecting different classes of service. (Kennedy 1071; PX 1006).

Panhandle did not unlawfully exploit its pipeline transportation monopoly over the Central Illinois Market to exact competitive advantages for itself in the sale of natural gas to LDC's (and the residential/commercial customers behind them) for system supply. See Findings in relation to Counts I and II.

For the reasons stated previously, the Court finds that Panhandle is not liable on the claims of monopoly leveraging as charged in Counts V and VI.

## COUNTS VII AND VIII

### Essential Facility

Regulatory constraints significantly impeded the ability of a producer, broker or other competitor of Panhandle to install a connecting line between a pipeline and a customer to which access was desired; the FERC would not grant a competitor's request for access into a service area of another pipeline simply because the competitor's gas prices were lower than those of the pipeline already serving the area.

Panhandle was a monopolist with respect to natural gas sales to G LDC's within the Central Illinois Market. Panhandle's pipeline system in some parts of the relevant market constituted an essential facility that producers, brokers, and its other competitors could not physically duplicate in every section of the Central Illinois Market. In some parts of the market it would have been (and was) economically feasible to physically duplicate the pipeline (e.g., NGPL, ANR). In other parts of the market it would not have been economically feasible to physically duplicate the facility. (Stipulation of 10/22/84, ¶ 32; Reed 4939).

See Findings concerning the cost and feasibility of constructing interconnects between other (non-Panhandle) interstate pipelines and those portions of the CILCO, CIPS, and IP service areas in the Central Illinois Market.

Of course, to the extent that a producer, broker, or other competitor could gain access to the Panhandle pipeline, physical duplication would not be necessary.

Northern Border Pipe Line Company filed an amendment to an application in FERC Dkt. No. CP 84–407–003, dated May 8, 1986 for a Section 7(c) certificate to extent its main line transmission facilities from Ventura, Iowa to Chrisman, Illinois. Northern Border also filed a request for a blanket certificate under Order No. 436 in FERC Dkt. No. CP 86–395–000, dated March 19, 1986. (Bray Trial Tr. 5644). This extension is nearly 400 miles in length

and it would cross the transmission facilities of several interstate pipelines, including NGPL, ANR, Northern Natural, Panhandle, Midwestern and TKL. The extension would also terminate in or near the distribution facilities of CILCO and would cross those of other LDC's in Illinois. The proposal filed by Northern Border evidences the fact that partial duplication of the main line transmission facilities of Panhandle and other pipelines was economically feasible. (DX 1140).

Panhandle did, legitimately, object to FERC when NGPL wanted to come into the CILCO market. Panhandle was justified in doing so because it had a G tariff in place, which FERC had approved, plus long term service contracts with CILCO, which made it the sole supplier of gas for CILCO until 1988. FERC ultimately decided to limit the NGPL interconnect to emergency uses only.

Aside from the issue of physical access to the Central Illinois Market, and perhaps more to the point, it was the G tariff, and not unilateral conduct on the part of Panhandle, which effectively denied access to other suppliers of natural gas to the Central Illinois Market.

Because of the turmoil in the natural gas industry at the time and the existence of the G tariff (and long term service contracts), this Court cannot find that Panhandle unlawfully denied producers, brokers, and other competitors access to its pipeline system serving the Central Illinois Market.

See Findings in relation to Counts I and II.

For the reasons stated previously, the Court finds that Panhandle is not liable on the claims of essential facility as charged in Counts VII and VIII.

### COUNTS IX AND X

#### Tying

Contrary to Plaintiff's assertions, the Court finds that the facts of this case are not appropriate for a *per se* analysis. Consequently, under the rule of reason analysis, Plaintiff must establish that Defendant exercised monopoly power in the relevant market. The Plaintiff has established that Defendant possessed monopoly power in the relevant market and that the sale of natural gas constituted a product market separate from the service of transporting natural gas.

*Panhandle Possessed Sufficient Market Power Over The Tying Item (Pipeline Transportation) To Appreciably Restrain Competition In The Tied Item (Natural Gas Sales)*

Regulatory constraints impeded the ability of a producer, broker or other competitor of Panhandle to simply install a connecting line between a pipeline and a customer to which access was desired. FERC regulations discouraged the duplication of pipeline delivery systems; the FERC would not grant a competitor's request for access into a service area of another pipeline simply because the competitor's gas prices are lower than those of the pipeline already serving the area.

*Panhandle's Tying Conduct Affected A Substantial Volume of Commerce In Natural Gas*

Panhandle G and SG customers forced to purchase natural gas and pipeline transportation from Panhandle on a bundled basis have purchased more than 200 billion cubic feet of gas from Panhandle during each year from 1983 to 1986. (PX 1027A). LDC customers within the Central Illinois Market purchased an estimated $415 million of gas from Panhandle in 1983, $340 million in 1984, and $246 million in 1985. (PX 521; PX 523). Illinois industrial end-users transporting gas under the Panhandle Guidelines program, and therefore subject to the Guidelines "first refusal" restriction, transported an estimated 9 bcf of gas in 1984 and 22 billion cubic feet in 1985. (DX 1420).

Panhandle did not unlawfully exercise control over its pipeline to force G LDC's into the purchase of natural gas from it. Panhandle and the G LDC's had long term agreements, due to expire in 1988–1989, which established Panhandle as the sole provider of natural gas to those LDC's. Those service agreements, based on specif-

ic demand characteristics of the LDC's, were enforceable until FERC, as it did in Orders 436 and 500, established new rules determining the basic dynamics of the relationship between the pipelines and the LDC's. Since the residential/commercial consumers took their gas from the LDC's, their claims are controlled by those findings.

Panhandle did exploit control of its pipeline to force industrial end-users into granting Panhandle a preference in the gas purchased for transport pursuant to the Guidelines. But the G tariff LDC's did not qualify for use of the Guidelines, and Panhandle did not have market power over the industrial end-users (including the State agencies involved in the State's proprietary claims). No LS LDC is a party to this action. See all previous Findings.

For all of the above reasons, the Court finds that Panhandle is not liable on the claims of illegal tying as charged in Counts IX and X.

## CONCLUSIONS OF LAW

### COUNTS I AND II

#### *Monopolization*

■ The offense of actual monopolization under Sherman Act, 15 U.S.C. § 2, requires proof of the following basic elements: "(1) the possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). *See, MCI Communications Corp. v. AT & T Co.*, 708 F.2d 1081, 1106 (7th Cir.1983), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). Panhandle possesses monopoly power in the relevant market. Panhandle's power, while not the consequence of a superior product, business acumen, or historic accident, was not willfully acquired or maintained.

### A. *The Relevant Market*

To determine whether a firm possesses monopoly power, courts commonly begin by ascertaining the relevant market and calculating the defendant's share of the market. In conducting this analysis, however, it is important to keep in mind the point of the exercise: "The definition of the relevant market has no independent significance under the Sherman Act. It relates only to the determination of whether a defendant possesses monopoly power." *Southern Pacific Communications Co. v. AT & T Co.*, 740 F.2d 1011, 1020 (D.C.Cir. 1984), *cert. denied*, 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985). As observed by the Seventh Circuit, "market share is simply an indication of [market] power and possesses no other significance." *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.*, 784 F.2d 1325, 1336 (7th Cir.1986).

■ The relevant market has both product and geographic dimensions, termed the "relevant product market" and the "relevant geographic market." *Brown Shoe Co. v. United States*, 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962). Within these geographic and product dimensions, the market inquiry seeks to identify an "area of effective competition" within which the defendant operates and within which the competitive effects of its challenged conduct will be felt. *Standard Oil Co. v. United States*, 221 U.S. 1, 61, 31 S.Ct. 502, 516, 55 L.Ed. 619 (1911).

■ The market definition must include both the seller's capabilities and the impact upon the buyer. *Sargent–Welch Scientific Corp. v. Ventron Corp.*, 567 F.2d 701, 711 (7th Cir.1977), *cert. denied*, 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978).

The relevant product market is broadly defined as comprised of those products or services "reasonably interchangeable by consumers for the same purpose." *United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956); *Fishman v. Wirtz*, 807 F.2d 520, 531 (7th Cir.1986). Within this more broadly defined area, narrower subdivisions of "submarkets" may exist that in

**900**

themselves qualify as relevant markets for antitrust purposes. As expressed by the Supreme Court:

> The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

*Brown Shoe Co.*, 370 U.S. at 325, 82 S.Ct. at 1523. *See also, Grinnell Corp.*, 384 U.S. at 572, 86 S.Ct. at 778; *Sargent–Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701, 710 (7th Cir.1977), *cert. denied,* 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978); *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 712 (7th Cir.1979), *cert. denied,* 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980).

As more fully set forth in the findings of fact, the relevant product market in this case is the sale of natural gas, plus alternate fuels and energy conservation, to G and SG LDC's.

The sales of gas by pipelines to G and SG LDC's are nearly fungible, being governed by the same FERC regulations, the same tariff conditions, and very similar contract provisions. The elasticity of the demand between natural gas and fuel alternatives or natural gas and energy conservation technology or methods, is inversely proportional, depending on the relative price and the market supply.

This market is too broad and must be further narrowed by reference to the capabilities of different types of end-users to take advantage of either alternative fuel or energy conservation methods or both. Because residential/commercial end-users' capabilities are so much more restricted,

these end-users constitute a separate part of the market than do industrial end-users with dual fuel capacities. This submarket is the relevant product market for purposes of antitrust analysis.

■ The relevant geographic market consists of the area "in which the seller operates, and to which the purchaser can practicably turn for supplies." *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 627, 5 L.Ed.2d 580 (1961). *See, Standard Oil Co. v. United States*, 337 U.S. 293, 299 n. 5, 69 S.Ct. 1051, 1055 n. 5, 93 L.Ed. 1371 (1949).

The Panhandle pipeline system constitutes the relevant geographic market. Ordinarily, Panhandle decisions regarding a specific customer (e.g., a G LDC) would have to be extended to all other similar customers (e.g., all other G LDC's) on the Panhandle system.

■ Just as a product submarket may constitute the relevant product area for antitrust analysis, "so may a geographic submarket be considered the appropriate section of the country." *Brown Shoe*, 370 U.S. at 336, 82 S.Ct. at 1523 (quoting *Erie Sand & Gravel Co. v. FTC*, 291 F.2d 279, 283 (3rd Cir.1961)). *See also, Denver Petroleum Corp. v. Shell Oil Co.*, 306 F.Supp. 289, 304 (D.Col.1969) (holding that a particular crude oil production field constituted the relevant geographic market, even though it was likely that the defendant's monopoly power extended beyond this area); *Woods Exploration and Producing Co. v. Aluminum Company of America*, 438 F.2d 1286, 1304–06 (5th Cir. 1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972) (applying the reasoning of *Denver Petroleum* to a natural gas production field controlled by the defendant's pipeline).

■ Where a competitor seeks access to a particular market in which the defendant competes, the focus on the relevant geographic inquiry is the market to which access is sought, even though other markets may exist for other purposes and potential claimants. *Fishman*, 807 F.2d at 531–32. *See also, Otter Tail Power Co. v. United*

*States*, 410 U.S. 366, 369, 93 S.Ct. 1022, 1025, 35 L.Ed.2d 359 (1973) (defining the relevant geographic market as any local municipal service areas to which competitors sought access through electric transmission lines controlled by the defendant); *City of Mishawaka v. American Electrical Power Co., Inc.*, 465 F.Supp. 1320, 1325–26 (N.D.Ind.1979), *aff'd in relevant part*, 616 F.2d 976 (7th Cir.1980), *cert. denied*, 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 (1981) (same as *Otter Tail*); *Woods Exploration*, 438 F.2d at 1304–06 (defining the relevant geographic market as a local natural gas production field to which a competitor sought access through a pipeline controlled by the defendants).

Where the defendant is a regulated utility, courts have held that the relevant geographic market for antitrust purposes can consist of individual towns served by the defendant or an "aggregation" of such local municipal service areas. *See, e.g., Otter Tail*, 410 U.S. at 369–70, 383 n. 1, 93 S.Ct. at 1025–26, 1032 n. 1 (Stewart, J. concurring and dissenting); *Fishman*, 807 F.2d at 533–34 (construing *Otter Tail* as supporting a geographic market definition consisting either of "[t]he aggregate of towns" in the defendant's service area or of a series of separate "municipal systems" in which the defendant competed).

The Court rejects Defendant's claim that the relevant geographic market is in fact larger than the entire area served by Panhandle's pipeline. It is true, as Defendant suggests, that LDC's served by Panhandle are or could be interconnected with other pipelines and could also gain access to other pipelines through interconnection with other LDC's. It is also true that Panhandle theoretically competed with others not only for sales to current customers but also for revival of service agreements with these customers and for new customers. However, in the context of a regulated industry, one regulated to the extent that FERC regulated the natural gas industry, the above were not effective alternatives for Panhandle's customers.

Panhandle misapplies the *Ball Memorial* case as support for a broader "regional, if not national" market than the Central Illinois Market. In *Ball Memorial*, the Seventh Circuit upheld a broader market than that posted by the Plaintiff because the evidence demonstrated that customers could "switch readily" to more distant suppliers who could "enter quickly." *Ball Memorial*, 784 F.2d at 1332. The court further stressed the absence of "barriers to entry," the fact that the defendant did not "own any assets that block or delay entry," and that the defendant did not have "captive customers." *Id.* at 1335–36. In sharp contrast, Panhandle's captive Central Illinois LDC customers were not able to switch readily; G and SG customers including those in Central Illinois constituted a captive market segment; other pipelines and producers were not able to enter quickly; capital cost and regulatory barriers substantially impeded entry; and Panhandle's control of the exclusive pipeline for LDC system supply in Central Illinois stood as an asset with which it can and has blocked entry.

Panhandle argues that the geographic market should include the total capacity of all other pipelines that might theoretically install a connecting pipeline to any portion of the Central Illinois Market. This argument is critical to its further assertion that Panhandle's gas sales market share is only 12–13% when one pulls in the "potential" capacity of other pipelines. However, the theoretical framework employed by Panhandle in coming to these conclusions specifically states that suppliers should not be included until "they have had non-eligible sales in the market for a continuous period of several years" and that "transportation" barriers should be taken into account to exclude suppliers who cannot "readily supply" customers within the tentatively identified market. Landes and Posner, *Market Power in Antitrust Cases*, 94 Harv.L.Rev. 937, 967 (1981).

In its analysis, Panhandle has simply disregarded these qualifications, including the full production capacity of pipelines that have never made actual sales into the area and that confront substantial entry barriers in the form of regulatory and contract impediments to transporting gas into the

area for LDC system supply. As of the time of trial, other pipelines had not yet been able to respond to high Panhandle prices since early 1983 by making competing system supply sales to LDC's within the Central Illinois Market. For some individual service areas within the Central Illinois Market, the cost of doing so relative to the potential sales was prohibitive. Even for the more densely populated northern Peoria service area of CILCO, NGPL was unsuccessful (as of the time of trial) in its efforts to install a connecting pipeline capable of selling NGPL gas to CILCO for its system supply. Even had another pipeline installed a connecting line to an LDC within Central Illinois, the G and SG tariff constraint would have precluded system supply purchases by the LDC's.

Respecting the recent Seventh Circuit decision in *Fishman*, 807 F.2d 520, the Court does not read *Fishman* as saying that where a competitor seeks access to a specific area, that area "ipso facto" becomes the relevant geographic market. Where a competitor seeks access to a local market, the focus of the geographic market inquiry is the market to which access is sought, even though other markets may exist for other purposes and potential claimants. *Id.* at 531–32. Having tentatively identified such a market, one then asks—as did the court in *Fishman*—whether customers within the area can realistically turn elsewhere for supplies; if not, then the area to which access is sought can stand as a relevant market on standard antitrust analytical grounds. *See also, Otter Tail*, 410 U.S. at 369, 93 S.Ct. at 1025; *Tampa Electric*, 365 U.S. at 327, 81 S.Ct. at 627.

The parties have jointly stipulated to specific counties and municipalities within which Panhandle has been the exclusive transporter of interstate natural gas. (Joint Stipulation ¶¶ 29, 30). The Court finds that this area comprises the relevant geographic submarket, not the 40 counties listed in the Complaint and not the broader market argued by Panhandle.

## B. *Monopoly Power*

Once the relevant market has been identified, the next step in the orthodox antitrust analysis of monopoly power is to determine whether monopoly power exists.

### 1. *Market Share*

Monopoly power is the "power to control prices or exclude competition." *DuPont de Nemours*, 351 U.S. at 391, 76 S.Ct. at 1005. *See, Grinnell*, 384 U.S. at 571, 86 S.Ct. at 1704; *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596 n. 20, 105 S.Ct. 2847, 2854 n. 20, 86 L.Ed.2d 467 (1985). The existence of monopoly power may, in some circumstances, be inferred from a firm's predominant share of the relevant market. *Grinnell*, 384 U.S. at 571, 86 S.Ct. at 1704. Panhandle controlled gas prices and excluded competition in the Central Illinois Market and throughout its pipeline system.

The material consideration in determining whether monopoly power exists is not that prices have actually been raised or competition actually excluded, "but that power exists to raise prices or to exclude competition when it is desired to do so." *American Tobacco Co. v. United States*, 328 U.S. 781, 811, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). *See, Photovest*, 606 F.2d at 721.

Where the record reveals a market share of 70 to 80%, courts have simply inferred the existence of monopoly power without specifically examining the actual degree of control over prices on competition, i.e., the extent of its monopoly power. *MCI Communications*, 708 F.2d at 1106–07; *Grinnell*, 384 U.S. at 571, 86 S.Ct. at 1704; *American Tobacco*, 328 U.S. at 797, 66 S.Ct. at 1133. Panhandle has maintained a share of the relevant market substantially in excess of 70 to 80% and thus it would ordinarily be proper for this Court to infer the existence of monopoly power.

Defendant sees it differently and asserts in its Proposed Findings:

In fact, PEPL's share calculation does not even reflect the competition which PEPL faces from suppliers of alternate fuels, from other sellers of gas which compete with PEPL through transportation over PEPL's own system, and from

potential pipeline interconnects over 30 miles in length. By the end of 1986, nearly 50% of the gas delivered by PEPL into its existing service area was transport gas not owned by PEPL. Thus, PEPL's actual share of the relevant sales market is considerably smaller than that computed on the basis of competing pipeline capacity alone. This evidence demonstrates that competing suppliers have considerable capability to displace PEPL sales and to render ineffective any effort by PEPL to restrict output or raise prices. PEPL's share in the system-wide relevant market is therefore sufficiently small to refute the contention that PEPL has monopoly power.

All of what Defendant argues above would be true if the relevant market was all sales on the Panhandle system, including direct sales to industrial end-users. But that is not the market. It would be ludicrous to say that the market is that broad, while ignoring the captive G and SG tariff customers who were denied lower priced gas through their LDC's because Panhandle would not transport gas for system supply. If any market is expanded far enough, the expansion may well dilute market power to the point where it cannot be effectively utilized. But a proper antitrust analysis focuses on the real market where the decisions impacted on the Defendant's ability to exercise power in the market and where the customers were meaningfully affected by those corporate business decisions.

In this case, that real market is the sale of natural gas to G and SG LDC's (and the residential/commercial consumers behind them), the alternate fuels available in the same market and energy conservation. Defendant is correct that Plaintiff's share calculation doesn't affirmatively reflect the competition faced from suppliers of alternate fuels, or, for that matter, conservation. But the total record makes it clear that, prior to the sharp increase in the price of gas, most customers served by the LDC's met their heat energy needs by the use of natural gas. For purposes of this analysis it is fair to assume that any reductions in the purchase of natural gas for system supply for the period 1983–1986 were the result of (a) conservation, (b) use of alternate fuels, and/or (c) industrial end-users making direct purchases outside of their LDC's system supply.

After those reductions are made, the amount of gas still purchased by the LDC's for system supply was so substantial as to negate Panhandle's argument that it did not have monopoly power. Certainly in 1983, 1984, and 1985 that could not be said. And, while it is true that, by 1986, a substantial amount of the gas being delivered into its service area was transport gas not owned by Panhandle, the figures are still sufficient to constitute an adequate share of the market to exercise market power. That is particularly true if one deducts the amount delivered to LS customers and industrial end-users from the amount transported which was not owned by Panhandle.

Thus, Panhandle's substantial share of the relevant market would ordinarily make it proper for this Court to infer market power.

### 2. Direct Evidence of Monopoly Power

In an industry subject to pervasive federal regulation, however, an inference of monopoly power cannot be based solely on a firm's predominant market share. Panhandle and competing pipelines are subject to substantial public utility regulation as to their rates, costs and return on equity, the terms and conditions of their services, and the initiation and abandonment of services. Such regulation may preclude a firm from unilaterally controlling prices, excluding competition or restricting output despite its predominant market share, which itself is often the direct result of such regulation. Therefore, the presumptive link between high market share and monopoly power is severed. *See*, Landes and Posner, 94 Harv.L.Rev. at 975. As the court said in *MCI Communications:*

> [T]he size of a regulated company's market share should constitute, at most, a point of departure in assessing the existence of monopoly power. Ultimately, that analysis must focus directly on the

ability of the regulated company to control prices or exclude competition—an assessment which, in turn, requires close scrutiny of the regulatory scheme in question.

708 F.2d at 1107. *See also, Southern Pacific*, 740 F.2d at 1000.

 Thus, market share is not the exclusive approach to assessing the presence or absence of monopoly power. Inferential proof of market share may be a proxy for direct evidence that the defendant possessed monopoly power in the sense of the power to "control prices or exclude competition." As observed by the Supreme Court in *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986):

> Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, "proof of actual detrimental effects, such as reduction of output," can obviate the need for an inquiry into market power, which is but a "surrogate for detrimental effects."

*Id.* at 460–61, 106 S.Ct. at 2018. *See also, Fishman*, 807 F.2d at 541 n. 18 (finding adequate proof of monopoly power over a market consisting of a single stadium where the evidence demonstrated that the defendant could, raise its rent to team sports events far above those being charged by adjacent stadiums without causing those events to switch arenas); and *Denver Petroleum*, 306 F.Supp. at 304 ("[W]hen, with an illegal practice such as present here in mind, one looks to an area and sees the existence of monopoly power, not by inference from market share, but by determining actual ability to exclude competition and control prices, there appears no real need to go further").

 Direct evidence of monopoly power is not only probative but necessary where the defendant, like Panhandle, is a regulated utility. Specifically, while market share is still viewed as a "point of departure" in assessing the existence of monopoly power, "[u]ltimately, that analysis must focus directly on the ability of the regulated company to control prices or exclude competition ..." *MCI Communications*, 708 F.2d at 1107. This requires consideration of the interrelationship between the particular anticompetitive practices at issue and the regulatory scheme under which the defendant operates, to determine whether the regulations effectively counter such abuses. *Id.* at 1107; *Southern Pacific*, 740 F.2d at 1001–02.

In *MCI Communications*, MCI sought access to local telephone exchanges after the FCC held that AT & T had a duty to provide interconnects.[1] Because of AT & T's agreement to negotiate with MCI, the FCC deferred further action on MCI's claim against AT & T. AT & T then negotiated in bad faith and, to further delay MCI's efforts to interconnect, filed tariffs with 49 states prohibiting interconnects, knowing that the state agencies lacked jurisdiction over these interconnect decisions. *MCI Communications*, 708 F.2d at 1095–96, 1156–78. After another appeal to the FCC, MCI was finally able to interconnect. Thus, AT & T's state tariff filings were designed to thwart an FCC ruling and an express obligation under FCC orders that AT & T negotiate interconnects.

*MCI Communications* did not involve a situation where, as here, the tariffs and service agreements had been filed and approved by the FERC many years earlier, and the parties operated under those tariffs until CILCO, a solely-supplied customer, decided much later that it wanted a unilateral change in the G tariff and long-term service agreement. Moreover, *MCI Communications* did not even involve long-term service agreements or regulatory

1. The FCC's initial decision was not entirely clear, but it was later clarified to require substantial interconnection. AT & T claimed that prior to the clarification it believed in good faith that the decision allowed only minimal interconnection. That interpretation was not only wrong, but the jury found that AT & T's interpretation was not in good faith. *Id.* 708 F.2d at 1140–41. In this case, the FERC has adopted Panhandle's interpretation of its tariff as a sole supplier tariff, and has only ordered changes prospectively. *See,* Opinion No. 265, supra.

obligations to obtain long-term supplies to meet that service obligation.

Government regulations do not stand as an effective check where they leave the challenged monopolizing conduct in the first instance in the defendant's discretion, or where the government agency is not able to respond to the abuses promptly and effectively. *Id.* at 1001. FERC regulation has not operated as an effective constraint on Panhandle's exercise of monopoly power.

The costs which Panhandle is allowed to recover through rates, including gas costs and allowed return on equity, and the design or structure of Panhandle's rates, are subject to extensive review and approval by the FERC. The FERC allocates Panhandle's allowed return over a projected design level of sales, and Panhandle cannot increase its profit margin on any units of sales without FERC approval.

However, Panhandle made its own decisions regarding the choice of gas making up the mix delivered throughout its system for the system supply of LDC's. Those decisions made a critical difference in the costs Panhandle was allowed to recover.

FERC's rate regulations, as extensive as they were, were not effective to protect against the exercise of monopoly power by the Defendant. FERC's review of gas costs is limited to a prudency review and, as a practical matter, prior to and during the time in question in this litigation, no pipeline needed to be significantly concerned that its choice of gas mix would be determined to be imprudent to the extent that the pipeline would not be allowed to recover 100% of its gas costs.

It is true, as argued by Defendant, that pipelines earn no profit on the gas cost portion of their rates. It is also true that gas costs are not a part of the rate base on which return is based, and a pipeline does not specifically enhance its profit by increasing its cost of gas. But these arguments ignore the real reasons that Panhandle made certain decisions that resulted in its using a very expensive mix of gas: (a) to protect TKL, a wholly owned subsidiary from annihilation because of TKL's take-or-

pay obligations which must be met; (b) Panhandle's own take-or-pay obligations; (c) dealing with the take-or-pay situations in such a way that the entire cost of any imprudent or unwise business judgments in incurring the take-or-pay exposure would be passed on totally to the customer, and not absorbed at all by the shareholders of TKL and Panhandle. These goals could be accomplished by Panhandle within the regulatory framework because the residential/commercial consumers behind the G and SG LDC's in the Panhandle system had no real alternative, either in the short run or the long run, but to continue to buy natural gas from Panhandle through their LDC.

Panhandle does lack the power independent of regulatory authority to restrict output. Panhandle sells gas under Certificates of Public Convenience and Necessity issued by the FPC or the FERC, and Panhandle has a regulatory service obligation to supply gas, upon request, up to the Contract Demand level specified in its service agreements with customers. Panhandle is subject to regulatory sanction, including the loss of its certificates, if it withholds deliveries of gas when it has adequate supplies available to meet the Contract Demand of its customers. The evidence does not show that Panhandle ever attempted to restrict gas deliveries in this fashion.

Panhandle's ability to exclude competition rests in large part upon FERC's historical perceived inability affirmatively to order a pipeline to grant competitors access to its pipeline system and in part on the fact that the decision whether to grant access rested in the first instance with Panhandle. Added to FERC's inability to constrain effectively Panhandle's transportation discretion is the agency's similarly limited ability to prevent Panhandle from passing through gas costs to its customers, rather than absorbing part of the costs as lower profits.

While Panhandle argues that FERC can prevent the pass through of gas costs on grounds of "imprudence," its only support for this assertion is an initial decision by a

FERC ALJ that did not clearly so hold. *Panhandle Eastern Pipe Line Co.,* FERC Dkt. TA 84–1–28–002 (Initial Decision of Law Judge, at pp. 6–7). Both the FERC itself and the District of Columbia Circuit Court have explicitly held that FERC has no such power. Order 436, p. 11–26; *Maryland People's Counsel v. FERC,* 761 F.2d 768, 770 (D.C.Cir.1985).

Panhandle questions the relevance of direct evidence of its monopoly power consisting of the sustained spread between its own system supply gas prices versus delivered spot market prices and the prices of other pipelines. While it concedes that substantial excess supplies of gas have been available since at least 1984, Panhandle nevertheless reasons that the spread between its own prices and those of other suppliers simply reflects historic cost differences. This argument, however, misses the point. Were Panhandle truly in a competitive market with respect to its captive LDC system supply sales, one would expect to see such a spread reduce to a greater extent and prices come more into conformity, whatever the historic source of the discrepancy. The known failure of Panhandle's prices to respond in such a manner is, thus, direct evidence that it possesses monopoly power over captive LDC market segments.

Panhandle likewise questions the relevance of the State's direct evidence of monopoly power consisting of Panhandle's proven ability to segment markets. Its reasoning is unclear on this point but appears to be that any apparent market segmentation that exists is a creature of FERC regulation rather than Panhandle discretion. The record is clear that it was Panhandle's decision to adopt a market strategy in which it initially excluded all LDC's from competitive gas transportation programs and later allowed transportation to non-captive fuel-switchable end-users and partial requirements LDC's but not to G and SG LDC's. Meanwhile, the FERC sought to encourage transportation to LDC's under § 311. Not only is such evidence highly relevant to Panhandle's monopoly power over captive G and SG customers, it also explains how Panhandle was able to respond to competitive pressure by the non-captive market segments without having to drop its prices to the captive group.

It is not the State's position that Panhandle "raised its rates above those of other pipelines to enhance its profits," as suggested by Panhandle. The State instead contends that Panhandle adopted strategies that enabled it to protect its profit margins against excess gas costs by not having to absorb costs on sales to captive customer groups, while bleeding off competitive pressure by non-captive groups through preferential transportation strategies. Viewed in this light, Panhandle's financial performance evidences its monopoly power; notwithstanding that it has faced extensive potential gas cost liability in recent years, it has yet to absorb a single dollar of such cost through lower profits.

Missing from Panhandle's arguments as to direct evidence of monopoly power is any discussion of the extensive evidence presented of actual instances when Panhandle successfully excluded competitors from captive market segments, specifically including the Central Illinois Market. Also missing is any discussion of the many internal Panhandle documents expressly acknowledging that it had the power to exclude and control price through gas costs. Most conspicuous in its absence, however, is any discussion of what is surely the strongest evidence of all concerning Panhandle's power to exclude: its control of the exclusive pipeline system serving LDC system supply sales in the Central Illinois Market.

It should be noted that every case discussed in these Conclusions of Law (*e.g., MPC I, MPC II, MPC III, AGD, Consolidated,* and the interlocutory appeal in this case) accepts as a given that pipelines such as Panhandle do have monopoly power. However, it should be clearly stated that, because of the ability of industrial end-users to switch to alternate fuels, Panhandle held no monopoly power over them. Included in this group would be not only the indirect purchaser industrial end-user plaintiff class members but also the State

agencies involved in the proprietary claim. Consequently, any claim in this case which involves an element of monopoly power or dangerous likelihood of monopoly power must fail as to those designated Plaintiffs on that ground alone.

Fuel-switchable industrial end-users sometimes purchase natural gas from LDC's, and sometimes they do not. Whether they do or do not is determined by the price of natural gas as opposed to alternate fuels. If alternate fuels establish a sustained price lower than natural gas, then the industrial end-user will expend the capital necessary either to switch permanently to the alternate fuel (such as coal) or to develop the ability to use a choice of fuels depending on which one is cheapest at a particular time. For example, an employee of St. Francis Hospital of Peoria testified at trial that a "flip of the switch" determined whether the heat generating energy being used at any particular time was natural gas or fuel oil.

Judge Posner, in the *en banc* decision on the interlocutory appeal in this case, touched on this lack of market power over the industrial customers in deciding that they could not bring a claim as an indirect purchaser:

> Since the industrial customers were not obligated to take a fixed (or their required) quantity of natural gas, and since they had competitive alternatives, Cilco's profit maximizing course of action was to swallow part of the overcharge rather than try to pass it on dollar for dollar in the form of higher rates. But its residential customers *unlike its industrial customers* had no good alternatives to natural gas (of which Cilco was the sole purveyor)....

*State of Illinois ex rel. Hartigan v. Panhandle Eastern*, 852 F.2d 891, 895 (emphasis added).

The Plaintiff virtually conceded (by lack of proof) that Panhandle did not have monopoly power over the industrial end-user segment of the market. The State agencies involved in the proprietary claims were either explicitly or implicitly always characterized as belonging to the "industrial end-

user" group. At the trial of this case, the entire focus of evidence regarding market power was on the residential/commercial consumer.

Plaintiff did not establish by a preponderance of the evidence that Panhandle had market/monopoly power over any but the residential/commercial consumer. In fact, in the Special Addendum to the Third Amended Complaint, Plaintiff asserted a submarket of residential/commercial consumers. The Court believes that this was done with the certain knowledge that the Plaintiff was not prepared to (and probably could not) prove Panhandle's monopoly power over the "industrial end-user" type of consumer involved in the proprietary claims.

### 3. *Willful Maintenance of Monopoly Power*

The Plaintiff must prove that Panhandle willfully maintained its monopoly power. *Grinnell*, 384 U.S. at 570–71, 86 S.Ct. at 1704. Mere size is not an offense under the Sherman Act. *United States v. Swift & Co.*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932). The existence of unexercised monopoly power does not violate the Sherman Act. *United States v. United States Steel Corp.*, 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343 (1920); *see, Byars v. Bluff City News Co., Inc.*, 609 F.2d 843 (6th Cir.1979); *Berkey Photo Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2nd Cir. 1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). Moreover, if monopoly power is lawfully obtained, the monopolist can lawfully raise prices and may charge what the market will bear. *See, Ball Memorial*, 784 F.2d at 1339. Not every action by a monopolist constitutes willful maintenance of monopoly power. A monopolist is free to compete and can engage in vigorous competition knowing that it will enlarge its market share. *Id.*

"[T]he lawful monopolist should be free to compete like everyone else; otherwise the antitrust laws would be holding an umbrella over inefficient competitors." *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797

F.2d 370, 375 (7th Cir.1986). A company with monopoly power is not required to agree to every demand of its customers or competitors; it has leeway in making business decisions. *Glen Eden Hospital v. Blue Cross & Blue Shield*, 555 F.Supp. 337, 345 (E.D.Mich.1983), *aff'd in pertinent part*, 740 F.2d 423 (6th Cir.1984). A monopolist need not maintain an operation, for example, if it is no longer profitable or practical, even though its abandonment may economically injure a customer. *See*, *International Railways of Central America v. United Brands*, 532 F.2d 231 (2nd Cir.1976), *cert. denied*, 429 U.S. 835, 97 S.Ct. 101, 429 U.S. 835 (1976) (defendant's decision to stop shipping produce from Central America because of political problems was justified even though the plaintiff railroad company would lose revenues).

 Just as other firms generally may refuse to deal with another party without violating antitrust laws, *Becker v. Egypt News Co.*, 713 F.2d 363, 366 (8th Cir.1983), a firm having an otherwise lawful monopoly has no duty to deal with a competitor, reduce prices or help new entrants in the market. *Olympia Equipment Leasing*, 797 F.2d at 376. Antitrust liability lies only if business reasons are merely a pretext for anticompetitive behavior; no liability attaches where the firm has valid business reasons for its activities. *Becker*, 713 F.2d at 370.

The natural gas pipeline industry has been, and continues to be, subject to pervasive public utility regulation. As the Seventh Circuit has stated, "the presence of a substantial degree of regulation ... may affect both the shape of 'monopoly power' and the precise dimensions of the 'willful acquisition or maintenance' of that power." *MCI Communications*, 708 F.2d at 1106. The duties, obligations and rights of Panhandle under FERC regulation must therefore be considered in determining whether Panhandle's conduct was proper and was undertaken in furtherance of legitimate business or regulatory objectives. *Southern Pacific*, 740 F.2d 980 (AT & T did not violate the antitrust laws through denial of access to an essential facility because it was justified on the basis of its duties under regulation to implement a public interest standard pertaining to interconnection).

A monopolist may engage in normal business activities even if its conduct has an adverse effect on a competitor. Thus, a government-regulated utility's decision to transport electricity only according to its regular rate schedule and not under preferential terms, as demanded by its customer, a municipal distributor, did not violate the Sherman Act. *Town of Massena v. Niagara Mohawk Power Co.*, 1980-2 Trade Cases (CCH) ¶ 63,526 at 76,791, 1980 WL 1889 (N.D.N.Y.1980).

The antitrust laws are not violated merely because a defendant makes anticompetitive statements. Mere intentions to increase sales or market share are "normal business goals, not forbidden by § 2 without other evidence of intent to monopolize." *United States Steel Corp. v. Fortner Enterprises*, 429 U.S. 610, 612 n. 1, 97 S.Ct. 861, 863 n. 1, 51 L.Ed.2d 80 (1977). Thus, the Plaintiff must also show some anticompetitive or predatory act.

> [A] statement of intent to compete, ... even if perceived as a threat, is not unlawful. Such a manifestation of intent to triumph in the competitive market, in the absence of unfair, anticompetitive or predatory conduct, is not enough to establish an antitrust violation.

*Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 273 (7th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982), quoting *Hayes v. Solomon*, 597 F.2d 958, 977 (5th Cir.1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980). Thus, statements by Panhandle personnel that they desired to continue making sales of gas under long-term service agreements and the sole supplier provision of the G tariff, rather than transporting gas which would displace those sales, were not by themselves unlawful.

██ In determining whether Panhandle willfully acquired or maintained monopoly power, it is not necessary to find that each allegedly anticompetitive act was in itself sufficient to demonstrate an abuse of mo-

nopoly power. Rather, one looks to the record as a whole. *Aspen Skiing,* 472 U.S. at 599, 105 S.Ct. at 2855. As observed by the Seventh Circuit within the specific context of a case involving a regulated utility monopolist, "[i]t is the mix of the various ingredients of utility behavior in a monopoly broth that produces the unsavory flavor." *City of Mishawaka,* 616 F.2d at 986. *See also, Woods Exploration,* 438 F.2d at 1307–09 (finding illegal monopolization in a pattern of exclusionary conduct that included the denial of competitive access to a natural gas pipeline controlled by the defendants).

Where the defendant is in the competitively unique position of being a monopolist, normally lawful conduct can cross over the threshold and become part of a larger pattern of willful monopolizing conduct. *City of Mishawaka,* 616 F.2d at 986; *Sargent–Welch,* 567 F.2d at 711–12. For example, in *Otter Tail,* the Supreme Court found illegal monopolization in a pattern of exclusionary conduct that consisted of denying competitors access to electric transmission facilities controlled by the defendant, exploiting contract arrangements so as to effectively hold competitors out of captive markets, and initiating litigation designed to prevent or delay the establishment of competing facilities.

*Otter Tail* involved actions by Otter Tail to prevent municipalities from establishing their own retail distribution system after Otter Tail's retail franchise expired:

> The antitrust charge against Otter Tail *does not involve the lawfulness of its retail outlets,* but only its methods of preventing towns it served from establishing their own municipal systems *when Otter Tail's franchises expired* .... When Otter Tail's franchise in each of these towns terminated, the citizens voted to establish a municipal distribution system. Otter Tail refused to sell the new system's energy at wholesale and refused to agree to wheel power from other suppliers of wholesale energy.

410 U.S. at 370–71, 93 S.Ct. at 1026 (emphasis added). Thus, *Otter Tail* may stand for the proposition that a utility cannot refuse to transport power it does not supply to a former long-term customer, but it does *not* stand for the proposition that a utility must renegotiate extant long-term service agreements to enable a customer to supplant the utility as its sole supplier.

In *City of Mishawaka,* the defendant was monopolizing or attempting to monopolize the retail sale of electricity by charging a relatively high wholesale rate to retail distribution systems while charging a low retail rate to customers of those systems. Wholesale rates were regulated by the FERC while retail rates were not. The FERC, however, was required to weigh and consider the discriminatory effect of wholesale and retail rates in combination. The Court found that the defendant evaded regulatory review by violating "the Federal Power Act, at least by its [the defendant's] own admission in failing to weigh in advance the discriminatory effects of its differences in wholesale and retail rates," and by filing new and higher superseding wholesale rates before the prior rate was adjudicated. 616 F.2d at 982. Thus, the Seventh Circuit upheld findings of illegal monopolization based upon the defendant's use of filed tariffs which were not a "sham" but had the economic effect of foreclosing competition, together with the defendant's use of "unrealistic alternatives" for wheeling competing electric power over transmission lines controlled by it. *Id.* at 986.

Similarly, in *United States v. United Shoe Machinery Corp.,* 110 F.Supp. 295, 344–35 (D.Mass.1953), *aff'd per curiam,* 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954), illegal monopolization was found in a pattern of exclusionary conduct that included the use of customer leases which, while not expressly exclusive, effectively foreclosed competitors from access to the customers, together with the defendant's use of a market segment strategy in which it offered favorable terms to less captive customer groups so as to retain their patronage without having to lower its price to other, captive groups.

In determining whether challenged practices by a monopolist constitute illegally willful acts of monopolization, it is also relevant to look to the impact of the practices on competitors, on consumers, and on the defendant itself. *E.g., Aspen Skiing*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467. "[A] healthy and unimpaired competitive process is presumed to be in the consumer interest." *Fishman*, 807 F.2d at 536. However, such is not always the case in a regulated industry.

Also relevant to the determination of willfulness is evidence that the defendant has been attempting to "exclude rivals on some basis other than efficiency" and has been "willing to sacrifice short run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival." *Aspen Skiing*, 472 U.S. at 610–11, 105 S.Ct. at 2861.

Within the context of non-regulated industries, some courts simply "presume" the element of willfulness from the defendant's use of business conduct which, while ordinary, leads to the acquisition or maintenance of monopoly power, irrespective of whether the defendant actually intends to thereby monopolize the market. However, where the defendant is a regulated utility, as is Panhandle, courts require a more specific showing of "specific intent to monopolize," namely, an intent to actually control prices or exclude competition, i.e., to seize or hold monopoly power. *MCI Communications*, 708 F.2d at 1107–08; *City of Mishawaka*, 616 F.2d at 985. This does not require proof of bad faith or malevolence in the criminal or tort sense. Rather, it is the intent to acquire or maintain monopoly power in the sense of the power to control price or exclude competition. As observed by the District of Columbia Circuit in the related context of attempted monopolization:

> [S]pecific intent ... has little relation to the defendant's altruistic or malevolent motivations. Rather, specific intent in this context refers to a purpose to acquire monopoly power by driving one's rival from the market by exclusionary or predatory means. The law thus requires

not *why* but *whether* one intends to acquire unlawful monopoly power.

*Ass'n for Intercollegiate Ath. for Women v. N.C.A.A.*, 735 F.2d 577, 584 (D.C.Cir. 1984) (emphasis in original). *See also, Aspen Skiing*, 472 U.S. at 602, 105 S.Ct. at 2857 (referring to specific intent as the intent "to accomplish the forbidden objective—as Judge Hand explained, 'an intent which goes beyond the mere intent to do the act.'").

The required specific intent may but need not be shown by direct evidence of an actual purpose to monopolize. Alternatively, specific intent may be proven by circumstantial evidence in light of the record as a whole. *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 375, 47 S.Ct. 400, 404, 71 L.Ed. 684 (1927) ("[A]lthough there was not direct evidence—as there could not well be—that the defendant's refusal to sell to the plaintiff was in pursuance of a purpose to monopolize, we think that the circumstances disclosed in the evidence sufficiently tended to indicate such purposes."); *City of Mishawaka*, 616 F.2d at 984–85 ("the trial court inferred utility intent to impair plaintiffs' competitive ability and the desire to preserve and expand its own existing monopoly from a consideration of the evidence in its entirety.").

The Court finds that, for the reasons discussed below, Panhandle did not (in most instances) willfully acquire or maintain monopoly power in the relevant market. Rather, Panhandle's conduct was primarily a result of the regulatory scheme, and the changes to that scheme, in existence during the course of events leading to this litigation.

This lawsuit generated a tremendous amount of discovery, a 13 week trial, and over 1,000 pages of Proposed Findings of Fact, Conclusions of Law and related materials. This case tells the story of an industry in turmoil, with almost nobody happy about their situation at any given time.

Many of the Findings of Fact in this case point to an ultimate bottom line finding of antitrust liability on the part of Panhandle.

This is so because it is clear from the record that Panhandle had monopoly power over residential/commercial indirect purchasers and was prepared to exercise it to protect its market. Many of the internal statements made by Panhandle personnel bear this out.

It is certainly true that Panhandle prevented G tariff LDC's such as CILCO from purchasing cheap spot market gas from other producers to be transported by Panhandle. It is also true that Panhandle, because of the regulatory scheme, was able to segment its market and transport off-system gas to industrial end-users and LS LDC's while at the same time holding LDC's such as CILCO to the terms of the G tariff.

It is also true that Panhandle, in order to help its affiliate TKL and to minimize its own take-or-pay exposure, sold a more expensive mix of gas than it had to, thus resulting in higher gas bills for the residential/commercial consumers, who had no real choice but to pay the higher price.

So far, all of these facts, and many more, point toward antitrust liability.

But these findings must be considered in the context of what was going on in the marketplace at the time in question, including not only the relative price of spot market natural gas (as compared to natural gas under contract to Panhandle) but also the changing nature of the FERC regulations and the decisions by the District of Columbia Circuit Court of Appeals.

First, as to the relative price of natural gas, spot market gas, including the price of transportation from wellhead to burner tip, was almost always less expensive (and often much less expensive) than the natural gas purchased from an LDC's system supply. So, if it were merely a matter of saying, "every LDC should have immediate access to the least expensive source of natural gas," Panhandle would be would be guilty on all counts. But, into this "broth" must next be mixed the ingredient of regulation.

Prior to 1978, under the NGA, pricing was so heavily regulated that there was really nothing to talk about. A pipeline did not really have any significant maneuvering room in that regard. With the passage of the NGPA, and the deregulation of gas prices, Pandoras' box was opened.

It is clear that the NGPA was passed in furtherance of a goal of increased competition. It is also clear that the FERC was interested in moving toward more competition regarding the sale of natural gas. That interest on the part of the FERC to create regulations which would open up the natural gas market was tempered by the developing gas surplus in the early 1980's along with a resulting take-or-pay problem in the natural gas industry.

The resulting FERC regulations (Orders 319 and 234–B) provided for transportation of natural gas pursuant to a blanket certificate under § 7(c) and other special marketing programs. These regulations, which had the desired effect of making some adjustments to a market which was in a state of disequilibrium, also spawned substantial litigation, resulting in a number of decisions by the D.C. Circuit.

Those decisions are critically important to the resolution of the antitrust issues in this case. An excellent discussion of these cases is contained in *Associated Gas Distributors v. FERC*, 824 F.2d 981 (D.C.Cir. 1987) ("*AGD*").

In *Maryland People's Counsel v. FERC*, 761 F.2d 768 (D.C.Cir.1985) (*MPC I*), the Court:

> ... invalidated as arbitrary and capricious FERC's authorization of a "special marketing program" under which a pipeline and its producer agreed to "amend the high-priced gas purchase contracts entered into between them in earlier years, so as to permit the producers to sell the committed gas elsewhere (at current market prices), crediting the volume of such sales against the pipeline's high-priced purchase obligations." We held that FERC had failed to set forth a reasonable basis for its decision to exclude "captive customers" from eligibility to purchase the cheaper released gas.

*Maryland People's Counsel v. FERC*, 761 F.2d 780, 781 n. 1 (D.C.Cir.1985) (*MPC II*) (citations omitted).

Needless to say, CILCO would have met the definition of "captive customer" referred to in *MPC I. MPC I* certainly pointed out the concern about market segmentation constituting a practice that would be considered unduly discriminatory.

In *MPC II*, the D.C. Circuit specifically addressed the legitimacy of FERC Orders 319 and 234–B, which provided for "blanket certificates" for the transportation of direct-sale of natural gas pursuant to Section 7(c) of the NGA. Panhandle's Transportation Guidelines involved the use of such a blanket certificate.

Much of the background provided in *MPC II* is already familiar to us—acute gas shortages in the 1970's leading to deregulation contained in the NGPA in 1978; long-term high-priced gas contracts between pipelines and producers; concern about industrial end-users shifting to cheaper alternative fuels, etc. 761 F.2d at 782–84. In *MPC II*, the Court stated:

> Inspection convinces us that highly relevant factors, underscored by MPC, have been brushed aside without warrant by the Commission. We therefore return this matter to the agency for the focused inquiry thus avoided—an inquiry into the impact of the Commission's enlarged and restyled blanket certificate program on the customers most vulnerable to pipeline monopoly power.

*Id.* at 786.

Maryland People's Counsel had argued that pipelines (like Panhandle) could exercise their economic power through the use of the blanket certificate by segmenting their market, making lower priced gas available to energy switchable industrial end-users, and maintaining higher priced gas to G type LDC's and the residential consumers they served. 761 F.2d at 784–85. Such, according to the *MPC II* court, constituted a clear violation of the antitrust laws:

> But many of the largest industrial end-users can shift, and pipelines, as sellers of gas, cannot lawfully lower prices to these customers without lowering prices to all. See, e.g., *Transcontinental Gas Pipe Line Corp.*, 28 F.P.C. 979, 983

(1962) (refusing to approve "patently discriminatory and singularly preferential" discount rates); *Otter Tail Power Co.*, 2 F.P.C. 134, 145 (1940) (utility regulation is designed to prevent the use of monopoly power to "discriminate against customers in a weak bargaining position").

761 F.2d at 785.

The *MPC II* Court, recognizing the many antitrust issues raised by the blanket certificate program, remanded the matter to FERC for further review. In the closing two paragraphs of the opinion, the Court framed the complexity of the problem facing FERC, but at the same time vacated the blanket certificate:

> In its oversight of the natural gas market, FERC confronts baffling problems. It must administer a pair of statutes that sometimes seem at cross-purposes; it must seek out the elusive optimal mix of competition and regulation; and whatever it does, it subjects itself to the slings and arrows of outraged producers or pipelines or LDC's or consumers. Appreciating that the Commission has an arduous task, we are nonetheless obliged to conclude that FERC has not discharged that task satisfactorily in the present case.

> On remand, FERC should fully consider and reasonably analyze the competitive concerns advanced here by MPC. We vacate the challenged orders to the extent that they allow transportation of direct-sale gas to fuel-switchable, non-"high-priority" end-users without requiring pipelines to furnish the same service to LDC's and captive consumers on non-discriminatory terms.

*Id.* at 789.

*MPC II* certainly appears to support the claims of the Plaintiff in this case that the market segmentation practice allowed by the blanket certificate (i.e., the Transportation Guidelines), had the effect of unduly discriminating against the captive G LDC's and the residential/commercial consumers behind them.

However, it is critical to note that the *MPC II* opinion did not specifically find that the blanket certificate effectively vio-

lated the antitrust laws, nor that any scheme that allowed for such market segmentation was illegitimate.

The Court remanded for FERC to "fully consider and reasonably analyze the competitive concerns." The wording of the opinion carefully avoids any conclusion as to what the result of FERC's analysis should be. In response to *MPC II*, the FERC, on remand, found that:

> The information gained from [existing] programs confirms our earlier view that all customers and consumers served by the pipelines that are releasing gas for sale under the SMPS are benefiting from the programs.

*Extension Order*, 28 F.E.R.C. 61,383 at 61,685–686, as cited in *Maryland People's Counsel v. FERC*, 768 F.2d 450, 452 (D.C. Cir.1985) (*MPC III*).

In support of this conclusion, the FERC cited to increased take-or-pay relief, wider fixed-cost spreading, and further exploration and development of natural gas reserves. *MPC III*, at 454. In order to appease the D.C. Circuit, the FERC imposed on the SMP's a new condition, requiring that:

> anyone with a firm contractual entitlement to purchase gas from a releasing pipeline ... be permitted to nominate up to ten percent of its firm contractual entitlement to be purchased for system supply under SMP.

*Extension Order*, 28 F.E.R.C. at 61,686, quoted at 768 F.2d at 453.

The Court in *MPC III* was not impressed either with the "10% rule" or the reassurance that the SMP programs were properly benefiting all customers and consumers. The *MPC III* Court found that the reassurances from FERC were the same ones rejected as justification in *MPC I* and *MPC II*. 768 F.2d at 454.

As to the 10% rule, *MPC III* found that there was no apparent reasoned basis for setting the figure at 10%, as opposed to some other percent. It was also found that in setting the 10% figure, FERC was recognizing that discrimination existed and that "substantial discrimination would remain." *Id.* at 454–55.

Consequently, the *MPC III* Court found that the new orders were not a substantial change, even though they might have been "marginally" less discriminatory. The problem, according to the Court, was that the new orders "continue to entail identical lapses of logic and evidence." Since the SMP's were scheduled to expire on October 31, 1985, and the FERC was to have comprehensive new rules on file by that day, the orders were not vacated, but rather, were allowed to "die a natural death." 768 F.2d at 455. The *MPC* case concluded with this important language:

> If the Commission wishes to retain discriminatory SMPs in some form after October 31, we trust that it will do so only if it can demonstrate that the petitioners' concerns are unfounded or are outweighed by other relevant considerations.

*Id.*

It should be noted that, in the *MPC* cases, the FERC referred to the SMP programs and the Blanket Certificate Program as experimental—as opposed to permanent adjustments in the regulatory scheme. The word experimental was used because the FERC, while recognizing that changes to their regulations were necessary to respond to changing market conditions, also recognized that it was important not to institute permanent change until it was determined that such constituted a wise course of action.

So, by August 6, 1985 (the date of the *MPC III* decision), the scene was set for a major change in regulation of the natural gas industry. The discussion of the central focus of the FERC's consideration of what was needed in the new rule, found in *AGD*, 824 F.2d at 995–96, is far superior to anything this Court could author. However, with due deference, the high points of that discussion are summarized below.

The basic premise was that the NGA was intended to protect interstate gas consumers from pipelines' monopoly power. By the early 1980's, four developments had occurred which made that goal achievable

by means of assured customer access to the wellhead market. *Id.* at 995.

(1) A nationwide pipeline network had matured. *Id.*

(2) "The removal of wellhead price controls greatly increased an underlying risk of the regulatory system—that pipelines' gas purchase costs would rise above competitive market levels." *Id.*

(3) "The conditions under which the NGPA began to relax wellhead price controls—namely acute gas shortage and sharply rising prices for alternative fuels—tended to divert pipeline attention from the hazards of incurring long-term obligations to buy high-priced gas. Under pressure from the Commission, the pipelines had typically purchased gas under contracts for very long terms." *Id.*

(4) "Various economic forces ... raised the wellhead price—and thereby the potential loss to consumers if they should be saddled with the result of pipelines' readiness to bid high prices." *Id.* at 996.

The following quote from *AGD*, although lengthy, articulately recounts the key findings of the FERC in support of Order 436 (which became effective November 1, 1985), and is also a summary of the provisions of Order 436:

These developments lie in the background of the key Commission findings in support of Order No. 436. (1) Despite the growth of a competitive wellhead market, the interstate pipelines retain market power in gas transportation. (2) Pipelines have generally declined to transport gas in competition with their own sales (except for transportation to customers that can switch to alternative fuels at little or no extra cost). (3) Pipeline discrimination in transportation has denied consumers access to gas to the lowest reasonable rates.

Thus the early 1980s created the likelihood, for the first time, that the Commission could best fulfill the purposes of the NGA by adopting rules enabling customers to buy gas at the wellhead and to overcome the interstate pipelines' general refusal to move gas that would compete with their own sales. Besides pro-

tecting consumers from the burden of the pipelines' purchase contracts at supra-market prices, such rules would have the long-term effect of subjecting pipelines to the ordinary constraints of a middleman under competitive conditions. This the Commission set out to achieve in Order No. 436.

The Order's regulatory package includes these elements: (1) If a pipeline seeks to take advantage of "blanket certification" of transportation (i.e., a certificate authorizing transportation services generically and thus obviating the need for unwieldy individual certification), it must commit itself to provide transportation on a non-discriminatory basis (and thus become an "open-access" pipeline). (2) When demand outruns capacity for open-access transportation, the open-access pipeline shall allocate capacity on a "first-come, first-served" basis. (3) Rate regulation for open-access transportation will take the form of ceilings and floors, with the pipeline free to adjust rates within that band. (4) Any open-access pipeline, by applying for certification, agrees to allow its LDC customers to convert their "contract demand" ("CD") (i.e., contract commitment to purchase gas) from an obligation to purchase gas to an obligation to use (or pay for) transportation services. The point of the option is to make open access a reality for the pipelines' LDC customers despite long-term contractual service arrangements previously certificated by the Commission. The Order also requires an open-access pipeline to give its LDC customers the option to reduce contract demand. (5) The Commission will issue "Optional, Expedited Certificates" for new facilities, services and operations where the pipeline undertakes the entire economic risk of the project. The Commission declined to include in the package any special provision to relieve pipelines from the burden of take-or-pay contracts providing for prices well above current competitive levels.

*Id.*

Needless to say, Order 436 was a major change in the regulation of the natural gas

industry, and it immediately had its detractors. The resulting litigation, *AGD*, upheld most components of the Order. Upheld, for example, were the open-access requirements (*Id.* at 997–1007) and many of the rate-related provisions. The Court upheld the concept of the rate provisions in Order 436, even though they provided for "Value of Service" discounting. Those provisions were vigorously attacked by the American Public Gas Association as being *per se* unduly discriminatory, with the Association citing to *MPC II* as support for its position.

> To read *MPC II* as a rule that price differentials based on demand conditions are always unduly discriminatory would render the decision a defiant and unreasoned exception to the general pattern. The judicial acceptance of such price differentials is longstanding.

*Id.* at 1011.

One of the defects of Order 436 was found to be FERC's failure to develop an adequate rationale in support of CD reduction. *Id.* at 1018–1020.

Maryland People's Counsel argued that, pursuant to *MPC II*, the new rules must provide a firm customer (such as CILCO) "an *immediate* option to convert any purchase obligation *completely*." *Id.* at 1020 (emphasis in original).

This is really what the Plaintiff has consistently asserted in this litigation. According to Plaintiff, once CILCO determined that there was lower priced gas available on the spot market, Panhandle had a duty to negotiate away the sole provider provision of its G tariff and immediately allow CILCO to purchase the cheapest gas it could find and have that gas transported over the Panhandle pipeline. This, of course, would leave Panhandle exposed to whatever consequences might ultimately flow from its enormous take-or-pay exposure.

The *AGD* Court found that the Commission was not required to provide a firm customer an immediate option to convert any purchase obligation completely. Unlike the situation in *MPC II*, the Court in *AGD* found that, in Order 436, the FERC had adequately supported its findings,

plausibly [ ] arguing that the pipelines require time to adjust to the new dispensation, particularly to resolve the take-or-pay problems presented by the producer-pipeline contracts. The specific phase-in period and percentages and election procedures resulted from detailed consideration of various options.

*Id.*

If the *AGD* Court found that the FERC was not required to promulgate a rule including an immediate option to convert any purchase obligations completely, how could this Court hold that it was an unlawful exercise of monopoly power for Panhandle to refuse to negotiate a similar tariff?

Actually, neither side here, Panhandle nor CILCO, was really all that interested in negotiating a new tariff. CILCO wanted to be relieved of the sole supplier provisions of its G tariff, while retaining an obligation on the part of Panhandle to provide them gas if things went wrong in the spot market.

Panhandle, on the other hand, wanted no change with continued captivity of the G customers. Neither side really bargained in complete good faith. Like the phony exchange regarding CILCO's demand for gas which it could not use and Panhandle's agreement to deliver gas it could not deliver, the negotiation process regarding a tariff substitution was mostly bluff with no significant attempt at compromise from either side. This Court is confident that CILCO had no real interest in anything short of total freedom and Panhandle was not interested in anything less than continued captivity for its G LDC's.

One of the major criticisms made of FERC in the *AGD* opinion was the failure of FERC to address the take-or-pay problem in Order 436:

> At the heart of the industry's immediate problem is the discrepancy between the average cost of gas that pipelines have under contract and the much lower price of gas available at the wellhead. The essence of that discrepancy is the same whether the pipelines buy over-priced gas and sell it at a loss, or decline to buy

such gas and thereby incur take-or-pay liabilities. The price discrepancy represents a sunk loss of billions of dollars (doubtless reflected in actual drilling expenses). At issue among the parties is who should bear it. All actors in the natural gas industry—producers, pipelines, LDC's and consumers—are candidates for this dismal position. There is one exception: fuel-switchable users, who can employ the cheapest fuel competing with gas and thus cannot be induced to pay more than the current competitive price.

*Id.* at 1021.

The *AGD* Court remanded Order 436 for FERC to consider, and factor in, the take-or-pay problem.

In a related case, *Consolidated Edison Company of New York, Inc. v. FERC*, 823 F.2d 630 (D.C.Cir.1987), (*Consolidated* ), the Court, on July 21, 1987, remanded a FERC change in its interpretation of the abandonment provision of 15 U.S.C. 717(b). The FERC change liberalized the abandonment process and established a procedure where FERC would "compare the needs of the current consumers against the benefit that would accrue to the natural gas market as a whole were the facilities in question released from Commission jurisdiction." One of the stated reasons for the change in policy was that it would give other purchasers an opportunity to replace higher-priced gas with lower-priced gas. Other reasons cited were: increased competition would pressure suppliers of gas to lower their prices; a pipeline would be more apt to take gas subject to a request for abandonment, thereby lowering its overall gas costs; as cheap gas replaces more expensive gas on a pipeline's system, both gas producers and pipelines would be more likely to renegotiate contracts, thereby reducing take-or-pay requirements and lowering the price of gas. *Id.* at 634–35.

While the *Consolidated* Court agreed that an increase in supply of a product will normally lower the cost of the product to consumers, it went on to suggest that some of the other rationales were of questionable validity. The Court also chided the

FERC for failing to address the take-or-pay problem in a more forthright manner, preferring instead to attempt to treat the natural gas industry as a free market:

... The FERC has not explained how other, captive consumers in the natural gas market will be able to benefit from the new abandonment policy. These less mobile consumers are geographically bound to pipelines that are in turn contractually bound by take-or-pay contracts that make it uneconomical for them to switch to a new market for natural gas, since the pipelines must still pay for the higher priced contractual gas whether or not they take delivery.

In short, the natural gas market is not a classic free market, where the laws of supply and demand operate ineluctibly [sic] for all participants. The FERC's apparent assumption that such standard laws apply across-the-board—or at least its failure to acknowledge the substantial obstacles to free-flowing gas exchange— is troubling.

*Id.* at 638.

The *Consolidated* Court suggested that the CD conversion reduction mechanism in Order 436 might provide a solution to the problem, but noted that Order 436 was then on remand because of problems with the provision, and cautioned that any future hope of successful use of the CD conversion reduction provision could only be considered speculative. *Id.* at 637 n. 9.

In response to *AGD*, the FERC on August 7, 1987, issued Order 500, an Interim Rule and Statement of Policy. On page 14 of that order, the FERC discussed the take-or-pay problem.

The causes of the pipelines' take-or-pay problems are many and complex. It is undoubtedly true that some pipelines imprudently entered into contracts incorporating both high prices and high take-or-pay levels. At the same time, pipelines entered into contracts, which were based on the anticipated demands of their customers, and whose terms reflected those which producers were able to obtain under the then prevailing market conditions. In many instances, pipeline take-

or-pay obligations mounted because of reduced purchases by their customers due to purchases from alternative suppliers, fuel switching by industrial users due to lower fuel oil prices, reduced levels of economic activity, and conservation. The Commission recognizes that it is difficult to assign blame for the pipeline industry's take-or-pay problems. In brief, no one segment of the natural gas industry or particular circumstance appears wholly responsible for the pipelines' excess inventories of gas. As a result, all segments should shoulder some of the burden of resolving the problem.

FERC, in Order 500, made the following reaffirmations and modifications:

Accordingly, in this interim rule, the Commission readopts the regulations originally promulgated by Order No. 436 (including the grandfathering provisions), with the following modifications: (1) in order to permit pipelines to minimize the incurrence of take-or-pay liability because of open-access transportation under these regulations, a producer must offer to credit gas transported by a pipeline against that pipeline's take-or-pay liability to the producer accruing under certain pre-June 23, 1987 gas purchase contracts; (2) in order to provide for equitable sharing, between pipelines and their customers, of the costs of settling already accrued take-or-pay obligations and reforming exiting contracts, the Commission adopts a policy as to the acceptable mechanisms for the pass-through of take-or-pay buyout and buy-down costs; (3) in order to avoid the future recurrence of the kind of take-or-pay problems that exist today, the Commission adopts principles on which pipelines may base future gas supply charges; and (4) while the Commission compiles a record to justify contract demand reductions the Commission eliminates the contract demand reduction option in former § 284–10(c) of its regulations but in order to maintain some meaningful access to transportation for sales customers, the Commission retains the contract conversion option in former § 284.10(c) of its regulations.

Order 500, p. 3–4.

It remains to be seen how well Order 500 and its successors deal with the complex problems of a changing natural gas industry.

The Plaintiff, on behalf of the residential/commercial indirect purchasers, argues that, while the *MPC* cases, *AGD*, and *Consolidated* all talk about take-or-pay in the industry-wide context, our case record establishes that take-or-pay was not a major concern for Panhandle and could not act as a legitimate basis for Panhandle's conduct. There can be no doubt from the record here that the take-or-pay exposure of Panhandle and TKL was enormous. It is also hard to dispute that, regarding that exposure, the typical settlement was $.10 on the dollar. It must also be conceded that Panhandle did not mention such exposure on annual statements to shareholders.

However, all of these established points beg the question. As of trial there remained a tremendous take-or-pay exposure and no assurance that the $.10 on the dollar settlement figure would continue, or that Panhandle could indefinitely continue to shield its shareholders from the effects of the take-or-pay problem.

The Plaintiff's position, that take-or-pay was not a problem, simply lacks credibility. It is an argument easily made because, in making it, it naturally follows from Plaintiff's point of view that there would have been no significant adverse consequences for Panhandle if it had surrendered to demands to let G tariff LDC's transport non-Panhandle gas. Such is not the case. This situation was not, and is not, a Panhandle/CILCO problem, unique to their tariff and service contract relationship. It was and is an industry-wide problem, not best dealt with by an application of the antitrust laws as if we were dealing with a free market situation. *Id.* at 638.

Looking to Panhandle's conduct as a whole, there is substantial direct and circumstantial evidence of Panhandle's intent to hold competition out of captive markets and deny captive customers access to com-

petitively priced gas supplies. Internal company documents reflect Panhandle's intent to "refuse to transport any third party gas into [a customer's] facility, even if a plant closing were to occur" (PX 75); "create maneuvering room to deal with our producers and our customers, while not penalizing our shareholders" (PX 86); "don't let LDC buy cheap gas for system supply to offset our sales" (PX 92); "organized effort to hold others out of our market" (PX 301); "[don't] give producers reason to believe we're giving away a captive market" (PX 114); "split pipeline to provide several separate services with different supplies and prices" (PX 129); and "no end-user transport—keep pressure on LDC's to maintain load" (PX 770).

Thus, Panhandle certainly intended to restrict competition. However, that intent was put into action by enforcement of the terms of the G tariff. As noted above, the presence of FERC regulation alters the meaning of "willful maintenance of monopoly power." While Panhandle's conduct may well have constituted willful maintenance had there been no FERC approved G tariff, the presence of the tariff provided Panhandle with a legitimate tool; use of that tool does not constitute willful maintenance. In other words, the effect of the G tariff was to define out of the "dimension of willful maintenance" the use of the tariff.

Thus, Plaintiff's claim that Panhandle willfully maintained its alleged monopoly power by manipulating its tariffs and contracts is specifically rejected. Plaintiff's claim is basically that Panhandle was under an obligation to modify its tariffs and contracts to make it economically feasible for Panhandle's G customers to purchase cheaper natural gas from other suppliers, despite the fact that Panhandle had regulatory approval to make sales to those customers as a sole supplier for the duration of their service agreements. This claim is unsupported by law and fact.

What Panhandle did, heavy-handedly, was to hold CILCO to the bargain of the G tariff and the service contracts which required CILCO to purchase all of its gas for system supply from Panhandle (unless CILCO requested gas that Panhandle could not deliver). At the time this had become a really hot issue (1982), six years remained on the service contract. That date was later moved back to 1989 by mutual agreement.

The interplay between Panhandle and CILCO after 1982 over whether the G tariff would allow CILCO to purchase certain transport gas for system supply without losing its G tariff status was predictable: All CILCO requests for transport gas were either explicitly or implicitly tied to a retention of G tariff status; Panhandle's responses evolved from no response to a mumbled response to a flat out position that CILCO could not buy transport gas without losing its G tariff status and incurring terrible financial penalties.

Throughout the development of the facts in this case it is painfully clear that Panhandle was willing to do whatever as necessary to hold on to whatever markets it could. The internal discussions by Panhandle executives could not be more clear on this point. It was "sink or swim" time for Panhandle. It could not compete with the spot market without major changes in its choice-of-gas mix. If that occurred, it would jeopardize the existence of its subsidiary TKL, and Panhandle would itself have incurred tremendous take-or-pay exposure on top of the take-or-pay exposure which had already begun to develop because of loss of load. If the Canadian gas project and the Algerian LNG project are factored in, Panhandle's business equation takes on all the appearances of a classic type A heart attack producer for those called upon to make the corporate decisions.

The decisions made by Panhandle in this case can best be described as an ordered retreat. Initially, before their gas prices assumed a sustained supracompetitive level (in relation to the spot market), the corporate position was simply to do business as usual, including no transport for marginal customers such as industrial end-users. When it became apparent that the marginal customers were beginning to switch to al-

ternate fuels, the second line of defense was business as usual as to the non-marginal consumers (residential/commercial), while offering transportation services to industrial end-users pursuant to the Transportation Guidelines. The third line of defense was to extend transport services to LS LDC's while enforcing the sole supplier provision as to the G tariff LDC's such as CILCO, IP, and CIPS.

At the same time, FERC was moving ever more rapidly toward a major restructuring of the regulation of the natural gas industry in its effort to deal with the disequilibrium in the market caused by the deregulation of the NGPA. CILCO's desire for access to cheaper gas was part regular business sense and part a reaction to the growing hue and cry on the part of residential/commercial consumers. Many residential consumers on limited incomes were literally faced with the choice of "heat or eat." The result of this mix of factors constituted chaos in the natural gas market.

The chaos engendered by all the litigation which ensued from the FERC orders was accurately described by the Eighth Circuit as follows:

> Order No. 436 has established a radically new transportation framework for natural gas. In one of the first opinions to explore the ramifications of Order No. 436, Judge Williams, writing for the D.C. Circuit, stated that
>
>> [t]he Order envisages a complete restructuring of the natural gas industry. It may well come to rank with the three great regulatory milestones of the industry: the passage of the Natural Gas Act, ... in 1938, the imposition of price controls on independent producers' wellhead sales under *Phillips Petroleum Co. v. Wisconsin*, ... and adoption of the Natural Gas Policy Act ... in 1978.
>
> *Associated Gas Distributors v. FERC*, 824 F.2d 981, 993 (D.C.Cir.1987) (citations omitted).
>
> Consequently, what might take place, what might happen, what new problems might be encountered, what ultimate

judgments on modification might be required or appropriate were all problems neither FERC nor the industry could perceive. The tentative, experimental nature of FERC's guarded approach is highlighted by the fact that Northern's rate structure was temporary in the sense that the rate was for three years. More evidence will develop obviously, and FERC will gain more experience in the operation of the new regulatory scheme as time goes on. It is quite permissible that this Northern order might constitute a laboratory for FERC in how open-access will or should be applied in the future. Necessarily we do not speak for eternity, much less what FERC—by whatever name then called—will or must hold on these issues.

*Mobil Oil Corp. v. FERC*, 886 F.2d 1023, 1028 (8th Cir., 1989).

Under more stable circumstances, this Court might well find that Panhandle's conduct in not agreeing to transport gas for CILCO for system supply, in refusing to negotiate a new tariff, etc. violated all of the antitrust laws cited in this case; however, this case cannot be decided as if these events occurred in a free market setting. This is a heavily regulated industry, and the industry was undergoing chaotic change at the time. In view of all of the unsuccessful attempts of FERC to deal with and initiate change in the industry which were remanded by the D.C. Circuit Court of Appeals (*MPC I, MPC II, MPC III, AGD, Consolidated*), this Court cannot say that Panhandle had a duty under the antitrust laws to surrender its rights under the G tariff. What would the shape of the "negotiated" tariff have to have been in order for Panhandle to have met such a duty? The FERC itself had serious problems coming to grips with the balancing of "free access" and the impact of free access on the pipelines. It was not until Order 500, issued on August 7, 1987, that FERC factored the take-or-pay problem into the balancing in any meaningful way.

If Panhandle had negotiated a new tariff, it would have had to make that same new tariff available to every other G customer

on its system. It is not reasonable to expect that, in regard to the tariff, Panhandle be ahead of the rest of the industry in making long term changes in its basic business relationships. Again, this is especially true where a valid tariff was in effect at the time that the dispute arose.

The fact that market conditions changed in the 1980's, making the G tariff less attractive to LDC's, does not mean that those LDC's were entitled to immediate gratification of their desire to have access to transport gas. If that logic were followed generally in the law of contracts, then a contract would routinely be voidable, on the option of either party, at any time when such party determined that the continued existence of the contract·was not in its own best interests. Such is not the law of contracts, and such is not the law of this case.

This is not a situation where CILCO was bound in perpetuity to purchase all of its gas from Panhandle. The service contracts were set to expire in 1988–1989. It is also clear that FERC was moving toward a major regulatory adjustment which would have addressed the problem on an industry-wide basis.

While it is true that the real impact of take-or-pay was less than the scope of the take-or-pay exposure, there was nothing to assure that producers would continue to settle take-or-pay claims on the basis of ten cents on the dollar, or that Panhandle be able to continue to shield its stockholders from substantial take-or-pay payout. The truth is, the take-or-pay situation for Panhandle and the industry was just as fluid and uncertain as everything else that was going on at the time. To suggest, as Plaintiffs do, that Panhandle be required to ignore the take-or-pay situation in arriving at a substitute tariff would be legally narcissistic and is a position not supported by the cases.

Here, Panhandle did not seek to change its terms and conditions so as to evade review; rather Panhandle defended its long-standing tariffs and service agreements. Moreover, until Order 436, the FERC had issued no orders requiring that Panhandle's sole supplier tariff be modified or stating that the tariff was no longer appropriate. In fact, all prior regulatory rulings regarding the tariff reached just the opposite conclusion.

Plaintiff has not claimed that the development and approval of the terms and conditions of Panhandle's G and LS tariffs, or the execution of long-term service agreements between the LDC's and Panhandle, were improper when made under regulatory standards or that they violated the antitrust laws.

In *El Paso Natural Gas Co.*, 38 FERC 61,008 at 61,028 (January 12, 1987), the Commission noted that under the Natural Gas Act a tariff that is on file and in effect must be treated as though it were a "statute, binding upon [the pipeline] and shipper alike." Consequently, Panhandle's reliance upon the literal language of the G tariff, and on the design and intent of the tariff, in responding to CILCO's transportation requests, can only be deemed to have been in good faith. This negates any inference that Panhandle was motivated by an improper exclusionary purpose or by an improper desire to segment its markets, and is one of the factors which establishes that Panhandle's conduct did not violate the antitrust law in this respect.

The fact that the FERC eventually ordered Panhandle to file a new tariff demonstrates that it was speculative as to the rates and tariffs under which FERC would permit Panhandle to operate if its G tariff did not preclude LDC's from purchasing gas from other suppliers.

Panhandle did not willfully maintain its monopoly power in 1986 by obtaining promises from G customers that they would not request system supply gas (or complain about Panhandle's conduct to FERC) if Panhandle elected to transport under interim 311 authority.

Except in very limited circumstances, Panhandle could not transport system supply gas for G customers without violating the G tariff. At the same time, Panhandle reasonably believed it could not refuse a transport request by an individual G customer, even though such transport would

violate the G tariff, because of a risk that a refusal could be found to be discriminatory and thereby subject Panhandle involuntarily and permanently to all of the provisions of Order 436. The only alternative if a G customer requested transport was to stop transporting under § 311 for all LDC's and end-users, which could have seriously disrupted their operations and contractual arrangements. Thus, even if Panhandle sought and obtained promises from G customers that they would not request transportation until June 30, 1986, the Court finds Panhandle did so for legitimate business and regulatory reasons, and such conduct was not a willful act to maintain a monopoly. In any event, such "promises" did not cause any injury because the G tariff is a sole supplier tariff, and G customers cannot purchase non-Panhandle gas without violating the tariff.

One strategy devised by Panhandle to deal with the rapidly changing market conditions was the Transportation Guidelines. Briefly, the Guidelines contained a minimum volume requirement, a bid-out procedure, and a six-month rebid provision. Panhandle allowed transportation of off-system gas under the Guidelines to industrial end-users and, eventually, to LS LDC's. Transportation for LDC's was never implemented under the Guidelines.

 Plaintiff claims that the Guidelines violated antitrust laws by segmenting the market and discriminating among the segments, and by providing Panhandle with such competitive advantages that potential competition stayed out of the market. This constitutes, according to Plaintiff, an unreasonable restriction on competition.

The Court has previously found that the Guidelines must be considered in the context of the G tariff. The Guidelines did provide for a segmentation of the market, but at the time the G tariff really foreclosed the use of the Guidelines by the G LDC's and the residential/commercial consumers behind them. The "discrimination" apparent in Panhandle's transportation policy was a legitimate enforcement of that G tariff. It thus cannot truly be said that the Guidelines were anticompetitive as applied to the residential/commercial consumers.

"The [Sherman] Act assumes that an enterprise will protect itself against loss by operating with superior service, lower costs, and improved efficiency ... [and not by] substitut[ing] for competition anticompetitive uses of its dominant economic power." *Otter Tail*, 410 U.S. at 380, 93 S.Ct. at 1031. Implementation of the Guidelines as a strategy to protect itself from loss was only feasible because of Panhandle's dominance in the Central Illinois Market. Certain provisions of the Guidelines were patently anticompetitive and completely unrelated to superior service, lower costs or improved efficiency.

For example, the provision requiring a rebid every six months was designed to give on-system suppliers continuous access to the market and had the natural results of keeping off-system suppliers out of the market and raising prices of gas.

Likewise the complicated bid-out procedure favored on-system suppliers so heavily that off-system suppliers refused to compete with Panhandle in Central Illinois because they could not do so consistently or effectively. For instance, the bid-out required an off-system supplier to do all the preliminary work required for meaningful bid but then passed that information to on-system suppliers who were free to match the bid if they could. As a result, the investment incurred in making a bid could be lost, time could be lost, and yet no new business gained. Further, the customer could be forced into a business relationship solely on the basis of price, with no consideration of other factors likely to be important in long-term business relationship. Also, the Guidelines did not provide for an auction so that the consumers could obtain the lowest competitive price.

The end results of the Guidelines, particularly at the beginning, were delayed service and prices higher than they would have been without the bid out and the right of first refusal, results which a company interested in effective competition must know would be unsuccessful. But Panhan-

dle was not interested in effective competition.

However, there is no party to this lawsuit which can complain about the Guidelines. Plaintiff has not proven by a preponderance of the evidence that Panhandle's monopoly power extended to the industrial end-users or the State agencies. Thus, while these parties may have been detrimentally affected by the Guidelines, implementation of the Guidelines cannot be said to have been maintenance of monopoly power. The residential/commercial customers stood behind G LDC's which were not allowed to transport off-system gas under the Guidelines during the relevant time period; this inability to transport pursuant to the Guidelines precludes any objection to the provisions contained therein. Thus while the Guidelines may be objectionable, they cannot form the basis for antitrust liability in this case.

## CONCLUSION

In summary, the Court concludes:

1. The relevant product market is the market for natural gas, alternate fuels and conservation. This product market can be narrowed to the relevant submarket of residential and commercial customers behind G and SG LDC's.

2. The relevant geographic market is the Panhandle pipeline system serving the Central Illinois region.

3. Panhandle possesses market power in the general sense. However, the evidence does not support a finding that Panhandle possessed monopoly power over either the industrial end-users or the state institutions, because they were capable of switching to alternate fuels. Because Panhandle exercised no monopoly power over the industrial end-users or the State agencies, certain objectionable portions of the Transportation Guidelines cannot be the basis for antitrust liability.

4. As to the residential/commercial members of the class, Panhandle did not engage in willful conduct in order to maintain its monopoly power. Panhandle was under no antitrust duty to negotiate a new

tariff. Rather, the G tariff under which natural gas was provided to those consumers through the LDC's was valid and enforceable, especially under the chaotic and fluid circumstances which existed in the industry during the relevant time period. Because the G LDC's were not allowed to transport under the Guidelines, the residential/commercial customers behind the LDC's cannot use the provisions of the Guidelines to establish Panhandle's antitrust liability as to them.

Therefore, the Court finds for the Defendant on the proprietary claims and representative claims for the industrial end-users under Counts I and II on the grounds that Plaintiff has not proved by a preponderance of the evidence that Panhandle held monopoly power as to either. Likewise, the Court finds for the Defendant on the representative claims of the residential/commercial customers on the grounds that Panhandle's conduct did not constitute willful acquisition or maintenance of monopoly power as to them.

## COUNTS 3 AND 4

### Attempt to Monopolize the Gas Sales Market

 To prove that Panhandle unlawfully attempted, under Section 2 of the Sherman Act, 15 U.S.C. § 2, and under Section 3 of the Illinois Antitrust Act, Ill.Rev.Stat. ch. 38, ¶ 60–3(3), to monopolize the gas sales market in Illinois, the Plaintiff must have established each of the following by a preponderance of the evidence:

1. the existence and scope of a relevant market within which the defendant competed;

2. predatory or anticompetitive conduct by the defendant directed to accomplishing the unlawful purpose;

3. that defendant acted with the specific intent to control prices or destroy competition;

4. a dangerous probability of successfully monopolizing the relevant market; and

5. that defendant's anticompetitive acts caused antitrust injury to plaintiff.

*See, Chillicothe Sand & Gravel v. Martin Marietta Corp.*, 615 F.2d 427, 430 (7th Cir.1980); *Lektro–Vend Corp. v. Vendo Co.*, 660 F.2d at 270. *See also, Lorain Journal Co. v. United States*, 342 U.S. 143, 153, 72 S.Ct. 181, 186, 96 L.Ed. 162 (1951); *Photovest*, 606 F.2d at 711.

The relevant market submarket is the sale of natural gas to G and SG LDC customers in a 37 county area in Central Illinois served exclusively by Panhandle (plus conservation and alternate fuels).

■ Further, Panhandle had sufficient market power that it could reasonably have been able to create a monopoly in the relevant market.

The Plaintiff has not proven that Panhandle engaged in predatory and anticompetitive conduct directed to achieving or maintaining a monopoly.

■ Since the Sherman Act does not list or define the specific activities which constitute the offense of attempted monopolization, it is necessary to examine the facts of each case, bearing in mind that the determination of what constitutes an attempt to monopolize "is a question of proximity and degree." *Swift & Co. v. United States*, 196 U.S. 375, 402, 25 S.Ct. 276, 281, 49 L.Ed. 518 (1905). In the words of the Seventh Circuit, one must "consider the firm's capacity to commit the offense, the scope of its objective, and the character of its conduct. The ultimate concern is the firm's actual or threatened impact on competition in the relevant market." *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*, 452 F.2d 579, 598 (7th Cir.1971), *cert. denied*, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972). As is true of the offense of actual monopolization, one looks to the total aggregation of conduct in which the defendant has engaged, where "[o]therwise lawful practices may become unlawful if they are part of an illegal scheme." *Photovest*, 606 F.2d at 719.

Panhandle denied competitive access to its key pipeline facility serving the Central Illinois Market through enforcement of its G tariff. It did so at a time when it held a clearly dominant position as the sole trans-porter within the affected Central Illinois LDC system supply market. For the reasons previously stated, however, the Court finds that Panhandle's conduct in enforcing its tariff and contract arrangements was not improper under the totality of the circumstances.

The Transportation Guidelines were flawed because some of the terms of the Guidelines were an unreasonable restraint of trade. But for the reasons previously stated, none of the persons or entities which Plaintiff represents can complain about the Guidelines. Consequently, there is no reason to discuss further the elements of attempted monopolization.

As a result, judgment is granted to Panhandle and against Plaintiff on Counts 3 and 4.

## COUNTS 5 AND 6

### *Monopoly Leveraging*

■ The first question to be answered under this count is whether monopoly leveraging is a separate offense under § 2 of the Sherman Act or whether it is merely one way of proving unlawful monopolization.

Defendant argues that monopoly leveraging is not a separate § 2 offense, citing the case of *Catlin v. Washington Energy Co.*, 791 F.2d 1343 (9th Cir.1986) as its authority.

In *Catlin*, the Ninth Circuit, on the facts of that case, declined to follow the Second Circuit's view, explained in *Berkey Photo*, 603 F.2d 263, that a separate cause of action did so exist. In the words of the *Catlin* court:

[T]o constitute a valid claim under Section 2, the introduction of the product in a second market must involve "some associated conduct which constitutes an anticompetitive abuse or leverage of monopoly power ... rather than aggressive competition on the merits." [*Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534] *Id.* at 545–46 [ (9th Cir. 1983) ]. *See also Betaseed, Inc. v. U and I, Inc.*, 681 F.2d 1203, 1231 n. 42 (9th Cir.1982) ("A firm may not use its mar-

ket position as a lever to create a monopoly in another market."

We have not adopted a monopoly leveraging theory flatly prohibiting the use of lawfully acquired monopoly power in one market to gain any competitive advantage in another market, especially where there has been no attempt to monopolize in the second market and no abuse of monopoly power in the first. We question whether *Berkey Photo* itself prohibits such leveraging. It defined "uses of monopoly power" to exclude reaping benefits of "efficient size," integration and "competitive advantages of [a monopoly's] broad-based activity." 603 F.2d at 276. Moreover, we have not held that monopoly leveraging is a separate Section 2 violation with elements of proof distinct from monopolization or attempted monopolization.

Other circuits have not adopted the "monopoly leveraging" theory announced by the Second Circuit in *Berkey Photo. See, e.g., Association for Intercollegiate Athletics for Women v. National Collegiate Athletic Association,* 735 F.2d 577, 586 n. 14 (D.C.Cir.1984) ("We emphasize that we merely assume for the purposes of argument, and do not affirm, the legal sufficiency of the leveraging offense described in *Berkey Photo.*")

We disagree with appellants' contention that we adopted the monopoly leveraging theory of *M.A.P. Oil [Co., Inc. v. Texaco, Inc.,* 691 F.2d 1303 (9th Cir.1982)] as a separate basis for Section 2 liability. Moreover, we decline any invitation to adopt the monopoly leveraging theory here as a basis for Section 2 liability independent of any proof of actual or attempted monopolization. In this respect, we follow the decision of the District of Columbia Circuit to "reserve for a case in which decision of the question is necessary the issue of whether leveraging is an independent section 2 offense separate from monopolization and attempted monopolization." *Association for Intercollegiate Athletics for Women,* 735 F.2d at 586 n. 14.

791 F.2d at 1346.

In *Berkey Photo,* the Second Circuit held:

Accordingly, *the use of monopoly power in one market to gain a competitive advantage in another is a violation of § 2 even if there has not been an attempt to monopolize the second market.* It is the use of economic power that creates the liability. But, as we have indicated, a large firm does not violate § 2 simply by reaping the competitive rewards attributable to its efficient size, nor does an integrated business offend the Sherman Act whenever one of its departments benefits from association with a division possessing a monopoly in its own market. So long as we allow a firm to compete in several fields, we must expect it to seek the competitive advantages of its broad-based activity—more efficient production, greater ability to develop complementary products, reduced transaction costs, and so forth. These are gains that accrue to any integrated firm, regardless of its market share, and they cannot by themselves be considered uses of monopoly power.

603 F.2d at 276 (emphasis added).

It may well be that the Seventh Circuit, like the Ninth Circuit, will decline to confront the issue until confronted with a case which will succeed or fail on monopoly leveraging claims because not all of the elements of monopolization or attempted monopolization are present.

This Court does believe, however, that ultimately the Seventh Circuit will recognize monopoly leveraging as a separate cause of action under § 2 of the Sherman Act. The case of *Fishman,* 807 F.2d 520, provides some indication of how the Court might respond to this issue:

Here the defendants, through the economic leverage provided by their stadium monopoly, succeeded in driving out all competition for ownership of the Bulls. They used a monopoly in one market to foreclose competition in another—a classic violation of the antitrust laws.

*Id.* at 536. *See also, Sargent–Welch,* 567 F.2d 701; *United States v. Griffith,* 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948).

In any event, this Court will proceed to analyze this claim on the belief that monopoly leveraging does constitute a separate claim under § 2 of the Sherman Act.

■■■ To prove unlawful monopoly leveraging under § 2 of the Sherman Act, 15 U.S.C. § 2, and under § 3 of the Illinois Antitrust Act, Ill.Rev.Stat. ch. 38, ¶ 60–3(3), the Plaintiff must establish each of the following elements by a preponderance of the evidence:

1. Panhandle had monopoly power in the first, "leveraging" market (pipeline transportation of natural gas);

2. Panhandle used that monopoly power to foreclose competition or otherwise exact a competitive advantage for itself in a second, "leveraged" market (sale of natural gas);

3. That said competitive advantage was not won on the competitive merits or as a result of procompetitive efficiencies, but instead involved a coercive use of the Defendant's monopoly power in the leveraging market;

4. The conduct was done with the specific intent to gain an unwarranted competitive advantage in the second market;

5. Panhandle's anticompetitive acts or practices proximately caused antitrust injury to plaintiff.

*Berkey Photo*, 603 F.2d at 276, 291.

■■■ Panhandle had monopoly power in the first, "leveraging" (pipeline transportation) market as to residential/commercial consumers. The leveraging market consisted of pipeline transportation of natural gas to G LDC customers (for use by residential/commercial consumers) within the Central Illinois Market. During the relevant period from late 1981 through 1986, Panhandle held monopoly power within the leveraging market, as evidenced by its virtual control over transport of gas into the Central Illinois Market.

There was no effective substitute for pipeline transportation of natural gas. Pipeline transportation is a service separate and distinct from the sale of gas itself.

Customers within the Central Illinois Market as a whole, and within individual LDC service areas aggregated within the large area, were practicably unable to turn to more distant suppliers other than Panhandle to meet their pipeline transportation needs; Panhandle remained, as of the time of trial, the sole pipeline physically connected to most of the service areas within the Central Illinois Market. It was the only pipeline connected to the Central Illinois Market until November of 1985, and it practicably remained the only pipeline available to Central Illinois LDC's for their system supply needs.

As to the Guidelines, Panhandle did use its monopoly power in transportation to foreclose competition and exact a competitive advantage for itself in a second, "leveraged" market. The competitive advantage created by the Guidelines was not won on the competitive merits or as a result of procompetitive efficiencies, but instead involved a coercive use of the Defendant's monopoly power in the leveraging market. The Guidelines were initiated and maintained with the specific intent to gain an unwarranted competitive advantage in the second market.

However, the Guidelines were not usable by the G and SG LDC's because of the G tariff. Consequently, these customers have no standing to complain about their terms. No LS LDC is a party to this litigation. Since the Court has found that under the circumstances, the terms of the G tariff were not a violation of the antitrust laws, this claim must fail.

■■■ Panhandle lacked monopoly powers in the leveraging market over the industrial end-users, including the state agencies involved in the Plaintiff's proprietary claims, so those claims must fall as well.

Plaintiff cites the case of *Kerasotes Michigan Theatres v. National Amusements, Inc.*, 854 F.2d 135 (6th Cir.1988) in support of its monopoly leveraging claim. That court stated:

A firm violates Section 2 by using its monopoly power in one market to gain a competitive advantage in another, albeit without an attempt to monopolize the second market. . . . there is no reason to

allow the exercise of such power to the detriment of competition in either the controlled market or any other. That the competition in the leveraged market may not be destroyed but merely distorted does not make it any more palatable. 854 F.2d at 137, citing *Berkey Photo*, 603 F.2d at 275.

That rule of law does not apply to the facts here, because Panhandle did not have monopoly power over the proprietary claimant in either market. As to the residential/commercial consumer claims, the case does not control because of the enforceable G tariff.

Judgment is granted in favor of Panhandle and against Plaintiff on Counts 5 and 6.

## COUNTS 7 AND 8

### *Essential Facility*

■ Defendant again argues that the essential facility claim, like the monopoly leveraging claim, is not a separate offense under § 2 of the Sherman Act, but rather is one way to prove unlawful monopolization. *Cf. Catlin*, 791 F.2d 1346. Defendant argues that Panhandle is entitled to judgment on counts 7 and 8 because they are duplicative of the monopolization counts.

The Court rejects Defendant's proposition on this point as did the Seventh Circuit (without discussion) in *MCI Communications Corp.*, 708 F.2d at 1132–1133.

■ The essential facilities, or "bottleneck," doctrine imposes upon a monopolist who controls an essential facility—meaning one that cannot reasonably be duplicated and to which competitors require access if they are to be able to compete—the obligation to make the facility available to competitors on non-discriminatory terms. *Fishman*, 807 F.2d at 539; *MCI Communications*, 708 F.2d at 1132; *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1520 (10th Cir.1984); *Hecht v. Pro–Football, Inc.*, 570 F.2d 982, 992–93 (D.C.Cir.1977); *Byars*, 609 F.2d at 856. *See also, United States v. Terminal Railroad Assn.*, 224 U.S. 383, 411, 32 S.Ct. 507, 516, 56 L.Ed. 810 (1912).

■ To be "essential," a facility need not be indispensable. It is sufficient if "duplication of the facility would be economically infeasible" and if "denial of its use inflicts a severe handicap on potential market entrants." *Hecht*, 570 F.2d at 992. *See also, Fishman*, 807 F.2d at 539 (quoting from *Hecht* to hold that a particular sports stadium constituted an essential facility even though an alternate, but inferior, stadium was already available and even though a comparable stadium was later constructed).

■ Also, the fact that competitors are ultimately able to construct alternative facilities does not excuse a denial of access to an essential facility resulting in substantial competitive injury. As observed by the Seventh Circuit:

> [T]he test is not whether it would be impossible to duplicate the facility.... The point of the essential facilities doctrine is that a potential market entrant should not be forced simultaneously to enter a second market, with its own large capital requirements.

*Fishman*, 807 F.2d at 540 (finding an essential facilities violation even though a comparable facility was subsequently added to the market). *See also, Woods Exploration*, 438 F.2d at 1301, 1307 (finding illegal monopolization in denial of access to a natural gas pipeline, even though the plaintiff later succeeded in installing its own alternative pipeline); *Gamco, Inc. v. Providence Fruit & Produce Building, Inc.*, 194 F.2d 484, 487 (1st Cir.), *cert. denied*, 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636 (1952) ("To impose upon plaintiff the additional expense of developing another site ... is clearly to extract a monopolist's advantage.").

■ As a denial of access need not be absolute, it may consist of a purported offer to deal but only on unreasonable or discriminatory terms. *See, Fishman*, 807 F.2d at 539 (a discriminatory offer of a ten year lease constituted a denial of access, where the defendant had reason to expect the offer to be unacceptable); *Aspen*, 738 F.2d at 1512–13 (an offer of access on terms that discriminated against the plain-

tiff in favor of the defendant constituted a denial of access); *Hecht*, 570 F.2d at 993 n. 44 (restrictive lease terms may have constituted an effective denial of access). *See also, United Airlines, Inc. v. C.A.B.*, 766 F.2d 1107, 1114 (7th Cir.1985) (assuming that a single airline controlled a "bottleneck" resource over computerized reservation services, "[i]t would not make a critical difference whether the monopolist refused to list the flights of competing airlines altogether or merely charged high prices in order to list them in order to slow the growth and weaken the competition of those airlines.").

Panhandle attempts to distinguish the leading essential facilities case, *MCI Communications*, as being concerned only with situations in which the defendant monopolist is "vertically integrated downstream" into the local retail market. The decision contains no such limitation when describing the basic theory of monopolization on which it is premised. Rather, like the Seventh Circuit's more recent *Fishman* decision, it asks whether the defendant monopolist controls an "essential facility" or "bottleneck." 708 F.2d at 1132; *Fishman*, 807 F.2d at 539. The fact that the bottleneck exists at the retail rather than the wholesale level is not the relevant inquiry; what is key is that somewhere along the distribution system, a bottleneck obstructs competitive attempts to reach a captive market group. *See, e.g., Otter Tail*, 410 U.S. at 377, 93 S.Ct. at 1030 (wholesale bottleneck over "wheeling" to captive retail customers); *Woods Exploration*, 438 F.2d 1286 (intermediate pipeline delivery bottleneck for removing natural gas from a captive production area).

■ To prove that Panhandle violated § 2 of the Sherman Act, 15 U.S.C. § 2 and § 3 of the Illinois Antitrust Act, Ill.Rev. Stat. ch. 38, ¶ 60–3(3), through denial of access to an essential facility, Plaintiff must establish each of the following by a preponderance of the evidence:

1. Panhandle possessed monopoly power within the relevant market;

2. Panhandle controlled an essential facility needed to compete in that market;

3. Competitors or potential competitors were unable to duplicate, practically or reasonably, the essential facility;

4. Panhandle denied access to the essential facility to a competitor;

5. Panhandle denied access with the specific intent to monopolize;

6. Access to the essential facility could feasibly have been provided;

7. Panhandle's denial of access proximately caused antitrust injury to plaintiff.

*See, MCI Communications*, 708 F.2d at 1132–33.

■ Panhandle did possess monopoly power within the relevant market as to residential/commercial consumers. See Findings for Counts I and II.

Defendant argues, at some length, that the Plaintiff cannot prove that Panhandle controlled an essential facility because the FERC's extensive regulatory powers precluded such control by Panhandle.

It is certainly true that the FERC had substantial regulatory power in a number of areas. But, Panhandle retained the ability to exercise considerable discretion regarding its business decisions within the regulatory framework (e.g., selection of mix of gas to be sold; decision to implement the Guidelines). It is fair to say that, far from negating the essential facilities character of the pipeline for competition into the area, FERC regulation imposed added entry barriers.

However, access to Panhandle's facilities was not needed in order for other sellers of gas to compete with Panhandle. Other pipelines could have established new interconnects for this purpose or used existing interconnects. Non-pipeline sellers of gas could have competed by using other pipelines, and sellers of alternate fuels did not need pipeline facilities to compete with gas sales.

Plaintiff must prove that it was impractical or unreasonable to duplicate Panhandle's facilities. This requirement is not satisfied by proving that Panhandle's entire system could not have been duplicated. Rather, Plaintiff must prove that the bene-

fits of Panhandle's system could not have been obtained through some other method, such as building a connection to an alternative pipeline. *See, United States Football League v. National Football League,* 1986 WL 8314 (unpublished, S.D.N.Y., July 21, 1986).

At trial, the Plaintiff offered no significant financial or cost information supporting the claim that Panhandle's entire system could not be duplicated. Duplication of the entire system was not necessary because interconnects with adjacent pipelines could provide the benefits of Panhandle's system.

The Court finds that for the time in issue here, 1981 to 1986, it would have been economically feasible for other pipelines to interconnect with most areas served by CILCO, CIPS, and IP. This is demonstrated by CILCO's interconnect with NGPL and with ANR, the proposed NGPL interconnect with the Springfield–Lincoln division, the proposed interconnect between Citizens Gas and Coke and Texas Gas, and others. Moreover, the Northern Border extension of its main line transmission facilities would cut through Panhandle's service area in Illinois. Thus, physical capacity on the system was available.

The feasibility of providing access was further demonstrated by the actual granting of access under the Guidelines, Pan-Mark, and interim 311 programs. While capacity limitations may have existed on certain "peak" days in the winter months, these limitations would not have affected capacity during most of the year; moreover, since direct producer sales would simply have displaced Panhandle gas sales, capacity would have been available for the producer sales even on the peak winter days.

Regulatory authority to transport producer gas to LDC's and direct-buying end-users within Central Illinois was available under FERC individual and blanket certificate authorities, including § 7(c) certification, NGPA § 311 and FERC Orders 234-B, 319 and 436. Once interconnected, of course, the use of any such pipeline interconnection would still be subject to FERC

limitation of use, as in the case of the NGPL interconnect.

■ What kept competition out of the Central Illinois Market was Panhandle's enforcement of the G tariff. Even if Panhandle's pipeline did constitute an essential facility, Panhandle still had the right, pursuant to the G tariff, to deny access to its facilities in the absence of an order by FERC to the contrary.

Accordingly, judgment is granted to Panhandle and against the State of Illinois on Counts 7 and 8.

### COUNTS 9 AND 10

#### *Tying*

■ In Counts 9 and 10, Plaintiff alleges that Panhandle violated Section 1 of the Sherman Act and Ill.Rev.Stat. ch. 38, ¶ 60-3(4) by conditioning the purchase of transportation service on the purchase of natural gas. Plaintiff claims that this tie-in was a *per se* violation of § 1, i.e., that the arrangement unreasonably restrained trade as a matter of law.

Defendant asserts that a *per se* analysis of this claim is inappropriate, arguing that the *per se* rule applies only after the courts have had considerable experience with the business relationships at issue. *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 9–10, 99 S.Ct. 1551, 1557, 60 L.Ed.2d 1 (1979). Because of rapid changes in natural gas regulation in the period of time under consideration, and the degree of obligations imposed by regulation on pipelines, Panhandle asserts that the *per se* rule should not apply.

Plaintiff responds that tying restrictions of the type used by Panhandle have long been viewed as coming within this category of acknowledged *per se* offenses. Plaintiff cites the cases of *Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 26–29, 104 S.Ct. 1551, 1553, 80 L.Ed.2d 2 (1984); *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 498, 89 S.Ct. 1252, 1256, 22 L.Ed.2d 495 (1969); *International Salt Co., Inc. v. United States,* 332 U.S. 392, 396, 68 S.Ct. 12, 15, 92 L.Ed. 20 (1947); *Digidyne Corp. v. Data*

*General Corp.*, 734 F.2d 1336, 1339–40 (9th Cir.1984).

The cases cited by Plaintiff involve either unregulated industries or industries where the dynamics of the market and the regulations were not undergoing the state of flux involved in this industry (the natural gas industry).

Plaintiffs further cite the cases of *Parts and Elec. Motors v. Sterling Elec., Inc.,* 826 F.2d 712 (7th Cir.1987) and *Collins v. Associated Pathologists, Ltd.,* 676 F.Supp. 1388 (C.D.Ill.1987), *aff'd,* 844 F.2d 473 (7th Cir.1988) in support of their assertion that the court should employ a *per se* analysis on this claim. Neither case provides that authority.

It is true that in the *Sterling* case the Seventh Circuit cites to the holding in *Jefferson Parish,* 466 U.S. at 14, 104 S.Ct. at 1557, that endorsed the use of the *per se* analysis in tying cases. *Sterling,* 826 F.2d at 718. It should be noted that the court also discussed Justice O'Connor's concurring opinion urging an abandonment of *per se* analysis. *Id.* 718–19. The court concluded that discussion by finding that the matter was moot because the issue was waived at trial. *Id.* at 719.

In the *Collins* case, the court held that whether a particular exclusive contract violates the Sherman Act would depend on the impact that contract had on competition in the relevant marketplace. 844 F.2d at 478. Actually, *Collins* is inapposite to the Plaintiff's position in this case. As the *Collins* court stated:

Thus under the law of this Circuit … the boycott would be illegal *per se* only if the agreement the individual members of APL combined to enforce was itself illegal *per se.*
If the individual members of APL did combine to persuade St. John's not to hire Dr. Collins as an independent pathologist, they did so to enforce their contract with St. John's under which it was agreed that APL would provide complete and adequate professional pathology screening. This agreement did not violate Section 1 of the Sherman Act … Because the agreement the alleged boy-

cott was used to enforce was not illegal, much less illegal *per se,* the district court correctly applied the rule of reason as the applicable standard.

*Id.* at 479–80.

Applying *Collins* to the facts of this case, the Court concludes that a *per se* analysis would not be appropriate, because neither the G tariff nor the service contracts were themselves illegal *per se.* What Panhandle did here was enforce the sole supplier provision of the G tariff and service contracts under which it was agreed that Panhandle would provide to the natural gas needs of the LDC's. This agreement, under the circumstances, did not violate § 1 of the Sherman Act.

■ Accordingly, the Court will analyze the tying claim under the "rule of reason." To prove a tying claim under the "rule of reason" analysis, the Plaintiff must prove each of the following by a preponderance of the evidence:

1. Panhandle conditioned the sale of one product on the purchase of another.
2. The tying involved two separate products, and Panhandle had a financial interest in the tied product.
3. Panhandle had sufficient market power in the tying product (transportation of natural gas) to appreciably restrain competition in the tied product market (sale of natural gas).
4. Panhandle employed the tying with the specific intent to restrain competition.
5. A substantial danger existed that Panhandle would acquire market power in the tied product. Panhandle's challenged conduct unreasonably restrained competition.
6. A not-insubstantial amount of commerce was affected.
7. The tying proximately caused antitrust injury to Plaintiff. *Fortner Enterprises, Inc.,* 394 U.S. at 498–500, 89 S.Ct. at 1252; *Carl Sandburg Village Condominiums Association No. 1. v. First Condominium Corp.,* 758 F.2d 203 (7th Cir.1985); *Jefferson Parish,* 466 U.S. at 32–42 [104 S.Ct. at 1568–73] (O'Connor,

J., concurring, joined by Berger, C.J., Powell, J., and Rehnquist, J.)

Defendant argues that, for LDC's, Panhandle's FERC-approved tariff and service agreements bundled gas and transportation as a single service. The G tariff required that G customers purchase their supplies of gas from Panhandle. Thus, Panhandle asserts, FERC regulations and mutual Panhandle/CILCO obligations required the purchase of system supply gas.

Plaintiff responds with the assertion that its ability to engage in unrestricted "marketplace shopping" (*Jefferson Parish*, 466 U.S. at 26–29, 104 S.Ct. at 1565–67) was denied altogether for LDC's within Central Illinois and was substantially restricted as to end-user customers such as the State agencies. Plaintiff suggests that, far from being a shield behind which Panhandle can hide, the tariff/contract structure was the principal device used to force bundled (i.e., tied) purchases on G and SG customers.

The Court believes that the Plaintiff has exaggerated its "right," in the context of a regulated industry, to engage in unrestricted "market shopping." To follow the Plaintiff's logic to its conclusion would require this Court to say that regulated industries can no longer be regulated to any meaningful degree. Such a finding would be nonsense.

Defendant argues that, unlike the facts in the *Jefferson Parish* case, the evidence in this case demonstrated that residential/commercial customers did not manifest a demand for gas and transportation as separate products. Thus, Panhandle's guidelines did not force, or tie, the purchase of separate products as to them.

The relevant inquiry here focuses, not on the residential/commercial customers behind the LDC's, but rather the LDC's themselves as well as the industrial end-users purchasing gas directly from Panhandle. As to them, because of the market forces at work in the natural gas industry, by 1983 at the latest, gas and transportation were clearly identified as separate products. And, beginning no later than the end of 1983, LDC's and industrial end-users

manifested a specific demand for gas and transportation as separate products.

However, the result of the G tariff was that sale of gas and transportation of gas remained bundled, regardless of the perceptions of the LDC's and industrial end-users. In other words, while it may be true that the LDC's perceived two separate products, as to the G LDC's, sale and transportation remained one product.

Thus, it was the G tariff, approved by FERC, and the service contract between Panhandle and CILCO that effectively required the purchase of system supply gas in the context of the issues of this case. The Court has already determined that, at the time and under the circumstances, the G tariff and service contracts were valid and enforceable.

Defendant next argues that, under the Guidelines, Panhandle did not have a financial interest in any off-system gas transported. Also, to the extent that on-system gas was sold by Panhandle producers, Panhandle points out that it was not Panhandle-owned gas. Therefore, according to Defendant, Panhandle had no financial interest in the sale, and no financial interest in the tied product.

These arguments by the Defendant are absurd. The "financial interest" in the tied product can be something other than ownership. Here, the "interest" was the take-or-pay relief. To suggest, as Panhandle does, that take-or-pay relief is only for the benefit of Panhandle's customers, and not Panhandle, is not worthy of any further comment.

As to the industrial end-users, Panhandle did not possess monopoly power in the tying product. As to the three G tariff LDC's in this case, Panhandle had sufficient market power in the tying product (transportation of natural gas) to restrain appreciably competition in the tied product market. The effect of enforcement of the G tariff was to restrain trade, but such did not constitute an unreasonable restraint under the circumstances.

It was certainly the intent of the tariff and service contract to exclude competition, but that is true of any contract which pro-

vides that A will only deal with B. Contracts of that kind are not automatically in violation of the antitrust laws.

Through the tying device of Guideline restrictions on full unbundling to eligible end-users, Panhandle did create unreasonable barriers to attempts by competitors to market gas to these customers who qualified for the Guidelines.

Within the Central Illinois Market, Panhandle unreasonably imposed substantial and unreasonable restrictions on access to end-users eligible for transportation under the Guidelines. This proven "actual effect" on competition satisfies the test of competitive unreasonableness under the rule of reason, given Panhandle's failure to demonstrate legitimate offsetting procompetitive benefits. *Jefferson Parish*, 466 U.S. at 29, 34–42, 104 S.Ct. at 1567, 1569–73. Panhandle's use of tying restrictions did not contribute to a more efficient provision of gas services; indeed, the quality of service to Central Illinois industrial end-users was undermined by interfering with their attempts to secure delivery of cheaper competitive gas. Where, as here, a tie-in's "anticompetitive impact outweighs its contribution to efficiency," it should be condemned" under even the rule of reason. *Id.* at 41–42, 104 S.Ct. at 1573.

Panhandle's tying practices entailed its exploitation of discretionary power over the substance of the Transportation Guidelines. These practices fell between the cracks of FERC regulatory power and were, therefore, not subject to prompt and effective corrective action by the FERC.

The requirement that a "substantial" volume of commerce in the tied product market be affected by the tie does not look to the percentage or share of the tied market affected. Rather, "the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar volume so as not to be merely *de minimus*, is foreclosed to competitors by the tie." *Fortner I*, 394 U.S. at 501, 89 S.Ct. at 1257. *See also, Fortner II*, 429 U.S. at 614, 97 S.Ct. at 864; *Jefferson Parish*, 466 U.S. at 16, 104 S.Ct. at 1560; *Digidyne Corp.*, 734 F.2d at 1341. Here,

the amount of business foreclosed to competitors by the tie was far from *de minimis*.

However, the residential/commercial consumers cannot take advantage of the court's finding in relation to the illegal tying claims, because it was the sole supplier provision of the G tariff and the service contracts that kept sale of gas and transport of gas bundled together as to them, not just the unilateral conduct of Panhandle.

■ As to Plaintiff's proprietary claim, it also fails, but for a different reason. Under either a *per se* rule or rule of reason analysis, Plaintiff must prove that "there is a substantial danger that the tying seller will acquire market power in the tied product market." *Carl Sandburg Village Condominium Ass'n No. 1. v. First Condominium Dev. Co.*, 758 F.2d 203, 210 (7th Cir.1985); *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 674 (7th Cir.1985), *cert. denied*, 475 U.S. 1129, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986). Because the state agencies involved fall into the category of fuel-switchable industrial end-users, the Plaintiff has not established by a preponderance of the evidence that there was a "substantial danger that the tying seller [Panhandle] would acquire market power in the tied product market."

Plaintiff argues that *Sterling*, 826 F.2d 712, stands for the proposition that there is no duty on the part of Plaintiff to prove at least a danger that Panhandle would acquire market power in the tied product. Careful reading of *Sterling*, however, shows that such is not the case. *Sterling* did not decide the question because Sterling failed to raise or presume the issue on appeal.

Accordingly, since Sterling failed to raise or preserve the issue, we need not construe *Will* with respect to the requirement of threatened market power in the tied product.

*Id.* at 718.

*Sterling* does suggest that the holdings in *Will* and *Carl Sandburg* are dictum, and the case goes on to discuss the split of the

*Jefferson Parish* Court on how tying cases should be analyzed and cites to certain scholarly treatises on the same subject. *Id.* at 718–19.

Further, in *Sterling*, it was undisputed that, in the tying product (Sterling parts), Sterling had 100% dominance in the market and that Sterling parts were unique. *Id.* at 720. In our case, the Plaintiff failed to establish by a preponderance of the evidence (and never really even tried to do so), that Panhandle had market power over the state agencies involved in the proprietary claim. Panhandle was not in a position to force the fuel-switchable end-users to play by Panhandle's rules because those end-users could switch to alternate fuels.

## PANHANDLE'S AFFIRMATIVE DEFENSES

Panhandle has asserted a number of affirmative defenses which it claims bar in whole or in part Plaintiff's claims. Although the Court has previously dismissed all Plaintiff's claims on the merits, as an alternative finding, the Court will discuss those affirmative defenses.

## I. BUSINESS JUSTIFICATION DEFENSE

█ The test of a legitimate business justification defense is whether the challenged conduct actually "promote[s] the redeeming virtues of competition: lower prices, greater efficiency and innovation, and more responsive service." *Paschall v. Kansas City Star Co.*, 727 F.2d 692, 698 (8th Cir.), *cert. denied*, 469 U.S. 872, 105 S.Ct. 222, 83 L.Ed.2d 152 (1984). As expressed by the Supreme Court, legitimate business reasons that may justify otherwise illegal actions consist of conduct which "benefit[s] consumers by making a better product or service available ..." as distinguished from improper conduct which "has the effect of impairing competition." *Aspen Skiing Co.*, 472 U.S. at 608–11, 105 S.Ct. at 2860–61.

█ Where a business justification defense is asserted, the defendant must prove that it was actually motivated by the asserted legitimate business objective and

that in pursuing these objectives, it employed the least competitively restrictive alternative available to it. *International Salt Co.*, 332 U.S. at 397–98, 68 S.Ct. at 13; *Digidyne Corp.*, 734 F.2d at 1343–44; *United States v. Jerrold Electronics Corp.*, 187 F.Supp. 545, 560 (E.D.Pa.1960); *aff'd per curiam*, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961). Further, purported business justifications asserted at the time of trial should not be taken at simple face value. "A monopolist's self-serving, *ex post facto* business justifications must be examined with care." *Byars*, 609 F.2d at 863.

In assessing claims of a business justification, it is important to keep in mind the policy concerns underlying the federal antitrust laws.

The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic and social institutions.

*Northern Pacific Railway v. U.S.*, 356 U.S. 1, 4, 78 S.Ct. 514, 515, 2 L.Ed.2d 545.

█ Thus, a valid business justification defense cannot be premised upon the assumption that competition will somehow be bad within the context of the particular industry or conduct in question, for the antitrust laws do "not support a defense based on the assumption that competition itself is unreasonable." *National Society of Professional Engineers v. United States*, 435 U.S. 679, 696, 98 S.Ct. 1355, 1367, 55 L.Ed.2d 637 (1978). *See also, Indiana Federation of Dentists*, 476 U.S. at 462–64, 106 S.Ct. at 2014–15; *MCI Communications*, 708 F.2d at 1139.

█ It is not a legitimate business justification for antitrust purposes that the defendant sought to protect itself from added

costs or lost profits. Precisely such a purported defense was squarely rejected by the Supreme Court in *Otter Tail*. The Court there observed that the Sherman Act "assumes that an enterprise will protect itself against loss by operating with superior service, lower costs, and improved efficiency," and not by substituting "anticompetitive uses of its dominant economic power." 410 U.S. at 380, 93 S.Ct. at 1031.

■ It is also not a legitimate business justification to suggest that the defendant would be a "better" provider of the particular product or service than its competitors. The Seventh Circuit rejected that justification in *Fishman*, where it was argued that the defendant might be a better provider of the service there at issue—professional live basketball in the Chicago area—than the plaintiff. As to that point, the Court held: "[T]he Sherman Act requires that the choice between them [the defendant and its competitor] result from unconstrained competition on the merits." *Fishman*, 807 F.2d at 537.

■ A monopolist has no duty or obligation to agree to every demand of its customers or competitors. Valid business reasons for its activities are a defense to a charge of antitrust violation. Antitrust liability lies only if business reasons are merely a pretext for anticompetitive behavior.

■ The general tests discussed above for evaluating a proffered defense of business justification do not factor in the element of federal regulation. To the contrary, they presume that the defendant was operating in a free market. The Defendant in this case was operating in the pervasively-regulated pipeline industry. The Court cannot ignore these regulations, since they were designed at least in part to balance what Congress and the FPC/FERC had determined were the harms of unrestrained competition in this particular industry with the benefits ordinarily conferred by the free market. Thus, the meaning of "competition" as discussed in the tests must be narrowed to the extent of the regulations.

Accepting that point as a given, however, Panhandle's proffered defense must still be rejected. Panhandle's basic argument here is that its corporate decisions and strategies can all be justified by its concern over take-or-pay exposure. That exposure, however, resulted from Panhandle's discretionary decisions and not because of anything mandated by regulation. It is evident to the Court that even within the regulatory strictures, Panhandle's conduct did nothing to promote lower cost, efficiency, innovation or better service. Rather, the take-or-pay concerns were actually concerns over potential lost profits, a business justification not recognized as a legitimate affirmative defense under antitrust laws. Accordingly, the defense is rejected.

## II. REGULATORY JUSTIFICATION DEFENSE

■ Where antitrust claims arise in the context of a regulated industry, the antitrust defendant is entitled to raise and have considered its "good faith adherence to regulatory obligations" as an antitrust defense. *MCI Communications*, 708 F.2d at 1109–10. For this regulatory justification defense to apply, the defendant must first be able to point to a regulatory basis for its challenged conduct that is reasonable in the sense of being "concrete, articulable and recognized as legitimate" by the appropriate regulatory agency.

■ In this respect, as the Court has already found, there was a substantial objective basis for interpreting the G and SG tariff as a "sole supplier" tariff. Further, as to other components of Defendant's regulatory defense, such as "service" and "take-or-pay," the record supports a finding that FERC regulations provided a sound regulatory basis for some of Panhandle's conduct that was "concrete, articulable, and recognized as legitimate."

■ However, there are aspects of this case to which this defense does not apply, because some of Panhandle's conduct cannot really be characterized as "adherence to regulatory obligations." What was really in question in this case was the lawfulness of Panhandle's exercise of discretion

in its business dealings. Thus to the extent that Panhandle's conduct resulted from an exercise of its discretion, the regulatory defense fails.

### III. IMPLIED IMMUNITY DEFENSE

 Conduct by a pervasively regulated company is impliedly immune from antitrust challenge if either:

(1) ... the activities that are the subject of [plaintiff's] complaint were required or approved by the ... Commission, pursuant to its regulatory authority, in a way that is incompatible with antitrust enforcement, ... or

(2) ... these activities are so pervasively regulated "that Congress must be assumed to have forsworn the paradigm of competition."

*In the Matter of Wheat Rail Freight Rate Antitrust Litigation,* 759 F.2d 1305, 1312–13 (7th Cir.1985), *cert. denied,* 476 U.S. 1158, 106 S.Ct. 2275, 90 L.Ed.2d 718 (1986) (quoting *MCI Communications,* 708 F.2d at 1102). Panhandle asserts that its conduct was immune under both standards.

 The courts do not generally favor implied antitrust immunities. As a result, for a defendant to prevail on such a defense theory, it must establish a "plain repugnancy" between the particular antitrust rule in issue and some conflicting regulatory provisions. In addition, immunity will be implied "only where necessary to make the regulatory scheme work" and even then "only to the minimum extent necessary." *MCI Communications,* 708 F.2d at 1102. *See also, United States v. Philadelphia National Bank,* 374 U.S. 321, at 350–51, 83 S.Ct. 1715, at 1734, 10 L.Ed.2d 915 (1963); *Otter Tail,* 410 U.S. at 372, 93 S.Ct. at 1027; *Southern Pacific,* 740 F.2d at 999–1000; and *Woods Exploration,* 438 F.2d at 1302–03. Further, the mere "pervasiveness of a regulatory scheme" does not immunize conduct from antitrust challenge where the conduct is "voluntarily initiated." *MCI Communications,* 708 F.2d at 1103 (citing *Otter Tail,* 410 U.S. at 374, 93 S.Ct. at 1028).

 Applying these principles, prior cases have rejected the implied immunity defense on facts closely analogous to those in this case. For example, in both *MCI Communications* and *Southern Pacific,* it was held that FCC review of AT & T's pricing and interconnection decisions did not impliedly immunize these decisions from antitrust challenge, where the initial rate or interconnection decision rested with AT & T. 708 F.2d at 1101; 740 F.2d at 1000. Similarly, in *Otter Tail,* it was held that an electric power company's denial of competitive access to its transmission lines did not impliedly immunize such conduct from antitrust challenge, even though federal legislation empowered the FPC to compel involuntary interconnections following such a refusal. With respect to natural gas pipelines, the FERC does not have even the limited wheeling power it has over electric transmission lines, so that the holding of *Otter Tail* applies with even greater force to the natural gas pipeline industry. 410 U.S. at 372, 93 S.Ct. at 1027.

Panhandle claims its conduct is also immune because its activities were so pervasively regulated that Congress must be assumed to have "forsworn the paradigm of competition." The FERC's regulatory powers are extensive, and the FERC determines, through its regulatory oversight, the degree of competition between pipelines. FERC approval is needed before a pipeline can build facilities and commence or abandon service. Even if a service agreement expires, the pipeline cannot terminate service unless it receives a certificate of abandonment. Through this regulatory power, granted to the FERC by Congress, the FERC controls the number of pipelines serving a specific area and the terms of service. The FERC can also compel a pipeline to provide gas sales service to a customer. See 15 U.S.C. § 717f.

The FERC also regulates a pipeline's rates and tariffs and thereby controls a pipeline's ability to set prices. This regulation also restricts a pipeline's profitability by limiting a pipeline to only a reasonable return on equity. FERC has the power to order "open access" transportation. *See,* 824 F.2d at 997–998. Also, the FERC can exclude a pipeline's excess capacity from

the pipeline's rate base unless the pipeline agrees to use the capacity for transportation. The FERC can, as it did with Panhandle, eliminate on a temporary or permanent basis, tariff restrictions that prohibit an LDC from buying from other suppliers, thus obligating a pipeline to provide non-discriminatory transportation to those customers. The FERC has also established general pipeline obligations to transport as a condition to existing, rather than new, certificates in Order No. 451.

By establishing this pervasive regulatory mechanism, Panhandle argues that Congress displaced competition with regulation as the device to discipline and control pipeline operations while ensuring gas service to consumers. Congress need not have expressed an intent to have affirmatively removed competition because it has conferred on the FERC the authority to determine the extent of competition in the pipeline industry. The United States Supreme Court recognized this in *Transcontinental Gas Pipe Line Corp. v. State Oil and Gas Board of Mississippi*, 474 U.S. 409, 421, 106 S.Ct. 709, 716, 88 L.Ed.2d 732 (1986) by noting that the principal goal of federal regulation of gas sales and transportation in interstate commerce is not to maximize competition; rather "[t]he aim of federal regulation remains to assure adequate supplies of natural gas at fair prices."

 Finally, Panhandle argues that *MCI Communications, Otter Tail,* and *City of Mishawaka* do not apply to the facts in this case because here the FERC designed and approved the G tariff, and also because those cases involved distinguishable regulatory schemes.

Panhandle's G tariff was designed by Panhandle and approved by the FPC in 1951, as a sole supplier tariff. In conjunction with the G tariff, Panhandle's rates are subject to review by the FERC and have been challenged by interested parties. The most recent review of these rates was in the 1982 and 1985 rate cases. Panhandle is required to operate in accordance with its tariffs. *See, El Paso Natural Gas Co.*, 38 FERC § 61,008 at 61,028 (January 12, 1987) (a tariff that is on file and in

effect must be treated as though it were a "statute, binding upon ... [the pipeline] and shippers alike") (citations omitted). Thus, the evidence establishes that the FERC (and its predecessor, the FPC) approved the tariffs and Panhandle was required to adhere to the tariffs.

In September 1985, the ALJ in CILCO's Complaint case ruled that Panhandle's tariff was a "full requirement tariff." Shortly thereafter, the FERC in Order No. 436–A stated, in response to requests by the ICC and CILCO for clarification of the effect of Order No. 436 on "full requirement" tariffs, that transportation and purchase of gas must be in accordance with a pipeline's tariff and that a full requirements customer seeking transportation must do so under the partial requirements tariff. Thus, particularly after Order No. 436–A and the ALJ's decision, Panhandle's refusal to transport non-Panhandle gas to CILCO while CILCO purchased gas under the G tariff was required and approved by FERC.

Using the antitrust laws to second guess the FERC's tariff approval and regulatory rulings, such as the FPC's approval of Panhandle's G tariff, the reaffirmation of the tariff by the ALJ in September 1985, and the continued validity of such full requirements tariff as set forth in Order No. 436–A, is incompatible with FERC's power to regulate natural gas companies and the sale and transportation of gas in interstate commerce. Such use of the antitrust laws would undermine reliance by pipelines and their customers on the FERC's decisions and regulatory pronouncements and on the FERC's approval of tariffs and rates, and would severely restrict the role of the FERC in regulating pipeline conduct. *See, Wheat Rail*, 759 F.2d at 1315.

However, much of the challenged conduct at issue in this case rested in the first instance in Panhandle's discretion, particularly in the denial of transportation access and the continued enforcement of exclusive dealing tariff-contract structure. While Panhandle flatly asserts that the G tariff was "designed" by the FPC, the relevant FPC order shows on its face that the FPC

simply modified terms and conditions that Panhandle itself had proposed. In any event, it remained within Panhandle's discretion to modify its tariff structure when industry changes following the NGPA created pressure on pipelines to unbundle the sale and transport of gas. The fact that Panhandle chose to enforce the tariff and contracts to foreclose competition to G and SG customers did not make this an action by the FERC; it remained a unilateral choice by Panhandle.

At any rate, implied immunity concepts can have no bearing on much of the conduct in which Panhandle has engaged: the flat refusals to transport through late 1983; the refusals to negotiate a new tariff; the Guidelines restrictions; the 7(c) offers to transport; the extraction of express promises from LDC customers to not take advantage of interim 311 transportation; the segmentation of markets; the purposeful raising of prices to captive customers to prevent customer losses by an affiliate. In no sense were any of these discretionary practices condoned by the FERC, let alone "necessary to make the regulatory scheme work." In each instance, the particular conduct involved was "voluntarily initiated" by Panhandle and was not a product of FERC regulatory directive.

As to the arguments that the activities in question were so pervasively regulated that Congress must be assumed to have forsworn the paradigm of competition, the Supreme Court has specifically held that the natural gas laws leave conduct subject to FERC review also subject to parallel antitrust review and challenge. *California v. FPC*, 369 U.S. 482, 486, 82 S.Ct. 901, 904, 8 L.Ed.2d 54.

Accordingly, Panhandle's assertion of implied immunity cannot stand as a defense.

## IV. FILED RATE/KEOGH DOCTRINE DEFENSE

The filed-rate doctrine was delineated by the United States Supreme Court in *Keogh v. Chicago & Northern Ry.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). In that case the Court held that an antitrust action could not be based on rate structures approved by the ICC. *Keogh* was recently reaffirmed by the Supreme Court in *Square D. Co. v. Niagara Frontier Tariff Bureau*, 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986).

The *Keogh* doctrine has been applied by the Seventh Circuit in *Wheat Rail*, 759 F.2d 1305, and *Minsky v. Auto Driveway*, 757 F.2d 718 (7th Cir.1985) to immunize conduct of carriers in charging rates approved by a regulatory agency from application of the antitrust laws.

Defendant argues, because the G tariff was a rate structure approved by FERC, its conduct is immunized. Defendant asserts, moreover, that the doctrine applies not only to conspiracies in the setting of rates but also to unilateral activity by a monopolist, citing *City of Newark v. Delmarva Power & Light Co.*, 467 F.Supp. 763 (D.Del.1979); *McLeran v. El Paso Natural Gas Co.*, 357 F.Supp. 329 (S.D.Tex.1972), *aff'd without opinion*, 491 F.2d 1405 (5th Cir.1974).

According to Panhandle, whether Plaintiff's claim are styled "a refusal to modify tariffs" or "manipulation of tariffs," Plaintiff's claims are nothing more than a direct attack on Panhandle's filed tariffs, and Plaintiff's claim for money damages is barred.

As this Court observed in an order entered in *Keystone Consolidated Industries, Inc. v. Panhandle Eastern Pipeline Co.*, Case No. 85–1386 (C.D.Ill.1987), Defendant's argument as framed is more properly analyzed under the implied immunity doctrine. The *Keogh* doctrine is concerned more narrowly with attempts to challenge the conduct that entered into the setting of a filed rate. *Id.* at pp. 24–25. *See also, Square D. Co.*, 476 U.S. at 422, 106 S.Ct. at 1929:

> *Keogh* simply held that an award of treble damages is not an available remedy for a private shipper claiming that the rate submitted to, and approved by, the ICC was the product of an antitrust violation.

Here, the State does not challenge the conduct that entered into the setting of the

G, SG and LS tariffs back in 1951. Rather, the State's tariff-related claims involve conduct occurring literally decades later.

As to Defendant's authority that this defense also applies to unilateral conduct by a monopolist, the Court would point out that all of Defendant's cited cases were decided at least seven years prior to the *Square D. Co.* case.

Defendant has failed to prove the applicability of the filed rate/*Keogh* doctrine defense to the facts in this case.

## V. NOERR–PENNINGTON DOCTRINE DEFENSE

■■■■ Under the *Noerr–Pennington* doctrine, antitrust liability may not be predicated on attempts to influence governmental action, even if the action sought or obtained would have or has anticompetitive effects. *See, Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). The *Noerr–Pennington* doctrine immunizes such conduct, for example, as filing (or defending) lawsuits, *Grip–Pak, Inc. v. Illinois Tool Works, Inc.*, 694 F.2d 466 (7th Cir.1982), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2430, 77 L.Ed.2d 1317 (1983); lobbying for legislation, *Eastern Railroad Presidents Conference*, 365 U.S. at 144, 81 S.Ct. at 533; and filing state tariffs, *MCI Communications*, 708 F.2d at 1100–01.

■■■■ Where a defendant's activity constitutes a "genuine attempt to influence governmental action," the question of whether the defendant also intends to harm a competitor's business is irrelevant to the First Amendment's protection of its activity. *Havoco of America, Ltd. v. Hollobow*, 702 F.2d 643, 650 (7th Cir.1983). The intention to harm a competitor through administrative or judicial proceedings is the precise matter shielded by *Noerr–Pennington* immunity. *Potters Medical Center v. The City Hospital Assn.*, 800 F.2d 568, 580 (6th Cir.1986), *quoting, MCI Communications*, 708 F.2d at 1156; *Gainsville v. Florida*

*Power & Light Co.*, 488 F.Supp. 1258, 1265–66 (S.D.Fla.1980).

■■■■ The *Noerr–Pennington* doctrine does not immunize sham conduct or conduct designed solely to interfere with the business relationships of a competitor. *Eastern Railroad Presidents Conference*, 365 U.S. at 144, 81 S.Ct. at 533. While the court recognized in *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) that the line between sham and legitimate conduct may be difficult to discern and draw, the *Noerr–Pennington* doctrine is to be applied liberally to protect the legitimate constitutional rights on which it is based. Thus, because First Amendment concerns are inherent in the doctrine, and because parties should be free to seek action from an appropriate regulatory body, antitrust liability can be imposed only upon clear and convincing evidence that the defendant's use of the regulatory process was a sham, rather than a legitimate effort to present a question to a regulatory body. *MCI Communications*, 708 F.2d at 1155.

■■■■ The issue of whether the defendant's conduct comes within the "sham" exception focuses on the genuineness of defendant's attempt to influence governmental action; the requisite motive is the intent to harm competitors by the simple fact of litigating rather than by the result of the process. *Grip–Pak, Inc. v. Illinois Tool Works, Inc.*, 694 F.2d at 472 (7th Cir.1982), on remand, 651 F.Supp. 1482, 1496–97 (N.D.Ill.1986); *accord, Havoco*, 702 F.2d at 649–50. Thus, unless a defendant's goal in the process is not to win a favorable result against its competition, but instead to harass the competitor, and "deter others, by the process itself—regardless of outcome," its conduct is immune. *Grip–Pak*, 694 F.2d at 472.

Panhandle argues that its opposition before the FERC to CILCO's efforts to obtain a second source of supply from NGPL and to obtain modification of the G tariff was a legitimate attempt to influence governmental action, i.e., obtaining decisions upholding the G tariff and remaining CILCO's sole supplier and avoiding an unnecessary

duplication of facilities. James Vergon of CILCO admitted that Panhandle had a right to and was justified in opposing CILCO.

Panhandle points out that Plaintiff has offered no evidence, let alone clear and convincing evidence, that Panhandle's purpose was not to win a favorable ruling in these proceedings but rather to harass CILCO and deter others by the process of litigating—regardless of the outcome. Consequently, Panhandle argues that the enumerated conduct is immune from challenge under the antitrust laws due to the *Noerr–Pennington* doctrine.

Panhandle further asserts that its filing for a blanket certificate under Order No. 436 was also a genuine attempt to influence governmental action, i.e., to obtain FERC approval. Panhandle asserts that Plaintiff has offered no evidence that Panhandle's purpose was not to obtain approval of its request but rather to harass and deter others.

The State responds that it is not challenging Panhandle's Order 436 filing *per se*. Consequently, Plaintiff suggests that Panhandle's reference to that conduct is not relevant. As to Panhandle's Order 436 filing, since the State admits that it is not attacking the filing *per se*, no defense need be interposed to that act.

As to opposition to the CILCO–NGPL interconnect, the State argues that Panhandle's opposition was a "sham" in that it "was not undertaken in the hope of influencing governmental action, but in the hope of delaying it." *Litton Systems, Inc. v. AT & T Co.*, 700 F.2d 785, 811–12 (2nd Cir.1983).

The State further argues that in any event, Panhandle's intervention before the FERC does not insulate other conduct in which it engaged to thwart the NGPL–CILCO interconnect, such as: (a) the sham acceptance of CILCO's CD increase request, when Panhandle actually lacked the capacity to honor the request; (b) its demands for veto or first refusal rights over use of the connection.

As to Panhandle's opposition to the CILCO–NGPL interconnect, and the related demand for veto or first refusal rights over use of the connection, the Court finds that the Defendant has established that its conduct was not a "sham" but rather a legitimate effort to influence governmental actions, even though the Defendant may also have intended to foreclose competition. *Havoco*, 702 F.2d at 650.

The "sham" acceptance of CILCO's contract demand increase request, when Panhandle actually lacked the capacity to honor the request, presents what may be a unique, and certainly bizarre issue for analysis. Panhandle's acceptance was clearly a sham, in that it did actually lack the capacity to honor the request. But then, CILCO's request for increase in contract demand was also a sham. CILCO knew that it did not need, and could not use the additional amount of natural gas requested. CILCO made the bad faith request for increased contract demand as its first effort to wiggle out of the "sole supplier" provision of the G tariff.

Since CILCO's request was a sham, it is hard to imagine that Panhandle should have been required to respond with anything more legitimate than what it did. This was a humorous event, not one which should incur the wrath of the antitrust laws. The Court said earlier in this opinion that the situation was like two card players bluffing in a game of high stakes poker. Perhaps a better analogy would be two aging prize fighters gamely swinging at each other but neither side landing a blow. At any rate, this conduct is not appropriately discussed in the context of the *Noerr–Pennington* doctrine, since it in no way involved an attempt to influence government action.

The State failed to respond to Defendant's argument that its conduct in resisting CILCO's complaint case (attacking the G tariff) was a legitimate effort to influence governmental action. The Court finds that the acts of resistance by Panhandle with the FERC are protected by the *Noerr–Pennington* doctrine. The record reflects that these acts of resistance consti-

tuted a genuine attempt to influence governmental action, and were not undertaken just to harass competitors and deter others by the process itself—regardless of the outcome. Again, this is true in spite of the fact that Panhandle also intended to harm competition.

## VI. PRIMARY JURISDICTION DEFENSE

■ The primary jurisdiction doctrine recognizes that sound reasons exist for a court to stay its hand until a regulatory agency, with responsibility for and expertise regarding issues raised in a case before the Court, has an opportunity to consider those matters. *Hansen v. Norfolk & W. Ry. Co.*, 689 F.2d 707, 710 (7th Cir.1982). Application of the doctrine is especially compelling when the issues are already before the administrative agency, as they are here. *MCI Communications,* 496 F.2d 214. The doctrine should be applied to avoid unnecessary disturbance of the FERC's complex regulatory scheme. *Mt. Hood Stages, Inc. v. Greyhound Corp.*, 616 F.2d 394, 398–99 (9th Cir.1980), *cert. denied,* 449 U.S. 831, 101 S.Ct. 99, 66 L.Ed.2d 36 (1980).

Defendant argues that the primary jurisdiction doctrine is properly applied to matters within the jurisdiction of the FERC despite the fact that plaintiff attempts to dress them in the cloak of the antitrust laws. The FERC is required to consider antitrust issues and competitive policies in determining matters within its jurisdiction. *Gulf States Utilities Co. v. FPC*, 411 U.S. 747, 761–62, 93 S.Ct. 1870, 1879, 36 L.Ed.2d 635 (1973); *Alabama Power Utilities Co. v. FPC,* 511 F.2d 383, 393 (D.C.Cir.1974); *MPC,* 761 F.2d at 781–82. The courts have accordingly dismissed or stayed cases raising antitrust claims on primary jurisdiction grounds where the expertise of the agency is essential for proper resolution of disputed factual or regulatory issues. *See, e.g., Far East Conference v. United States,* 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952); *Interstate Natural Gas Co. v. Southern California Gas Co.,* 209 F.2d 380 (9th Cir.1953); *Hansen v. Norfolk & W. Ry.,* 689 F.2d 707 (7th Cir.1982).

The United States Supreme Court in *United States v. Radio Corp. of America,* 358 U.S. 334, 348, 79 S.Ct. 457, 465, 3 L.Ed.2d 354 (1959), succinctly set forth the rationale for the primary jurisdiction doctrine:

> Accordingly, this court consistently held that when rates and practices relating thereto were challenged under the antitrust laws, the agencies had primary jurisdiction to consider the reasonableness of such rates and practices in light of the many relevant factors including alleged antitrust violations, for otherwise sporadic action by federal courts would disrupt an agency's delicate regulatory scheme, and would throw existing rate structures out of balance.

Defendant asserts that Plaintiff's claims are a direct attack on Panhandle's tariffs and rate structure. Thus, according to Defendant, the tariffs and rates require an analysis of Panhandle's costs, the allocation of those costs, and the interests of Panhandle's customers who are not parties to this suit and many of which are outside the jurisdiction of this Court. These are functions clearly within the province of the FERC, and the FERC has more expertise in these matters.

The FERC has already ruled that Panhandle's tariff was a sole supplier tariff. The FERC has also modified Panhandle's tariffs prospectively by eliminating the sole supplier provision of the G tariff and the minimum bill in the LS tariff, and directed Panhandle to file revisions to its tariffs. Panhandle, at the time of trial, had on file an application for a blanket certificate under Order No. 436.

Defendant argues that the proper course for the Court to follow in light of these circumstances would be to defer to the FERC pending final rulings, including rulings on any requests for rehearing, in the CILCO Complaint case, Panhandle's application for a blanket certificate, the Panhandle prudency case and the IPAMS case.

■ Panhandle's primary jurisdiction defense was considered and rejected by the Court prior to trial in this litigation. The

Court determined that it would not defer to the FERC, since antitrust enforcement is a matter generally handled by the federal courts, since the FERC's expertise was not essential to resolving the antitrust issues in dispute, and since deferral to the FERC could have resulted in lengthy delays in the resolution of the antitrust case, which would not have been in the public interest. *See, Keystone Consolidated Industries,* Case No. 85–1386, slip op. at 26–27 (C.D.Ill. 1987). These conclusions have particular bearing upon the natural gas industry, which the Supreme Court has held to be subject to parallel antitrust regulation even with respect to practices subject to FERC review. *California v. FPC,* 369 U.S. at 485, 82 S.Ct. at 1904. Further, primary jurisdiction is a discretionary doctrine that allows a court to stay an antitrust suit, not to displace it altogether, so that application of the doctrine after the litigation has already gone ahead would be pointless. *United States v. Philadelphia National Bank,* 374 U.S. 321, 353, 83 S.Ct. 1715, 1736, 10 L.Ed.2d 915 (1963) ("Court jurisdiction is not thereby ousted, but only postponed.").

Accordingly, the Court rejects Defendant's primary jurisdiction defense.

## VII. ILLINOIS BRICK DEFENSE

This defense was previously considered by the Seventh Circuit and, as to the residential/commercial customers, rejected. See discussion herein at page 3 and citations therein.

## VIII. EXCLUSION OF STATE ANTITRUST LAW DEFENSE

■ Congress is empowered to regulate interstate commerce; this grant of power excludes state regulation unless: (1) the state regulation is incidental as direct regulation is prohibited; or (2) the state regulation is evenhanded to effectuate legitimate local public interest, and its effects on interests commerce are only incidental. However, if the burden imposed on such commerce is clearly excessive in relation to the putative local benefits the statute is preempted. *See, Edgar v. MITE Corp.,* 457 U.S. 624, 640, 102 S.Ct. 2629, 2639, 73 L.Ed.2d 269 (1982).

Plaintiff's lawsuit, according to Defendant, is a direct attempt to regulate the interstate sale and transportation of natural gas and is an undue burden on interstate commerce because it would interfere with the interstate sale and transport of natural gas and would supplant uniform federal regulation. Plaintiff's state law claims are therefore, according to Defendant, preempted by federal regulation of natural gas pipelines.

The Court has previously rejected defense arguments of general federal preemption of applicable state antitrust laws. Panhandle has presented no new authority to support its renewed assertions of such federal preemption, and its attempt to resurrect the issue is therefore rejected. *See Keystone Consolidated,* Case No. 85–1286, slip op. at 27. *See also, California, et al. v. ARC America Corporation, et al.,* —— U.S. ——, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989).

## OTHER ISSUES

Plaintiff complains about an incident in early 1986, when Panhandle, as a precondition to allowing 7(c) transport under interim Order 436, made every G tariff LDC on its system agree not to complain to FERC that they were not being allowed to transport gas. Plaintiff characterizes that conduct as blackmail. Defendant responds that the conduct was a necessary precondition to interim 7(c) transport, because of concerns Panhandle had regarding the implementation of Order 436. Both the Plaintiff and the Defendant are correct on this point. It was blackmail since, if the LDC's had not agreed, Panhandle would not have allowed the industrial end-users who had been transporting gas prior to October 31, 1985, to begin doing so again during the transition period when Panhandle was in the process of deciding whether to opt in to the open access provisions of Order 436.

But Panhandle's conduct was also understandable, in view of the substantial uncertainty surrounding the interpretation of Order 436. Panhandle did not want to take

the risk of committing itself to open access under Order 436 until the matter became a little more settled. It was in the interests of the LDC's and Panhandle that the fuel-switchable end-users have access to transport gas. To the extent that Panhandle's conduct could be considered an unlawful restraint of trade, the Court cannot determine from the record that any antitrust type injury flowed from that conduct. Consequently, there can be no antitrust liability.

On a related point, as of October 31, 1985, the transport of gas for industrial end-users pursuant to the blanket certificate program terminated, due in part to the ruling in *MPC III* and in part to Panhandle's decision not to continue transporting gas for industrial end-users across the board until the corporate decisions were made whether to transport on a non-discriminatory basis under Order 436. However, the regulations still separately provided for specific authorization to transport under 7(c). Such an application by an industrial end-user was expensive and took a considerable time to process. Plaintiff argues that Panhandle's announced decision to transport for industrial end-users specifically certified under 7(c) was a sham, because the period of time required to obtain the 7(c) certification was larger than the interim period between the entry of Order 436 and its implementation. That may be, but the record also establishes that FERC, because of problems in dealing with Order 436, extended the implementation date, and some 7(c) transport did occur.

Further, since 7(c) transport was limited to industrial end-users, the Court cannot find that Plaintiff can assert any possible injury to any class or group of Plaintiffs that it represents. The interlocutory appeal in this case, based on *Illinois Brick*, threw out any money damages claims of industrial end-user indirect purchasers, and there is no evidence in the record that the state agencies included in the Plaintiff's proprietary claim ever attempted to obtain specific 7(c) certification.

## CONCLUSION

The Court has determined here that Panhandle did not violate the antitrust laws by enforcing its sole supplier G tariff during a unique period of turmoil and change in the operation of the natural gas industry. As a result of Panhandle's decisions, residential/commercial natural gas consumers were forced to pay very high prices for natural gas. Some persons undoubtedly were placed in a position of choosing whether to "heat or eat." The natural reaction in such a situation would be to establish Panhandle as the "guilty" party and make them pay for that decision.

But such a result would not be just. A variety of forces came together in the 1980's which turned the natural gas industry upside down. It was only with the execution of FERC Order 500 in August of 1987 that any real opportunity for creating stability in the natural gas market occurred, and that stability has proven temporary since Order 500 is now under scrutiny.

The desire of the G tariff LDC's and the ICC to break away from the burden of the G tariff during a period when Panhandle gas prices were supracompetitive as compared with spot market gas is certainly understandable. Nobody wants to pay more for energy today than they were paying yesterday. Frustration of that desire, however, does not create antitrust liability.

Panhandle's position in this case was not aided by the attitude of its corporate executives, expressed repeatedly throughout the record as being in the nature of "Let them eat cake." It is indeed difficult to consider the facts objectively when faced with such constant reminders of the corporate officials' obvious indifference to the impact of their decisions on the "little people" at the far end of the pipeline. It would be fair to say that Panhandle was found not liable here in spite of its conduct, rather than as a result of its conduct.

The Transportation Guidelines were fatally flawed from an antitrust perspective, but no group or class represented by Plaintiff can take advantage of those flaws.

As to Counts I and II, monopolization, the Court finds for the Defendant Panhandle, and against the Plaintiff State of Illinois.

As to Counts III and IV, attempted monopolization, the Court finds for the Defendant Panhandle and against the Plaintiff State of Illinois.

As to Counts V and VI, monopoly leveraging, the Court finds for Defendant Panhandle and against the Plaintiff State of Illinois.

As to Counts VII and VIII, essential facility, the Court finds for Defendant Panhandle and against the Plaintiff State of Illinois.

As to Counts IX and X, illegal tying, the Court finds for Defendant Panhandle and against the Plaintiff State of Illinois.

The Clerk is directed to enter judgment in favor of Defendant and against the Plaintiff on all counts.